1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KING COUNTY,

        Plaintiff,

    v.

BP P.L.C., a public limited company of England and Wales, CHEVRON CORPORATION, a Delaware corporation, CONOCOPHILLIPS, a Delaware corporation; EXXON MOBIL COR-PORATION, a New Jersey corporation, ROYAL DUTCH SHELL PLC, a public limited company of England and Wales, and DOES 1 through 10,

        Defendants.

Case No.

NOTICE OF REMOVAL

[Removal from the Superior Court of the State of Washington, King County, Cause No. 18-2-11859-0]

Action Filed: May 9, 2018

NOTICE OF REMOVAL

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF KING COUNTY AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendant Chevron Corporation removes this action—with reservation of all defenses and rights—from the Superior Court of the State of Washington for King County, Case No. 18-2-11859-0, to the United States District Court for the Western District of Washington pursuant to 28 U.S.C. §§ 1331, 1332, 1334, 1441(a), 1442, 1452, and 1367(a), and 43 U.S.C. § 1349(b). All Defendants that Plaintiff has served or purported to serve have consented to this Notice of Removal. Consequently, without conceding that any such Defendant has been properly joined and served in this action, it is clear that any and all defendants who have been properly joined and served have joined in the removal of this action.

This Court has original federal diversity jurisdiction under 28 U.S.C. § 1332 because no defendant is a citizen of the same state as Plaintiff and because the amount in controversy exceeds $75,000. This Court also has original federal question jurisdiction under 28 U.S.C. § 1331 because the Complaint arises under federal laws and treaties and presents substantial federal questions as well as claims that are completely preempted by federal law. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims over which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction. As set forth below, removal is proper pursuant to 28 U.S.C. §§ 1441, 1442, 1446, and 1452, and 43 U.S.C. § 1349(b).

In addition, the Complaint is legally without merit and, at the appropriate time, Defendants will move to dismiss Plaintiff's claims pursuant to Rule 12 of the Federal Rules of Civil Procedure.

Through its Complaint, King County calls into question longstanding decisions by the Federal Government regarding, among other things, national security, national energy policy, environmental protection, development of outer continental shelf lands, the maintenance of a national petroleum reserve, mineral extraction on federal lands (which has produced billions of dollars for the Federal Government), and the negotiation of international agreements bearing on the development and use of

NOTICE OF REMOVAL

1

fossil fuels.  Many of the Defendants have contracts with the Federal Government to develop and ex-tract minerals from federal lands and to sell fuel and associated products to the Federal Government for the nation's defense.  The gravamen of the Complaint seeks either to undo all of those federal pol-icies or to extract "compensation" from Defendants for having contracted with the Federal Govern-ment or relied upon national policies to develop fossil fuel resources.

In the Complaint's view, a state court, on petition by a county, may regulate the nationwide—and indeed, worldwide—economic activity of key sectors of the American economy, those that sup-ply the fuels that power production and innovation, keep the lights on, and form the basic materials from which innumerable consumer, technological, and medical devices are fashioned.  Though nomi-nally asserted under state law, the Complaint puts at issue long-established federal statutory, regula-tory, and constitutional issues and frameworks, and it seeks to hold a small number of oil and gas companies—who themselves are responsible for a mere fraction of global greenhouse gas emis-sions—liable for the alleged effects of *global* warming, including sea level rise, droughts, extreme precipitation, and wildfires caused by greenhouse gas emissions from countless nonparties.

This case is about *global* emissions.  Plaintiffs allege that the "Defendants have produced such vast quantities of fossil fuels that they are five of the ten largest producers in all of history," and that "[t]he cumulative greenhouse gases in the atmosphere attributable to each Defendant has in-creased the global temperature and contributed to sea level rise, including in King County."  Compl. ¶ 97.  Plaintiff's claims are not limited to harms caused by fossil fuels extracted, sold, marketed, or used in Washington.  Instead, its claims depend on Defendants' nationwide and global activities, as well as the activities of billions of fossil fuel consumers, including not only entities such as the U.S. government and military, but also hospitals, schools, manufacturing facilities, and individual house-holds.

This lawsuit implicates bedrock federal-state divisions of responsibility, and appropriates to itself the direction of such federal spheres as nationwide economic development, international rela-tions, and America's national security.  Reflecting the substantial and uniquely federal interests posed

NOTICE OF REMOVAL

2

by greenhouse gas claims like these, the Supreme Court and the Ninth Circuit have recognized that causes of action of the types asserted here are governed by federal common law, *not* state law.

The Complaint has no basis in law and is inconsistent with serious attempts to address important issues of national and international policy. Accordingly, Plaintiff's Complaint should be heard in this federal forum to protect the national interest by its prompt dismissal.

## I.  TIMELINESS OF REMOVAL

1.  Plaintiff King County filed a Complaint against Chevron and other named Defendants in the Superior Court for King County, Washington, Case No. 18-2-11859-0, on May 9, 2018. A copy of all process, pleadings, or orders in the possession of Chevron is attached as Exhibit A to the Declaration of William E. Thomson, filed concurrently herewith.

2.  This notice of removal is timely under 28 U.S.C. § 1446(b) because it is filed fewer than 30 days after service. 28 U.S.C. § 1446(b). All Defendants that have been served (or purportedly served) as of this date have consented to this removal. *See* Thomson Decl. ¶ 4. In addition, consent to this removal petition is not required as removal does not proceed "solely under 28 U.S.C. § 1441." 28 U.S.C. § 1446(b)(2)(A); *see also, e.g.*, 28 U.S.C. § 1452.[1]

## II.  SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.  Plaintiff is King County, Washington. Plaintiff brings claims against Defendants for alleged injuries relating to climate change, seeking damages and equitable relief stemming from injuries suffered as a result of "global warming" and other "[c]limate change impacts," including sea level rise, storms, heatwaves, drought, extreme precipitation, wildfires, and other natural phenomena. *See* Compl. ¶¶ 136; *see also id.* ¶ 166. Plaintiff asserts causes of action for public nuisance and trespass. In addition to compensatory damages, Plaintiff seeks an "abatement fund remedy to be paid for

---

[1] In filing or consenting to this Notice of Removal, Defendants do not waive, and expressly preserve any right, defense, affirmative defense, or objection, including, without limitation, personal jurisdiction, insufficient process, and/or insufficient service of process. A number of Defendants contend that personal jurisdiction in Washington is lacking over them, and these Defendants will move to dismiss for lack of personal jurisdiction at the appropriate time. *See, e.g.*, *Carter v. Bldg. Material & Const. Teamsters' Union Local 216*, 928 F. Supp. 997, 1000–01 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.").

NOTICE OF REMOVAL                                    3

by Defendants to provide for infrastructure, costs of studying and planning, and other costs in King County necessary for King County to adapt to global warming impacts." Compl., Relief Requested.

4.      All or many Defendants will deny that any Washington court has personal jurisdiction over them, and it is anticipated that all Defendants will deny any liability as to Plaintiff's claims. Defendants expressly reserve all rights in this regard. For purposes of meeting the jurisdictional requirements for removal only, however, Defendants submit that removal is proper on at least nine independent and alternative grounds.

5.      *First*, removal is authorized under 28 U.S.C. § 1441(a), (b)(2), and 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount-in-controversy requirement is satisfied. Plaintiff King County is a citizen of the State of Washington, *see Moor v. Cnty. of Alameda*, 411 U.S. 693, 717–718 (1973), and none of the Defendants is a citizen of the State of Washington, *see* Compl. ¶¶ 12, 15, 18, 21, 24. The amount-in-controversy requirement is met because the Complaint alleges damages in excess of $75,000. *See, e.g.*, *id.* ¶ 148; *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288 (1938) ("[T]he sum claimed by the plaintiff controls if the claim is apparently made in good faith.").

6.      *Second*, the action is removable under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims, to the extent that such claims exist, implicate uniquely federal interests and are governed by federal common law, and not state common law. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985). The Ninth Circuit has held that comparable claims, in which a municipality alleged that the defendants' greenhouse gas emissions led to global warming-related injuries such as coastal erosion, were governed by federal common law. *See Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012) ("*Kivalina*"). Federal common law applies only in those few areas of the law that so implicate "uniquely federal interests" that application of state law is affirmatively inappropriate. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507 (1988); *see also Am. Elec. Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*") ("borrowing the law of a particular State would be inappropriate"). As a result, the Ninth Circuit's determination in *Kivalina* that federal common law applies to comparable claims of global

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

warming-related tort claims necessarily means that state law should not apply to those types of claims. Plaintiff's claims, therefore, arise (to the extent they exist at all) under federal common law, not state law, and are properly removed to this Court.

7.     **Third**, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because the action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005). In fact, the causes of action as alleged in the Complaint attack federal policy decisions and threaten to upset longstanding federal-state relations, second-guess policy decisions made by Congress and the Executive Branch, and skew divisions of responsibility set forth in federal statutes and the United States Constitution.

8.     **Fourth**, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are completely preempted by the Clean Air Act and/or other federal statutes and the United States Constitution, which provide an exclusive federal remedy for those seeking stricter regulations regarding the nationwide and worldwide greenhouse gas emissions put at issue in the Complaint.

9.     **Fifth**, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), because this action "aris[es] out of, or in connection with (A) any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil or seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

10.    **Sixth**, Defendants are authorized to remove this action under 28 U.S.C. § 1442(a)(1) because, assuming the truth of Plaintiff's allegations, a causal nexus exists between their actions, taken pursuant to a federal officer's directions, and Plaintiff's claims; they are "persons" within the meaning of the statute; and can assert several colorable federal defenses. *See Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014).

NOTICE OF REMOVAL

5

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

11.     *Seventh*, removal is authorized under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 because Plaintiff's claims are based on alleged injuries to and/or conduct on federal enclaves.  As such, Plaintiff's claims arise under federal question jurisdiction and are removable to this Court.  *See* U.S. Const., art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'").

12.     *Eighth,* removal is authorized under 28 U.S.C. § 1452(a) and 28 U.S.C. § 1334(b) (the bankruptcy removal statute) because Plaintiff's state-law claims are related to cases under Title 11 of the United States Code.  Plaintiff alleges that Defendants (improperly defined by Plaintiff to include the conduct of Defendants' subsidiaries, *see, e.g.*, Compl. ¶¶ 15–17) engaged in conduct constituting a public nuisance over many decades.  Because Plaintiff's claim is predicated on historical activities of Defendants, including predecessor companies and companies that they may have acquired or with which they may have merged, and because there are hundreds, if not thousands, of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related.  *See PDG Arcos, LLC v. Adams*, 436 F. App'x 739 (9th Cir. 2011).

13.     *Ninth and finally*, removal is authorized under 28 U.S.C. § 1441(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1333 because the action necessarily raises disputed and substantial federal questions that implicate federal authority over the "navigable waters of the United States."  *See* 33 U.S.C. § 403; 33 U.S.C. § 426i; *see also Grable*, 545 U.S. at 314.  Indeed, Plaintiff's claims fall within the Court's original admiralty jurisdiction and are removable for that reason alone.  *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995).

14.     For the convenience of the Court and all parties, Defendants will address each of these grounds in additional detail.  Should Plaintiff challenge this Court's jurisdiction, Defendants will further elaborate on these grounds and will not be limited to the specific articulations in this Notice.

NOTICE OF REMOVAL

6

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

**III.     THIS COURT HAS DIVERSITY JURISDICTION BECAUSE NO DEFENDANT IS A CITIZEN OF WASHINGTON STATE AND THE AMOUNT IN CONTROVERSY EXCEEDS $75,000**

15.     This action is removable because 28 U.S.C. § 1332's requirements for diversity jurisdiction are met.  Plaintiff King County is a citizen of the State of Washington, and none of the Defendants is a citizen of the State of Washington.  The Complaint alleges damages in excess of $75,000, thereby satisfying the amount-in-controversy requirement.

16.     Plaintiff King County "is a Washington county organized and existing under and by virtue of the laws of the State of Washington, RCW 36.01, *et seq*."  Compl. ¶ 11.  For diversity purposes, counties are citizens of the state in which they are located.  *Moor v. Cnty. of Alameda*, 411 U.S. 693, 717–18 (1973); *Naffe v. Frey*, 789 F.3d 1030, 1039 n.4 (9th Cir. 2015) ("[T]he County of Los Angeles is a citizen of California for purposes of diversity jurisdiction.").  Accordingly, King County is a citizen of the State of Washington.

17.     None of the Defendants is a citizen of the State of Washington.  As the Complaint alleges, no defendant is a Washington corporation and no defendant has its headquarters or principal place of business in the State of Washington.  *See* 28 U.S.C. § 1332(c)(1).  Defendant BP p.l.c. "is a public limited company registered in England and Wales with its headquarters in London, England."  Compl. ¶ 12.  Defendant Chevron Corporation "is a Delaware Corporation with its principal place of business in San Ramon, California."  *Id.* ¶ 15.  Defendant ConocoPhillips "is a Delaware Corporation with its principal place of business located in Houston, Texas."  *Id.* ¶ 18.  Defendant Exxon Mobil Corporation "is a New Jersey corporation with its principal place of business located in Irving, Texas."  *Id.* ¶ 21.  And Defendant Royal Dutch Shell plc "is a public limited company registered in England and Wales with its headquarters in The Hague, Netherlands."  *Id.* ¶ 24.

18.     Based on these facts, there is complete diversity between the parties.  28 U.S.C. § 1332(a) and (c)(1).

19.     The amount in controversy exceeds $75,000, exclusive of interests and costs.  28 U.S.C. § 1332(a).  "[T]he sum claimed by the plaintiff controls if the claim is apparently made in

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

good faith." *St. Paul Mercury Indem. Co. v. Red Cab. Co.*, 303 U.S. 283, 288 (1938).  The Complaint alleges that the consequences of climate change will require King County to "incur a 10% [insurance] rate increase (or approximately $450,000 in additional premium based off 2017 property values) during its 2018-2019 policy term."  Compl. ¶ 148.  The Complaint also asserts that King County will sustain "[h]igher costs for maintenance, operations, and emergency repairs" for "King County-owned assets and infrastructure," which could cost "hundreds of millions of dollars."  *Id.* ¶¶ 145, 168.  According to King County, "the scope, scale, and cost of investment must increase over time to address the magnitude of projected impacts."  *Id.* ¶ 153.

20.     Based on these allegations, Plaintiff claims that Defendants are liable for damages in excess of $75,000.  Although Defendants deny all of these allegations—and fully reserve their rights to contest their adequacy for pleading purposes or otherwise—the value of Plaintiff's claims meet the amount-in-controversy requirement of 28 U.S.C. § 1332.  Accordingly, this action is removable under 28 U.S.C. § 1441(a) and (b)(2).

## IV.   THIS COURT HAS FEDERAL-QUESTION JURISDICTION BECAUSE PLAINTIFF'S CLAIMS ARISE, IF AT ALL, UNDER FEDERAL COMMON LAW

21.     This action is removable because Plaintiff's claims, to the extent that such claims exist, are necessarily governed by federal common law, and not state common law.  Title 28 U.S.C. § 1331 grants federal courts original jurisdiction over "'claims founded upon federal common law as well as those of a statutory origin.'"  *Nat'l Farmers Union*, 471 U.S. at 850 (quoting *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972) ("*Milwaukee I*")).  As the Ninth Circuit explained in holding that similar claims for injuries caused by global warming were governed by federal common law, even "[p]ost-*Erie*, federal common law includes the general subject of environmental law and specifically includes ambient or interstate air or water pollution."  *Kivalina*, 696 F.3d at 855.  As Plaintiff's claims arise under federal common law, this Court has federal question jurisdiction and removal is proper.

22.     Though "[t]here is no federal *general* common law," *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (emphasis added), federal common law continues to exist, and to govern, in a few

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

subject areas in which there are "uniquely federal interests," *Boyle*, 487 U.S. at 504. *See generally* Henry J. Friendly, *In Praise of* Erie—*and the New Federal Common Law*, 39 N.Y.U. L. Rev. 383 (1964). Such uniquely federal interests will require the application of federal common law where, for example, the issue is one that by its nature is "'within national legislative power'" and there is "a demonstrated need for a federal rule of decision" with respect to that issue. *AEP*, 564 U.S. at 421 (citation omitted). Federal common law therefore applies, in the post-*Erie* era, in those discrete areas in which application of state law would be inappropriate and would contravene federal interests. *Boyle*, 487 U.S. at 504–07. The decision that federal common law applies to a particular issue thus inherently reflects a determination that state law does *not* apply. *Nat'l Audubon Soc'y v. Dep't of Water*, 869 F.2d 1196, 1204 (9th Cir. 1988); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 312 n.7 (1981) ("*Milwaukee II*") ("[I]f federal common law exists, it is because state law cannot be used.").

23.     In *Kivalina*, the Ninth Circuit, quoting the Supreme Court's decision in *AEP*, reiterated that federal common law applies to "'subjects within the national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands.'" 696 F.3d at 855 (quoting *AEP*, 564 U.S. at 421) (further citation and internal quotation marks omitted). Although Congress sometimes affirmatively directs the application of federal common law, the *Kivalina* court noted that "[m]ore often, federal common law develops when courts must consider *federal* questions that are not answered by statutes." *Id*. (emphasis added). Given that claims asserting injuries from global warming have an intrinsic interstate and transnational character, the Ninth Circuit held that such claims inherently raise federal questions and fall within the settled rule that federal common law governs "the general subject of environmental law and specifically includes ambient or interstate air and water pollution." *Id*. at 855; *see also id.* ("federal common law can apply to transboundary pollution suits"); *AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area within national legislative power, [and] one in which federal courts may fill in statutory interstices."). Thus, while the Ninth Circuit had previously expressed skepticism that federal common law, as opposed to state law, would govern a localized claim for air pollution arising from a specific source within a single

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

state, *see Nat'l Audubon Soc'y*, 869 F.2d at 1203–04, the court in *Kivalina* found that claims arising from injuries allegedly caused by *global* warming implicate interstate and, indeed, international aspects that inherently invoke uniquely federal interests and responsibilities.  *See Kivalina*, 696 F.3d at 856–57; *see also Massachusetts v. EPA*, 549 U.S. 497, 498 (2007) ("The sovereign prerogatives to force reductions in greenhouse gas emissions, to negotiate emissions treaties with developing countries, and (in some circumstances) to exercise the police power to reduce motor-vehicle emissions are now lodged in the Federal Government."); *United States v. Solvents Recovery Serv.*, 496 F. Supp. 1127, 1134 (D. Conn. 1980) (describing Supreme Court jurisprudence recognizing "the strong federal interest in controlling certain types of pollution and protecting the environment").

24.     Although *Kivalina* did not expressly address the viability of the plaintiff's purported alternative common law claims resting on state law (which the district court dismissed without prejudice), the *Kivalina* court's finding that federal common law applied to the municipality's global warming claims means that state law *cannot* be applied to such claims.  The conclusion that federal common law governs an issue rests, not on a discretionary choice between federal law and state law, but on a determination that the issue is so distinctively federal in nature that application of state law to the issue would risk impairing uniquely federal interests.  *Boyle*, 487 U.S. at 506–07; *see also, e.g.*, *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159–60 (9th Cir. 2016) (liability of defense contractor to third party under government contract for weapons systems implicated "uniquely federal interests" in national security that would be impaired if disparate state-law rules were applied); *Nat'l Audubon Soc'y*, 869 F.3d at 1204 ("[I]t is inconsistent to argue 'that both federal and state nuisance law apply to this case.  If state law can be applied, there is no need for federal common law; if federal common law exists, *it is because state law cannot be used.*'") (emphasis added).

25.     Accordingly, the Ninth Circuit's holding in *Kivalina* that federal common law governs global warming-related tort claims such as Plaintiff's here necessarily means that state law cannot govern such claims.  Although Plaintiff purports to style its nuisance and other common law claims as arising under state law, the question of whether a particular common law claim is controlled by

federal common law rather than state law is itself a question of law that is governed by federal law as set forth in *Erie* and its progeny. While Plaintiff contends that its claims arise under Washington law, the question of which state, if any, may apply its law to address global climate-change issues is a question that is itself a matter of federal law, given the paramount federal interest in avoiding conflicts of law in connection with ambient air and water. Moreover, the law is well settled that, in determining whether a case arises under federal law and is properly removable, the Plaintiff's proffered position on a question of law is not entitled to any deference. *See New SD, Inc. v. Rockwell Int'l Corp.*, 79 F.3d 953, 956 (9th Cir. 1996).

26. The extent to which the global warming-related tort claims in this case and in *Kivalina* would impair uniquely federal interests is confirmed by comparing these inherently interstate and transnational claims to the more localized pollution claims that the Ninth Circuit in *National Audubon* held were governed by state law. The claims in *National Audubon* involved a challenge to the Los Angeles Department of Water and Power's diversion of "four freshwater streams that would otherwise flow into Mono Lake." 869 F.2d at 1198. This discrete conduct in California allegedly exposed part of Mono Lake's lakebed, increased the lake's "salinity and ion concentration," and led to "air pollution in the form of alkali dust storms from the newly exposed lake bed." *Id.* at 1198–99. The Ninth Circuit held that the allegation that some of the dust reached Nevada was not enough to show that the case involved the sort of "interstate dispute previously recognized as requiring resolution under federal law," such that it was "'inappropriate for state law to control.'" *Id.* at 1204. Given their essentially localized nature, the claims involved only a "domestic dispute" that did not fit within the interstate paradigms that the Supreme Court had to that point recognized as properly governed by federal common law. *Id.* at 1205; *cf. Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497–98 (1987) (holding that New York law applied to pollution claims arising from discharges from a lakeside New York business, even though those effluents flowed to Vermont side of the lake and caused injury there).

27. In light of the federal nature of the issues raised by global warming, as described in *AEP* and in *Massachusetts v. EPA*, the *Kivalina* court correctly reached a different conclusion with

11

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

respect to global warming-related tort claims such as those presented here.  Because global warming occurs only as the result of the undifferentiated accumulated emissions of all emitters in the world over an extended period of time, any judgment as to the reasonableness of particular emissions, or as to their causal contribution to the overall phenomenon of global warming, inherently requires an evaluation at an interstate and, indeed, transnational level.  Thus, even assuming that state tort law may properly address local source emissions within that specific state, the imposition of tort liability for allegedly unreasonably contributing to *global* warming would require an over-arching consideration of *all* of the emissions traceable to sales of Defendants' products in each of the states, and in fact, in the more than 180 nations of the world.  Given the Federal Government's exclusive authority over foreign affairs and foreign commerce, and its preeminent authority over interstate commerce, tort claims concerning global warming directly implicate uniquely federal interests, and a patchwork of 50 state's common law rules cannot properly be applied to such claims without impairing those interests.  Indeed, the Supreme Court expressly held in *AEP* that in cases like this, "borrowing the law of a particular State would be inappropriate."  564 U.S. at 422.  Such global warming-related tort claims, to the extent they exist, are therefore governed by federal common law.  *Kivalina*, 696 F.3d at 855–56.

28.    Under the principles set forth above, Plaintiff's claims are governed by federal common law.  The gravamen of Plaintiff's claims is that "Defendants' cumulative production of fossil fuels . . . places each of them among the top sources of global warming pollution in the world" and therefore "contributes measurably to global warming."  Compl. ¶ 9; *see also id.* ¶¶ 79, 93–95, 97, 99, 133–44, 161, 171.  Plaintiff's Complaint alleges that Defendants are responsible for "over 11% of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the dawn of the Industrial Revolution," *id.* ¶ 99(c); that "GHG pollution from the burning of fossil fuels is the dominant cause" of the global average temperature increase over the last century, *id.* ¶¶ 94, 95; and that other natural phenomena, such as sea level rise, a longer frost-free season, decreasing snow and ice cover, extreme precipitation, heatwaves, and wildfires, are attributable to Defendants' conduct, *id.* ¶¶ 1, 133, 135–37, 139–42, 144, 146–47, 154, 156–57, 162, 166, 176, 179.  As

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

is evident from the term "global warming" itself, both the causes and the injuries Plaintiff identifies are not constrained to particular sources, cities, counties, or even states, but rather implicate inherently national and international interests, including treaty obligations and federal and international regulatory schemes.  *See id.* ¶ 93 (noting the contribution of emissions from "others"); *id.* ¶ 99(c) (only "11%" of $CO_2$ emissions allegedly caused by Defendants); *id.* ¶ 95 (global warming causes "*global* sea level rise") (emphasis added); *see, e.g.*, *Massachusetts*, 549 U.S. at 509, 523–24 (describing Senate rejection of the Kyoto Protocol because emissions-reduction targets did not apply to "heavily polluting nations such as China and India," and EPA's determination that predicted magnitude of future Chinese and Indian emissions "offset any marginal domestic decrease"); *AEP*, 564 U.S. at 427–29 (describing regulatory scheme of the Clean Air Act and role of the EPA); *see also* The White House, Statement by President Trump on the Paris Climate Accord (June 1, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/06/01/statement-president-trump-paris-climate-accord (announcing United States withdrawal from Paris Climate Accord based on financial burdens, energy restrictions, and failure to impose proportionate restrictions on Chinese emissions).

29.    Indeed, the Complaint itself demonstrates that the unbounded nature of greenhouse gas emissions, diversity of sources, and magnitude of the attendant consequences have catalyzed myriad federal and international efforts to understand and address such emissions.  *See, e.g.*, Compl. ¶ 85–91.  The paramount federal interest in addressing the worldwide effect of greenhouse gas emissions is manifested in the regulatory scheme set forth in the Clean Air Act as construed in *Massachusetts v. EPA*.  *See AEP*, 564 U.S. at 427–29.  Federal legislation regarding greenhouse gas emissions reflects the understanding that "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  as with other questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our Nation's energy needs and the possibility of economic disruption must weigh in the balance."  *Id.* at 427.  As a "question[] of national or international policy," the question of how to address greenhouse gas emissions that underlies the requested relief at the heart of

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

Plaintiff's claims implicates inherently federal concerns and is therefore governed by federal common law. *Id.*; *see also Milwaukee II*, 451 U.S. at 312 n.7 ("[I]f federal common law exists, it is because state law cannot be used.").  Because common law claims that rest on injuries allegedly caused by global warming implicate uniquely federal interests, such claims (to the extent they exist at all) must necessarily be governed by federal common law.  This Court therefore has original jurisdiction over this action.

## V.   THE ACTION IS REMOVABLE BECAUSE IT RAISES DISPUTED AND SUBSTANTIAL FEDERAL ISSUES

30.    "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed . . . to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a).  Federal district courts, in turn, "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Supreme Court has held that suits apparently alleging only state-law causes of action nevertheless "arise under" federal law if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.  Applying this test "calls for a common-sense accommodation of judgment to the kaleidoscopic situations that present a federal issue."  *Id.* at 313.

31.    Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold a national industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heatwaves, and wildfires that are allegedly caused by global climate change.  There is no question that Plaintiff's claims raise a "federal issue, actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities."

32.    The issues of greenhouse gas emissions, global warming, hydrologic cycle disruption, and sea level rising are not unique to King County, the State of Washington, or even the United

NOTICE OF REMOVAL

14

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

States.  Yet what the Complaint attempts to do is to supplant decades of national energy, economic development, and federal environmental protection and regulatory policies by prompting a Washington state court to take control over an entire industry and its interstate commercial activities, and impose massive damages contrary to the federal regulatory scheme.

33.   Collectively as well as individually, Plaintiff's causes of action depend on the resolution of disputed and substantial federal questions in light of complex national considerations.  For example, the Complaint's first cause of action seeks relief for an alleged nuisance.  Indeed, "the scope and limitations of a complex federal regulatory framework are at stake in this case.  And disposition of whether that framework may give rise to state law claims as an initial matter will ultimately have implications for the federal docket one way or the other."  *Bd. of Comm'rs of Se. La. Flood Protection Auth. v. Tenn. Gas Pipeline Co*, 850 F.3d 714, 723 (5th Cir. 2017) (cert. petition pending) ("*Flood Protection Authority*").

34.   Under federal law, federal agencies must "assess both the costs and benefits of [an] intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs."  Executive Order 12866, 58 Fed. Reg. 190.  Under Washington law, were it to apply, nuisance claims require a plaintiff to prove that the defendant's conduct is unreasonable, which is determined "by weighing the harm to the aggrieved party against the social utility of the activity."  *Lakey v. Puget Sound Energy, Inc.*, 176 Wash. 2d 909, 923 (2013).  Plaintiff alleges that Defendants, through their national and, indeed, global activities, have "caused, created, assisted in the creation of, contributed to, and/or maintained and continue[] to cause, create, assist in the creation of, contribute to and/or maintain global warming-induced sea level rise and other climate change hazards, a public nuisance in King County."  Compl. ¶ 161; *see also id.* ¶ 162.  Plaintiff alleges that "Defendants' conduct constitutes a substantial and unreasonable interference with and obstruction of public rights and property, including, *inter alia*, the public rights to health, safety, and welfare of King County residents and other citizens whose safety and lives are at risk from increased storm surge flooding and

15

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

whose public and private property is threatened with widespread damage from global warming-induced sea level rise, greater storm surges, and flooding." *Id.* ¶ 161.

35.     But Congress has directed a number of federal agencies to regulate Defendants' conduct, and in doing so to conduct the same analysis of benefits and impacts that Plaintiff would have the state court undertake in analyzing Plaintiff's claims.  And federal agencies have performed these cost-benefit analyses.  *See, e.g.*, Final Carbon Pollution Standards for New, Modified and Reconstructed Power Plants, 80 Fed. Reg. at 64683–84 (EPA considering the impacts of "wildfire" and "extreme precipitation events," such as "droughts, floods, hurricanes, and major storms").  The benefits and harms of Defendants' conduct are broadly distributed throughout the Nation, to all residents as well as all state and government entities.  Given this diffuse and broad impact, Congress has acted through a variety of federal statutes—primarily but not exclusively, the Clean Air Act—to strike the balance between energy extraction and production and environmental protections.  *See* Clean Air Act, 42 U.S.C. § 7401(c) (Congressional statement that the goal of the Clean Air Act is "to encourage or otherwise promote reasonable Federal, State, and local governmental actions . . . for pollution prevention"); *see also, e.g.*, Energy Reorganization Act of 1974, 42 U.S.C. § 5801 (Congressional purpose to "develop, and increase the efficiency and reliability of use of, all energy sources" while "restoring, protecting, and enhancing environmental quality"); Mining and Minerals Policy Act, 30 U.S.C. § 1201 (Congressional purpose to encourage "economic development of domestic mineral resources" balanced with "environmental needs"); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 (Congressional findings that coal mining operations are "essential to the national interest" but must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental effects").

36.     The question of whether the federal agencies charged by Congress to balance energy and environmental needs for the entire Nation have struck that balance in an appropriate way is "inherently federal in character" and gives rise to federal question jurisdiction.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001); *see also Pet Quarters, Inc. v. Depository Trust & Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (affirming federal question jurisdiction where claims implicated federal agency's acts implementing federal law); *Bennett v. Southwest Airlines Co.*,

16

484 F.3d 907, 909 (7th Cir. 2007) (federal removal under *Grable* appropriate where claims were "a collateral attack on the validity of" agency action under a highly reticulated regulatory scheme).  Adjudicating these claims in federal court, including whether private rights of action are even cognizable, is appropriate because the relief sought by Plaintiff would necessarily alter the regulatory regime designed by Congress, impacting residents of the Nation far outside the state court's jurisdiction.  *See, e.g.*, *Grable*, 545 U.S. at 312 (claims that turn on substantial federal questions "justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues"); *West Virginia ex rel. McGraw v. Eli Lilly & Co.*, 476 F. Supp. 2d 230, 234 (E.D.N.Y. 2007) (removal under *Grable* is appropriate where state common law claims implicate "an intricate federal regulatory scheme . . . requiring some degree of national uniformity in interpretation").

37.     The Complaint also calls into question Federal Government decisions to contract with defendants for the extraction, development, and sale of fossil fuel resources on federal lands.  Such national policy decisions have expanded fossil fuel production and use, and produced billions of dollars in revenue for the federal treasury.  Available, affordable energy is fundamental to economic growth and prosperity generally, as well as to national security and other issues that have long been the domain of the Federal Government.  Yet, Plaintiff's claims require a determination that the complained-of conduct—the lawful activity of placing fossil fuels into the stream of interstate and foreign commerce—is unreasonable, and that determination raises a policy question that, under the Constitution and the applicable statutes, treaties, and regulations, is a federal question.  *See In re Nat'l Sec. Agency Telecommc'ns*, 483 F. Supp. 2d 934, 943 (N.D. Cal. 2007) (holding that removal jurisdiction existed over case that implicated state-secrets privilege because "the privilege is 'not only a contested federal issue, but a substantial one,' for which there is 'a serious federal interest in claiming the advantages thought to be inherent in a federal forum'" (quoting *Grable*, 545 U.S. at 313)).  The cost-benefit analysis required by the claims asserted in the Complaint would thus necessarily entail a usurpation by the state court of the federal regulatory structure of an essential, national industry.  "The validity of [Plaintiff's] claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law." *Flood Control Authority*,

850 F.3d at 724; *see also Bader Farms, Inc. v. Monsanto Co.*, No. 16-cv-299, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017) ("Count VII is in a way a collateral attack on the validity of APHIS's decision to deregulate the new seeds"); *Bennett*, 484 F.3d at 909 (holding that federal removal is proper under *Grable* "when the state proceeding amounted to a collateral attack on a federal agency's action"). Indeed, the "inevitable result of such suits," if successful, is that Defendants "would have to change [their] methods of doing business and controlling pollution to avoid the threat of ongoing liability." *Ouellette*, 479 U.S. at 495.

38.     Plaintiff's Complaint, which seeks to hold Defendants liable in nuisance and trespass for their business of manufacturing, producing, and/or promoting the sale of fossil fuel products—despite Defendants' uncontested compliance with state and federal law—necessarily implicates numerous other disputed and substantial federal issues. Beyond the strictly jurisdictional character of the points addressed above and herein, it is notable that this litigation places at issue multiple significant federal issues, including but not limited to: (1) whether Defendants can be held liable consistent with the First Amendment and the Noerr-Pennington doctrine for communications campaigns purportedly intended "to deny and discredit the mainstream scientific consensus on global warming" (*id.* ¶ 6); (2) whether a state court may hold Defendants liable for conduct that was global in scale (production of fossil fuels), that allegedly produced effects that are global in scale (increased $CO_2$ levels and rising sea levels), and on that basis, order Defendants to modify their conduct on a global scale (abating rising sea levels), consistent with the constitutional principles limiting the jurisdictional and geographic reach of state law and guaranteeing due process; (3) whether fossil fuel *producers* may be held liable, consistent with the Due Process Clause, for climate change when it is the combustion of fossil fuels—including by Plaintiff and the People of the State of Washington themselves—that leads to the release of greenhouse gases into the atmosphere; (4) whether a state may impose liability under state common law when the Supreme Court has held that the very same *federal* common law claims are displaced by federal statute, and notwithstanding the commonsense principle that "[i]f a federal common law cause of action has been extinguished by Congressional displacement, it would be incongruous to allow it to be revived *in any form*," *Kivalina*, 696 F.3d at 857 (emphasis added);

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

(5) whether a state court may regulate and burden on a global scale the sale and use of what federal policy has deemed an essential resource, consistent with the United States Constitution's Commerce Clause and foreign affairs doctrine, as well as other constitutional principles; (6) whether a state court may review and assess the validity of acts of foreign states in enacting and enforcing their own regulatory frameworks; and (7) whether a state court may determine the ability to sue based on alleged damages to land, such as coastal property and interstate highways (*see* Compl. ¶¶ 161–62 ), which depends on the interpretation of federal laws relating to the ownership and control of property.

39.     Plaintiff's Complaint also raises substantial federal issues because the asserted claims intrude upon both foreign policy and carefully balanced regulatory considerations at the national level, including the foreign affairs doctrine.  Plaintiff seeks to govern extraterritorial conduct and encroach on the foreign policy prerogative of the Federal Government's executive branch as to climate change treaties.  "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."  *Am. Ins. Assoc. v. Garamendi*, 539 U.S. 396, 413 (2003).  Yet, this is the precise nature of Plaintiff's action brought in state court.  *See United States v. Belmont*, 301 U.S. 324, 331 (1937) ("The external powers of the United States are to be exercised without regard to state laws or policies . . . [I]n respect of our foreign relations generally, state lines disappear."); *Hines v. Davidowitz*, 312 U.S. 52, 63 (1941) ("Our system of government . . . requires that federal power in the field affecting foreign relations be left entirely free from local interference.").  Indeed, Plaintiff's Complaint takes issue with multiple federal decisions, threatening to upend the federal government's longstanding energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on the issue of climate change.  *Garamendi*, 539 U.S. at 424.

40.     Through its action, Plaintiff seeks to regulate greenhouse gas emissions worldwide, far beyond the borders of the United States.  Plaintiff alleges that its injuries are caused by global weather phenomena, such as increases in the Earth's ambient temperatures, ocean temperature, sea

NOTICE OF REMOVAL

19

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

level, and extreme storm events, and that Defendants are a substantial contributing factor to such cli-mate change as a result of their collective operations on a worldwide basis, which Plaintiff claims ac-counts for "11% of all the carbon and methane pollution from industrial sources that has accumulated in the atmosphere since the dawn of the Industrial Revolution." *Id.* ¶¶ 99(c), 162, 176.  But "[n]o State can rewrite our foreign policy to conform to its own domestic policies.  Power over external af-fairs is not shared by the States; it is vested in the national government exclusively.  It need not be so exercised as to conform to State laws or State policies, whether they be expressed in constitutions, statutes, or judicial decrees." *United States v. Pink*, 315 U.S. 203, 233–34 (1942).  States have no au-thority to impose remedial schemes or regulations to address what are matters of foreign affairs.  *Ginergy v. City of Glendale*, 831 F.3d 1222, 1228–29 (9th Cir. 2016) ("It is well established that the fed-eral government holds the exclusive authority to administer foreign affairs.").   Yet Plaintiff's Com-plaint seeks to replace international negotiations and Congressional and Executive decisions with their own preferred foreign policy, using the ill-suited tools of Washington common law and private litigation.  Even when *states* (as opposed to the King *County* here) have made similar efforts, enact-ing laws seeking to supplant or supplement foreign policy, the Supreme Court has held that state law can play no such role.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–81 (2000); *Garamendi*, 539 U.S. at 420–24.

## VI.    THE ACTION IS REMOVABLE BECAUSE IT IS COMPLETELY PREEMPTED BY FEDERAL LAW

41.    This Court also has original jurisdiction over this lawsuit because Plaintiff requests relief that would alter or amend the rules regarding nationwide—and even worldwide—regulation of greenhouse gas emissions.  This action is completely preempted by federal law.

42.    The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state-law claims where "the extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

43.     For the reasons set forth above, litigating in state court the inherently transnational activity challenged by this Complaint would inevitably intrude on the foreign affairs power of the federal government and is completely preempted.  *See Garamendi*, 539 U.S. at 418 ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict."); *see also California v. Gen. Motors Corp.*, No. C06-05755-MJJ, 2007 WL 2726871,*14 (N.D. Cal. Sept. 17, 2007) (dismissing claims against automakers because the federal government "ha[s] made foreign policy determinations regarding the United States' role in the international concern about global warming," and a "global warming nuisance tort would have an inextricable effect on . . . foreign policy").

44.     In addition, Plaintiff's claims are preempted by the Clean Air Act.  A state cause of action is preempted under the "complete preemption" doctrine where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action."  *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003).  It also requires a determination that the state-law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action.  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

45.     Both requirements for complete preemption are present here.  Among other things, Plaintiff's Complaint seeks an "abatement" of a nuisance it alleges Defendants have caused—namely, a rise in sea levels, an increase in the frequency and intensity of flooding, and an increase in the intensity and frequency of storms and storm-related damages.  As such, it seeks regulation of greenhouse gas emissions far beyond the borders of Washington and even the borders of the United States.  This can be accomplished only by a nationwide and global reduction in the emission of greenhouse gases.  Even assuming that such relief can be ordered against Defendants for their production and sale of fossil fuels, which are then combusted by others at a rate Plaintiff claims causes the alleged injuries, this claim must be decided in federal court because Congress has created a cause of action by which a party can seek the creation or modification of nationwide emission standards by petitioning

NOTICE OF REMOVAL

21

the EPA.  That federal cause of action was designed to provide the exclusive means by which a party can seek nationwide emission regulations.  Because Plaintiff's state causes of action would "dupli-cate[], supplement[], or supplant[]" that exclusive federal cause of action, they are completely preempted.  "If a federal common law cause of action has been extinguished by Congressional dis-placement, it would be incongruous to allow it to be revived in any form." *Kivalina*, 696 F.3d at 857.

   A.   **The Clean Air Act Provides the Exclusive Cause of Action for Challenging EPA Rulemakings**

46.   The Clean Air Act permits private parties, as well as state and municipal governments, to challenge EPA rulemakings (or the absence of such) and to petition the EPA to undertake new rulemakings.  *See, e.g.*, 5 U.S.C. § 553(e); 42 U.S.C. §§ 7604, 7607.

47.   The Clean Air Act provides the exclusive cause of action for regulation of nationwide emissions.  The Act establishes a system by which federal and state resources are deployed to "pro-tect and enhance the quality of the Nation's air resources so as to promote the public health and wel-fare and the productive capacity of its population."  42 U.S.C. § 7401(b)(1).  At the heart of this sys-tem are the emission standards set by EPA.  Specific Clean Air Act provisions authorize or require emission standards to be set if certain findings are made, and such standards must comport with the statutory criteria set by Congress, consistent with the dual goals of the Act.  Under the Clean Air Act, "emissions have been extensively regulated nationwide." *N.C. ex rel. Cooper v. Tenn Valley Auth.*, 615 F.3d 291, 298 (4th Cir. 2010).   Regulation of greenhouse gas emissions, including carbon diox-ide, is governed by the Clean Air Act, *see Massachusetts*, 549 U.S. at 528–29, and EPA has regulated these emissions under the Act, *see, e.g.*, 40 C.F.R. §§ 51.166(b)(1)(i), 52.21(b)(1)(i) (regulation of greenhouse gases through the Act's prevention of significant deterioration of air quality permitting program); 77 Fed. Reg. 62,624 (Oct. 15, 2012) (regulation of greenhouse gas emissions from light-duty motor vehicles); 81 Fed. Reg. 73,478 (Oct. 25, 2016) (regulation of greenhouse gas emissions from medium- and heavy-duty engines and motor vehicles).

48.   Congress manifested a clear intent that judicial review of Clean Air Act matters must take place in federal court.  42 U.S.C. § 7607(b).

22

49.     This congressionally provided statutory and regulatory scheme is thus the "exclusive" means for seeking the nationwide regulation of greenhouse gas emissions and "set[s] forth procedures and remedies" for that relief, *Beneficial Nat'l Bank*, 539 U.S. at 8, irrespective of the savings clauses applicable to some other types of claims.  At least one federal court has observed that the Clean Air Act preempts such state common law nuisance cases because "[i]f courts across the nation were to use the vagaries of public nuisance doctrine to overturn the carefully enacted rules governing air-borne emissions, it would be increasingly difficult for anyone to determine what standards govern.  Energy policy cannot be set, and the environment cannot prosper, in this way."  *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d at 298.

**B.      Plaintiff's Asserted State-Law Causes of Action Duplicate, Supplement, and/or Supplant the Federal Cause of Action**

50.     Plaintiff asks the Court to order Defendants to "abate the global warming-induced nuisance to which they have contributed."  Compl. ¶ 10; *see also id.*, Relief Requested (requesting "an abatement fund remedy").

51.     According to Plaintiff's own allegations, the alleged nuisances can be abated only by a global—or at the very least national—reduction in greenhouse gas emissions.  *See* Compl. ¶ 93 ("Today, due primarily to the combustion of fossil fuels produced by Defendants *and others*, the atmospheric level of carbon dioxide is 410 ppm . . .") (emphasis added); *id.* ¶ 99(a) ("100 fossil fuel producers are responsible for 62% of *all greenhouse gas emissions* from industrial sources since the dawn of the Industrial Revolution . . .") (emphasis added).

52.     Plaintiff's state-law tort claims are effectively an end-run around a petition for a rule-making regarding greenhouse gas emissions because they seek to regulate nationwide emissions that Plaintiff concedes conform to EPA's emission standards.  *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 539 (1992).  The claims would require precisely the cost-benefit analysis of emissions that the EPA is charged with undertaking and would directly interfere with the EPA's determinations.  *See supra* ¶¶ 26–27.  Because Congress has established a clear and detailed process by which a party can petition the EPA to

NOTICE OF REMOVAL

23

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

1  establish stricter nationwide emissions standards, Plaintiff's claims are completely preempted by the

2  Clean Air Act.

3       53.    Because Congress has provided an exclusive statutory remedy for the regulation of

4  greenhouse gas emissions which provides federal procedures and remedies for that cause of action,

5  and because Plaintiff's claims fall within the scope of the federal cause of action, Plaintiff's claims

6  are completely preempted by federal law and this Court has federal-question jurisdiction.

7  **VII.   THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF**

8            **LANDS ACT**

9       54.    This Court also has original jurisdiction pursuant to the Outer Continental Shelf Lands

10  Act ("OCSLA").  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  This action "aris[es]

11  out of, or in connection with (A) any operation conducted on the outer Continental Shelf which in-

12  volves exploration, development, or production of the minerals, or the subsoil or seabed of the outer

13  Continental Shelf, or which involves rights to such minerals."  43 U.S.C. § 1349(b); *In re Deepwater*

14  *Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("th[e] language [of § 1349(b)(1)] [i]s straightforward

15  and broad").  The outer continental shelf ("OCS") includes all submerged lands that belong to the

16  United States but are not part of any State.  43 U.S.C. §§ 1301, 1331.

17       55.    The breadth of federal jurisdiction granted by OCSLA reflects the Act's "expansive

18  substantive reach."  *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

19  "OCSLA was passed . . . to establish federal ownership and control over the mineral wealth of the

20  OCS and to provide for the development of those natural resources."  *Id*. at 566.  "[T]he efficient ex-

21  ploitation of the minerals of the OCS . . . was . . . a primary purpose for OCSLA."  *Amoco Prod. Co.*

22  *v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).  Indeed, OCSLA declares it "to be

23  the policy of the United States that . . . the outer Continental Shelf . . . should be made available for

24  expeditious and orderly development."  43 U.S.C. § 1332(3).  OCSLA's "congressional mandate es-

25  tablishes a clear program for thoughtful, graduated, and tightly controlled development of oil lands

26  on the outer continental shelf."  *North Slope Borough v. Andrus*, 642 F.2d 589, 594 (D.C. Cir. 1980).

27  Any environmental concerns are "mitigated by intricate constraints imposed by Congress and the

28

NOTICE OF REMOVAL

24

Secretary, and enforced carefully by the Secretary." *Id.* The statute further provides that "since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

56.     When enacting Section 1349(b)(1), "Congress intended for the judicial power of the United States to be extended to the entire range of legal disputes that it knew would arise relating to resource development on the [OCS]." *Laredo Offshore Constructors, Inc. v. Hunt Oil. Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985). Consistent with Congress' intent, courts repeatedly have found OCSLA jurisdiction where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS.[2] *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

57.     OCSLA jurisdiction exists even if the Complaint pleads no substantive OCSLA claims. *See, e.g.*, *In re Deepwater Horizon*, 745 F.3d at 163. The Court, moreover, may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 608 (D. Del. 2011) (citing *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1205 (5th Cir. 1998)).

58.     Under OCSLA, the Department of Interior administers an extensive federal leasing program aiming to develop and exploit the oil and gas resources of the federal Continental Shelf. 43 U.S.C. § 1334 *et seq.* Pursuant to this authority, the Interior Department "administers more than

---

[2]  As stated in 43 U.S.C. § 1333(a)(1):  "The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed . . . for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . ."

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

5,000 active oil and gas leases on nearly 27 million OCS acres.  In FY 2015, production from these leases generated $4.4 billion in leasing revenue . . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production."  Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), *available at* https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.  Certain Defendants and their affiliates, of course, participate very substantially in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 11 billion barrels of natural gas from the federal outer continental shelf in the Gulf of Mexico alone.  U.S. Dep't of Int., Minerals Mgmt. Serv., Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (1947–1995), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%201947%-20-%201995.pdf.  In 2016, Chevron U.S.A. produced over 49 million barrels of crude oil and 50 million barrels of natural gas from the outer continental shelf on the Gulf of Mexico.  U.S. Dep't of Int., Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol. (2016), *available at* https://www.data.boem.gov/Production/Files/Rank%20File%20Gas%202016.pdf.  Numerous other Defendants conduct, and have for decades conducted, similar oil and gas operations on the federal OCS; indeed, Defendants and their affiliated companies presently hold approximately 32.95% of all outer continental shelf leases.  *See* Bureau of Ocean Energy Management, Lease Owner Information, *available at* https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.  For example, certain BP companies and Exxon Mobil currently own lease interests in, and the BP companies operate, "one of the largest deepwater producing fields in the Gulf of Mexico," which is capable of producing up to 250,000 barrels of oil per day.  *See* Thunder Horse Field Fact Sheet (last visited Aug. 21, 2017), *available at* http://www.bp.com/content/dam/bp-country/en_us/PDF/Thunder_Horse_Fact_Sheet_6_14_2013.pdf.  And as noted on the BP website, production from this and other OCS activities will continue into the future.  *Id.* ("BP intends to sustain its leading position as an active participant in all facets of the Deepwater US Gulf of Mexico—as an explorer, developer, and operator.").  A substantial portion of

the national consumption of fossil fuel products stems from production on federal lands, as approved by Congress and Executive Branch decision-makers.

59.     The Complaint itself makes clear that a substantial part of Plaintiff's claims "'arise[] out of, or in connection with," Defendants' "operation[s] 'conducted on the outer Continental Shelf' that involve "the exploration and production of minerals." *In re Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "production . . . of massive quantities of fossil fuels and fossil fuel products," Compl. ¶¶ 2, 28, 97, 99(c), a substantial quantum of which arise from outer continental shelf operations, *see* Ranking Operator by Oil, Bureau of Ocean Energy Mgmt., *available at* https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil (documenting Chevron's oil and natural gas production on the federal outer continental shelf from 1947 to 2017).  Plaintiff alleges that emissions have risen due to increased outer continental shelf extraction technologies. *See, e.g.*, Compl. ¶ 70 (discussing Shell subsidiary drilling ships exploring for oil off the coast of Alaska, conduct which may implicate the Alaskan outer continental shelf).  Many of the emissions Plaintiff challenges necessarily arise from the use of fossil fuels extracted from the OCS.

60.     The relief sought also arises out of and impacts OCS extraction and development. *See, e.g.*, Compl., Relief Requested (seeking damages designed to cripple the energy industry and equitable relief that would no doubt rein in extraction, including that on the OCS).  And "any dispute that alters the progress of production activities on the OCS threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Congress intended such a dispute to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1211.

## VIII.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

61.     The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1).  "A party seeking removal under section 1442 must demonstrate that (a) it is a 'person' within the meaning of the statute; (b) there is a

NOTICE OF REMOVAL

27

causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham*, 445 F.3d at 1251 (citations omitted).  All three elements are satisfied here for Chevron and many other Defendants, which have engaged in activities pursuant to the directions of federal officers that, assuming the truth of Plaintiff's allegations, have a causal nexus to Plaintiff's claims, and which have colorable federal defenses to Plaintiff's claims, including, for example, performing pursuant to government mandates and contracts, performing functions for the U.S. military, and engaging in activities on federal lands pursuant to federal leases.

62.     First, Defendants are "persons" within the meaning of the statute.  The Complaint alleges that Defendants are corporations (Compl. ¶ 2), which the Ninth Circuit has held qualify as "person[s]" under the statute.  *See Leite*, 749 F.3d at 1122 n.4.

63.     Second, assuming the truth of Plaintiff's allegations, there is a causal nexus between Defendants' alleged actions, taken pursuant to a federal officer's direction, and Plaintiff's claims.  In *Leite*, the Ninth Circuit held removal proper where a military contractor, which was sued for failing to warn about asbestos in military equipment, showed extensive evidence of federal control over its activities.  This included "detailed specifications governing the form and content of all warnings that equipment manufacturers were required to provide," which the Navy was directly involved in preparing and which could not be altered.  749 F.3d at 1123.  Here, Plaintiff's causation and damages allegations depend on the activities of Defendants over the past decades—many of which were undertaken at the direction of, and under close supervision and control by, federal officials.

64.     To take only one example, Chevron and other Defendants have long explored for and produced minerals, oil and gas on federal lands pursuant to leases governed by the Outer Continental Shelf Lands Act as described above.  *E.g.*, Thomson Decl., Exs. B–C.  In doing so, those Defendants were "'acting under' a federal 'official'" within the meaning of Section 1442(a)(1).  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 153 (2007).  Under OCSLA, the Interior Department is charged with "manag[ing] access to, and . . . receiv[ing] a fair return for, the energy and mineral resources of the

NOTICE OF REMOVAL

28

Outer Continental Shelf."  Statement of Walter Cruickshank, Deputy Director, Bureau of Ocean Energy Management, Before The Committee On Natural Resources, July 6, 2016, *available at* https://www.boem.gov/Congressional-Testimony-Cruickshank-07062016/.  To fulfill this statutory obligation, the Interior officials maintain and administer the OCS leasing program, under which parties such as Defendants are required to conduct exploration, development and production activities that, "in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson*, 551 U.S. at 154.

65.     OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."  Thomson Decl., Ex. C § 10.  Indeed, for decades Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions, and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles." *Id.*, Ex. B § 10 (emphasis added).  All drilling takes place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further had to conform to "diligence" and "sound conservation practices." *Id.*, Ex. C §§ 9, 10. Federal officers further have reserved the rights to control the rates of mining (*id.*, Ex. B § 10) and to obtain "prompt access" to facilities and records (*id.*, Ex. B § 11; *id.*, Ex. C § 12).  The government also maintains certain controls over how the leased oil/gas/minerals are disposed of once they are removed from the ground, as by preconditioning the lease on a right of first refusal to purchase all materials "[i]n time of war or when the President of the United States shall so prescribe" (*id.*, Ex. B § 14; *id.*, Ex. C § 15(d)), and mandating that 20% of all crude and natural gas produced pursuant to

drilling leases be offered "to small or independent refiners" (*id.*, Ex. C § 15(c)).  The Federal Treasury has reaped enormous financial benefits from those policy decisions in the form of statutory and regulatory royalty regimes that have resulted in billions of dollars of revenue to the Federal Government.

66.     Certain Defendants have also engaged in the exploration and production of fossil fuels pursuant to agreements with federal agencies.  For example, in June 1944, the Standard Oil Company (a Chevron predecessor) and the U.S. Navy entered into a contract "to govern the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve," a strategic petroleum reserve maintained by the Navy.  *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014).  "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."  GAO Fact Sheet, Naval Petroleum Reserves – Oil Sales Procedures and Prices at Elk Hills, April Through December 1986 (Jan. 1987) ("GAO Fact Sheet"), *available at* http://www.gao.gov/assets/90/87497.pdf.  In response to the OPEC oil embargo in 1973–74, the Naval Petroleum Reserves Production Act of 1976 (Public Law 94-258, April 5, 1976) was enacted, which "authorized and directed that NPR-1 be produced at the maximum efficient rate for 6 years."  *Id.*  In 1977, Congress "transferred the Navy's interests and management obligations to [the Department of Energy]," and Chevron continued its interest in the joint operation until 1997.  *Id.*  That contract governing Standard's rights shows the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve:

- The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over the development of the entire Reserve and the production of oil therefrom*."  Thomson Decl., Ex. D, Recitals § 6(d)(i) (emphases added).

- "[The] Navy shall, subject to the provisions hereof, have the exclusive control over the exploration, prospecting development and operation of the Reserve[.]"  *Id.*, Ex. D § 3(a).

- "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."  *Id.*, Ex. D § 4(a) (emphasis added).

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

- "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve." *Id.*, Ex. D § 3(b).  In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and binding upon Navy and Standard." *Id.*, Ex. D § 9(a).

- The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production.  *Id.*, Ex. D §§ 4(b), 5(d)(1).

The contract demonstrates that Defendants' activities under federal officers went far beyond simple compliance with the law or participation in a regulated industry

67.     As discussed above, these and other federal activities are encompassed in Plaintiff's Complaint.  *See supra* ¶¶ 46–58.  Plaintiff alleges that the drilling and mining operations Defendants performed led to the sale of fossil fuels—including to the Federal Government—which led to the release of greenhouse gases by end-users—including the Federal Government.  Furthermore, the oil and gas Defendants extracted—which the Federal Government (i) reserved the right to buy in total in the event of a time of war or whenever the President so prescribed and (ii) has purchased from Defendants to fuel its military operations—is the very same oil and gas the production and promotion of which Plaintiff alleges give rise to nuisance and trespass liability.  Accordingly, Plaintiff seeks to hold Defendants liable for the very activities Defendants performed under the control of a federal official, and thus the nexus element has been satisfied.

68.     Third, Defendants intend to raise numerous meritorious federal defenses, including preemption, *see Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1249–50 (9th Cir. 2017), the government contractor defense, *see Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *Gertz v. Boeing*, 654 F.3d 852 (9th Cir. 2011), and others.  In addition, Plaintiff's claims are barred by the United States Constitution, including the Commerce and Due Process clauses, as well as the First Amendment and the foreign affairs doctrine.  These and other federal defenses are more than colorable.  *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (a defendant invoking section 1442(a)(1) "need not win his case before he can have it removed").  Accordingly, removal under Section 1442 is proper.

NOTICE OF REMOVAL

31

1
2

## IX. THE ACTION IS REMOVABLE BECAUSE THIS CASE ARISES FROM ACTS ARISING FROM MULTIPLE FEDERAL ENCLAVES

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

69.     This Court also has original jurisdiction under the federal enclave doctrine.  The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings."  U.S. Const., art. I, § 8, cl. 17.  "Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'"  *Durham*, 445 F.3d at 1250; *see also Totah v. Bies*, No. C 10-05956 CW, 2011 WL 1324471, at *2 (N.D. Cal. Apr. 6, 2011) (denying motion to remand where defamation claim arose in the Presidio in San Francisco, a federal enclave).  The "key factor" in determining whether a federal court has federal enclave jurisdiction "is the location of the plaintiff's injury or where the specific cause of action arose."  *Sparling v. Doyle*, No. 13-cv-00323-DCG, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014); *see also Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992) ("Failure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status."); *Bd. of Comm'rs of Se. La. Flood Protection Auth.-E. v. Tenn. Gas Pipeline Co.*, *LLC*, 29 F. Supp. 3d 808, 831 (E.D. La. 2014) (noting that defendants' "conduct" or "the damage complained of" must occur on a federal enclave).  Federal jurisdiction is available if some of the events or damages alleged in the complaint occurred on a federal enclave.  *See Durham*, 445 F.3d at 1250; *Bell v. Arvin Meritor, Inc.*, No. 12-00131-SC, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012) (finding federal enclave jurisdiction where "some of the[] locations . . . are federal enclaves"); *Totah*, 2011 WL 1324471, at *2 (holding that court can "exercise supplemental jurisdiction over related claims" that did not arise on federal enclave).

23
24
25
26

70.     Three requirements exist for land to be a federal enclave:  (1) the United States must have acquired the land from a state; (2) the state legislature must have consented to the jurisdiction of the Federal Government; and (3) the United States must have accepted jurisdiction.  *Wood v. Am. Crescent Elevator Corp.*, No. 11-397, 2011 WL 1870218, at *2 (E.D. La. May 16, 2011).

27
28

NOTICE OF REMOVAL

32

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

71.      Upon information and belief, the federal government owns federal enclaves in the area at issue where Plaintiff's "damage complained of" allegedly occurs. *Tenn. Gas Pipeline*, 29 F. Supp. 3d at 831.  Indeed, Plaintiff broadly alleges injuries to huge swaths of the County, *see* Compl. ¶¶ 133–44, and "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences of this federal enclave status," *Fung*, 816 F. Supp. at 571.

72.      On information and belief, Defendants maintain or maintained oil and gas operations on military bases or other federal enclaves such that the Complaint, which bases the claims on the "production, marketing, and sale of massive quantities of fossil fuels and fossil fuel products" (Compl. ¶ 28), arises under federal law.  *See, e.g.*, *Humble Pipe Line Co. v. Waggoner*, 376 U.S. 369, 372 (1964) (noting that the United States exercises exclusive jurisdiction over oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Mississippi River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale AFB, "the reduction of fugitive oil and gas to posses- sion and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  *See* GAO, *U.S. Fish and Wild- life Service: Information on Oil and Gas Activities in the National Wildlife Refuge* (Oct. 30, 2001), *available at* http://www.gao.gov/new.items/d0264r.pdf.  Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department—pursuant to a joint operating agreement with the Navy. *See Chevron U.S.A.*, 116 Fed. Cl. at 205.  Pursuant to that agreement, Standard Oil "operat[ed] the lands of Navy and Standard in the Reserve."  Thomas Decl., Ex. D at 4.

## X.      THE ACTION IS REMOVABLE UNDER THE BANKRUPTCY REMOVAL STATUTE

73.      The Bankruptcy Removal Statute allows removal of "any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a govern- mental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or

cause of action under section 1334 of this title." 28 U.S.C. § 1452(a).  Section 1334, in turn, provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings, arising under Title 11, or arising in or related to cases under title 11" of the United States Code. 28 U.S.C. § 1334(b).  The Ninth Circuit has emphasized that "'related to' jurisdiction is very broad, including nearly every matter directly or indirectly related to the bankruptcy." *Sasson v. Sokoloff* (*In re Sasson*), 424 F.3d 864, 868 (9th Cir. 2005).  An action is thus "related to" a bankruptcy case if it "'could conceivably have any effect on the estate being administered in bankruptcy.'"  *PDG Arcos, LLC*, 436 F. App'x at 742 (quoting *In re Feitz*, 852 F.2d 455, 457 (9th Cir. 1988)).  Where a Chapter 11 plan has been confirmed, there must be a "close nexus" between the post-confirmation case and the bankruptcy plan for related-to jurisdiction to exist.  *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1194 (9th Cir. 2005) (citing *In re Resorts Int'l, Inc.*, 372 F.3d 154, 166–67 (3d Cir. 2004)).  "[A] close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter 'affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan.'"  *In re Wilshire Courtyard*, 729 F.3d 1279, 1289 (9th Cir. 2013) (quoting *Pegasus Gold*, 394 F.3d at 1194).

74.     Plaintiff's claims are purportedly predicated on historical activities of Defendants, including predecessor companies, subsidiaries, and companies that Defendants may have acquired or with which they may have merged, as well as numerous unnamed but now bankrupt entities.  Indeed, Plaintiff explicitly premises its theories of liability on the actions of Defendants' subsidiaries.  *See, e.g.*, Compl. ¶¶ 29, 97.[3]  Because there are hundreds of non-joined necessary and indispensable parties, there are many other Title 11 cases that may be related.  Indeed, the related climate-change cases that Plaintiff's counsel recently filed on behalf of other cities and counties already generated bankruptcy court proceedings.  *See*, *e.g.*, *In re Peabody Energy Corp.*, Case No. 16-42529, 2017 WL

---

[3]  To the extent Plaintiff seeks to hold Defendants liable for the conduct of their subsidiaries, affiliates or other related entities, such attempts are improper.  *See, e.g.*, *Gustavson v. Wrigley Sales Co.*, 961 F. Supp. 2d 1100, 1132 (N.D. Cal. 2013) (holding that "parent-subsidiary relationship . . . is an insufficient basis, standing alone, for holding [parent] liable for [subsidiary's] conduct").

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

4843724 (Bankr. E.D. Mo. Oct. 24, 2017) (holding that the plaintiffs' state-law claims were discharged when Peabody emerged from bankruptcy in March 2017); *In re Arch Coal, Inc.*, Case No. 16-40120, Dkt. 1615 (Bankr. E.D. Mo. Nov. 21 2017) (stipulation providing that any action in the Peabody bankruptcy proceedings that results in dismissal of any of the plaintiffs' claims against Peabody will require dismissal of claims against Arch).  Accordingly, Plaintiff's broad claim has the required "close nexus" with Chapter 11 plans to support federal jurisdiction.  *Wilshire Courtyard*, 729 F.3d at 1289; *see also In re Dow Corning Corp.*, 86 F.3d 482, 493–94 (6th Cir. 1996).

75.    As just one example of how Plaintiff's historical allegations have created a "close nexus" with a Chapter 11 plan, one of Chevron's current subsidiaries, Texaco Inc., filed for bankruptcy in 1987.  *In re Texaco Inc.*, 87 B 20142 (Bankr. S.D.N.Y. 1987).  The Chapter 11 plan, which was confirmed in 1988, bars certain claims against Texaco arising prior to March 15, 1988.  *Id.* Dkt. 1743.[4]  Plaintiff's Complaint alleges that Texaco, as well as unnamed Chevron "predecessors" and "subsidiaries," engaged in culpable conduct prior to March 15, 1988, and it attributes this conduct to defendant "Chevron."  *See* Compl. ¶¶ 15–17.  Plaintiff's claim against Chevron thus is at least partially barred by Texaco's confirmed Chapter 11 plan to the extent that the claims relate to Texaco's conduct prior to 1988.  Accordingly, even though Texaco's Chapter 11 plan has been confirmed and consummated, Plaintiff's claim has a "close nexus" to the plan to support federal jurisdiction.  *See Wilshire Courtyard*, 729 F.3d at 1292–93 (federal court had "'related to' subject matter jurisdiction under the *Pegasus Gold* test despite the fact that the Plan transactions have been long since consummated").

## XI.    THE ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS IMPLICATE THE "NAVIGABLE WATERS OF THE UNITED STATES"

76.    Federal statutes give exclusive jurisdiction over construction and dredging activities in navigable waters to the Army Corps of Engineers ("the Corps") and authorize the Corps to regulate the "navigable waters of the United States."  *See* 33 U.S.C. § 403; 33 U.S.C. § 426i.  Plaintiff's claims based on its allegations that sea level rise will harm its shoreline directly implicate the Corps'

---

[4]  There are pending motions to reopen Texaco's bankruptcy case, which motions are being actively litigated in the Bankruptcy Court.  *See id.* Dkt. 3923.

NOTICE OF REMOVAL                                        35

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

exclusive jurisdiction over the "navigable waters of the United States." *See* Compl. ¶ 142.  Thus, Plaintiff will have to show that the remedy it seeks is consistent with federal action and will be authorized by the Corps.  This in turn will require interpretation of an extensive web of federal regulations.  *See, e.g.*, 33 C.F.R. § 320.4(a)(1)–(2); 33 U.S.C. § 408(a).  Accordingly, Plaintiff's claims provide a basis for federal jurisdiction because they present federal issues that are (1) "necessarily raise[d]," (2) "actually disputed," (3) "substantial," and (4) capable of resolution in federal court "without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 314.

77.     Plaintiff's claims also require the Court to evaluate the exercise of federal authority over many prior years.  For example, Congress expressly authorized the Corps to "study [the] rehabilitation of the Elliott Bay Seawall" in Seattle, Washington to determine how to mitigate future damage.  Water Resource Development Act of 2007, § 4096(a), Pub. L. No. 110-114.  The Corps has studied the feasibility of replacing aging seawall structures to protect Seattle's shoreline and waterfront.  *See* Elliot Bay Seawall, *available at* http://www.nws.usace.army.mil/Missions/Civil-Works/Programs-and-Projects/Projects/Elliott-Bay-Seawall/.  But Plaintiff's nuisance claims are grounded on alleged past and future "sea level rise," which Plaintiff alleges will "require retrofitting and/or replacing many King County-owned assets and infrastructure to reduce the potential for damage."  Compl. ¶ 145.  Because Plaintiff alleges that past federal activity directed at these very issues failed to prevent its injuries, its Complaint challenges—and necessarily requires evaluation of—the adequacy of past federal decision making.  This gives rise to federal question jurisdiction.  *See Bd. Of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 724 (5th Cir. 2017) (in the context of comprehensive regulatory scheme, nuisance claims amount to "a collateral attack . . . premised on the notion that the scheme provides inadequate protection" (brackets omitted)); *Pet Quarters, Inc. v. Depository Trust and Clearing Corp.*, 559 F.3d 772, 779 (8th Cir. 2009) (complaint "presents a substantial federal question because it directly implicates actions taken by" a federal agency); *McKay v. City and Cty. of San Francisco*, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (denying remand and ruling that federal jurisdiction lies under *Grable* because state-

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

law claims were "tantamount to asking the Court to second guess the validity of the FAA's decision"); *Bader Farms, Inc. v. Monsanto Co.*, 2017 WL 633815, at *3 (E.D. Mo. Feb. 16, 2017).

78.     To succeed on its public nuisance claim, Plaintiff must prove causation. *See* Wash. Rev. Code § 7.48.010. But a crucial element of Plaintiff's theory of causation is the rising sea level along the Pacific coast and Puget Sound, which are navigable waters of the United States. *See* Compl. ¶ 95. More specifically, the attenuated chain of causation contemplated by Plaintiff's Complaint is as follows: (1) Defendants extract, manufacture, deliver, market, and sell fossil fuels, *id.* ¶¶ 2, 5; (2) the combustion of those fuels around the globe causes the release of greenhouse gases, *id.* ¶ 79; (3) released greenhouse gases then "trap atmospheric heat and increase global temperatures," *id.*; (4) increased temperatures cause thermal expansion of "navigable waters" and the melting of land-based ice therein, *id.* ¶ 139; (5) such phenomena cause the accelerated rise of "navigable waters," *id.*; (6) Plaintiff's current infrastructure is inadequate to address the rising waters, *id.* ¶ 10; and (7) "navigable waters" will encroach upon Plaintiff's land, causing damage, *id.* ¶¶ 8, 142, 162. Every link in this chain is inextricably intertwined with federal issues, including, as relevant here, the movement and impact of "navigable waters" and second-guessing of federal infrastructure. *See supra*, ¶ 77–78.

79.     Finally, Plaintiff's claims are removable because they fall within the Court's original admiralty jurisdiction. The Constitution extends the federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. Const. Art. III, § 2. "Congress has embodied that power in a statute giving federal district courts 'original jurisdiction [over] . . . [a]ny civil case of admiralty or maritime jurisdiction[.]" *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531 (1995) (alterations in original). "The admiralty and maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, *even though the injury or damage is done or consummated on land*." 46 U.S.C. § 30101(a) (emphasis added).

80.     The alleged injuries have occurred on the navigable waters surrounding King County. Plaintiff alleges that several Defendants' production and sale of fossil fuels occur on and/or over the

GIBSON, DUNN & CRUTCHER LLP
333 SOUTH GRAND AVENUE,
LOS ANGELES, CA 90071-3197
213.229.7000

navigable waters of the United States. *See, e.g.*, Compl. ¶ 54 ("Chevron, through its subsidiaries and agents, also produces oil in Alaska, and upon information and belief, some of this crude oil is supplied to Washington."); *id.* ¶ 60 ("ConocoPhillips is Alaska's largest oil producer and ships Alaskan crude oil to Washington" with a "fleet consist[ing] of five tankers 'designed specifically for the twice-monthly 2,500 to 5,000-mile round trip from Valdez, Alaska, to Washington, California and Hawaii."). Beyond that, Plaintiff alleges that the tort arises from production of fossil fuels, including worldwide extraction, a significant portion of which takes place on "mobile offshore drilling unit[s]" that operate in navigable waters. *See In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 808 F. Supp. 2d 943, 949 (E.D. La. 2011). "Under clearly established law," a floating drilling platform is "a vessel, not a fixed platform." *Id.* And Defendants' fossil fuel extraction is connected to maritime activity because (1) it has the "potential to disrupt maritime commerce" by damaging ports, *see Grubart*, 513 U.S. at 538; and (2) "[o]il and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce," *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538–39 (5th Cir. 1986). Because Plaintiff's claims fall within the Court's admiralty jurisdiction, they are removable under 28 U.S.C. §§ 1441 and 1333.

## XII.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

81.   Based on the foregoing allegations from the Complaint, this Court has original jurisdiction over this action under 28 U.S.C. §§ 1331 and 1332. Accordingly, removal of this action is proper under 28 U.S.C. §§ 1334, 1441, 1442, 1452, and 1446, as well as 43 U.S.C. § 1349(b).

82.   The United States District Court for the Western District of Washington is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Superior Court of Washington for King County. *See* 28 U.S.C. § 84(a); 28 U.S.C. § 1441(a). Pursuant to Local Rule 3(e)(1), the action should be assigned to the Seattle Division of this Court.

83.   All defendants that have been properly joined and served (or purported to be served) have consented to the removal of the action, *see* Thomson Decl., ¶ 4, and there is no requirement that any party not properly joined and served consent. *See City of Ann Arbor Employees' Ret. Sys. v.*

*Gecht*, No. C-06-7453 EMC, 2007 WL 760568, at *8 (N.D. Cal. Mar. 9, 2007); 28 U.S.C.
§ 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and
served").[5]   Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders from the
state-court action being removed to this Court that Defendant Chevron Corporation has been able to
obtain from the Superior Court and which are in its possession are attached as Exhibit A to the Thom-
son Declaration.

84.    Upon filing this Notice of Removal, Defendant Chevron Corporation will furnish writ-
ten notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Su-
perior Court of Washington for King County, pursuant to 28 U.S.C. § 1446(d).

Accordingly, Defendants remove to this Court the above action pending in the Superior Court
of Washington for King County.

---

[5]  In addition, bankruptcy removal under 28 U.S.C. § 1452 and federal officer removal "represent[]
an exception to the general rule . . . that all defendants must join in the removal petition."  *Ely
Valley Mines, Inc. v. Hartford Accident & Indem. Co*., 644 F.2d 1310, 1315 (9th Cir. 1981).

NOTICE OF REMOVAL

39

1   Dated: May 25, 2018

GIBSON, DUNN & CRUTCHER LLP

By:  *s/ Theodore J. Boutrous, Jr.*
      *s/Joshua S. Lipshutz*

Theodore J. Boutrous, Jr. (*pro hac pending*)
tboutrous@gibsondunn.com
Joshua S. Lipshutz (*pro hac pending*)
jlipshutz@gibsondunn.com

333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  +213 229 7000
Facsimile:  +213 229 7520

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  *s/ Robert M. McKenna*
      *s/Adam N. Tabor*

Robert M. McKenna (WSBA No. 18327)
rmckenna@orrick.com
Adam Nolan Tabor (WSBA No. 50912)
atabor@orrick.com

701 Fifth Ave., Suite 5600
Seattle, WA 98104
Telephone:  +1 206 839 4300
Facsimile:  +1 206 839 4301

STERN & KILCULLEN, LLC

By:  *s/ Herbert J. Stern*
      *s/Joel M. Silverstein*

Herbert J. Stern (*pro hac pending*)
hstern@sgklaw.com
Joel M. Silverstein (*pro hac pending*)
jsilverstein@sgklaw.com

325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, NJ 07932-0992
Telephone:  +973 535 1900
Facsimile:  +973 535 9664

SUSMAN GODFREY LLP

By:  *s/ Neal S. Manne*
      *s/Erica Harris*

Neal S. Manne (*pro hac pending*)
nmanne@susmangodfrey.com
Erica Harris (*pro hac vice pending*)
eharris@susmangodfrey.com

NOTICE OF REMOVAL

40

1

2
3
4

1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: +713.651.9366
Facsimile: +713.654.6666

5

*Attorneys for Defendant Chevron Corporation*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF REMOVAL

41