1

THE HONORABLE ROBERT S. LASNIK

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                              WESTERN DISTRICT OF WASHINGTON

10                                          AT SEATTLE

11   KING COUNTY,

12              Plaintiff,                        Case No. 2:18-cv-00758

13        v.                                      **DEFENDANTS' MOTION TO
                                                  DISMISS FIRST AMENDED
14   BP P.L.C., a public limited company of       COMPLAINT [12(b)(6)];
     England and Wales, CHEVRON                   MEMORANDUM OF POINTS AND
15   CORPORATION, a Delaware corporation,         AUTHORITIES**
     CONOCOPHILLIPS, a Delaware
16   corporation; EXXON MOBIL                     NOTED ON MOTION CALENDAR:
     CORPORATION, a New Jersey corporation,
17   ROYAL DUTCH SHELL PLC, a public              **Noted:** September 28, 2018
     limited company of England and Wales, and
18   DOES 1 through 10,                           **ORAL ARGUMENT REQUESTED**

19              Defendants.

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS                      i          GIBSON, DUNN & CRUTCHER LLP
FOR FAILURE TO STATE A CLAIM                                         333 South Grand Avenue,
                                                                   Los Angeles, CA 90071-3197
                                                                         213.229.7000

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................................ 1

II. BACKGROUND ......................................................................................................... 3

    A.  Global Warming Is a National and Global Issue .................................................. 3

    B.  Plaintiff Seeks to Hold Five Energy Producers Solely Liable for Global
        Warming .............................................................................................................. 5

III. LEGAL STANDARD .................................................................................................. 6

IV. ARGUMENT .............................................................................................................. 6

    A.  Plaintiff's Claims Arise Under Federal Common Law and Should Be
        Dismissed ............................................................................................................ 7

        1.  Federal common law governs global-warming based tort claims
            like Plaintiff's ............................................................................................ 8

        2.  Congress has displaced federal common law governing global
            warming based tort claims through the Clean Air Act ........................... 11

        3.  Congress has displaced any federal common law nuisance claim
            based on the domestic production of fossil fuels ................................... 13

        4.  Congress has displaced any federal common law nuisance claim
            based on "promotion" of lawful products ............................................. 15

        5.  Alternatively, Plaintiff has failed to plead a viable federal
            common law claim .................................................................................. 16

    B.  Plaintiff's Claims Are Independently Barred by Numerous Federal
        Doctrines ........................................................................................................... 20

        1.  Plaintiff's claims infringe on the federal foreign affairs power ........... 20

        2.  Plaintiff's claims are barred by the Commerce Clause ........................ 22

        3.  Plaintiff's claims are barred by the Due Process and Takings
            Clauses ................................................................................................... 24

        4.  Plaintiff's claims are preempted by federal law ................................... 26

        5.  Plaintiff's claims are barred by the First Amendment ......................... 28

    C.  The Amended Complaint Does Not Allege Viable State-Law Claims ............. 30

        1.  Plaintiff fails to state a public nuisance claim ..................................... 30

        2.  Plaintiff fails to state a trespass claim ................................................. 34

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

i

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

**TABLE OF CONTENTS**
(continued)

Page

3. Plaintiff's allegations fail to plausibly suggest that Defendants proximately caused the alleged injuries ................................................. 36

4. No remedy is available ........................................................................ 38

D. Plaintiff's Claims Violate the Separation of Powers ........................................ 39

V. CONCLUSION ........................................................................................................ 40

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

ii

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
    486 U.S. 492 (1988) ............................................................................................28

*Am. Elec. Power Co. v. Conn.*,
    564 U.S. 410 (2011) ..................................................................................... *passim*

*Am. Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003) ..................................................................................... *passim*

*Amigos Bravos v. U.S. Bureau of Land Mgmt.*,
    816 F. Supp. 2d 1118 (D.N.M. 2011) ...........................................................37, 38

*Anderson v. Teck Metals, Ltd.*,
    2015 WL 59100 (E.D. Wash. Jan. 5, 2015) .........................................................33

*Asche v. Bloomquist*,
    132 Wash. App. 784 (2006) ...........................................................................31, 38

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .........................................................................................6, 33

*Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001)..............................................................................38

*In re Assicurazioni Generali, S.P.A.*,
    592 F.3d 113 (2d Cir. 2010) ...............................................................................20

*Barclays Bank PLC v. Franchise Tax Bd. of Cal.*,
    512 U.S. 298 (1994) ...........................................................................................24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................6

*Benefiel v. Exxon Corp.*,
    959 F.2d 805 (9th Cir. 1992)........................................................................37, 38

*Benz v. Compania Naviera Hidalgo, S.A.*,
    353 U.S. 138 (1957) ...........................................................................................19

*BMW of N. Am. v. Gore*,
    517 U.S. 559 (1996) ......................................................................6, 23, 24, 25

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

iii

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ...................................................................................24

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1988) ............................................................................26, 28

*Bradley v. Am. Smelting & Refining Co.*,
    104 Wash. 2d 677 (1985) ....................................................................34, 35

*Brannan v. United Student Aid Funds, Inc.*,
    94 F.3d 1260 (9th Cir. 1996) .....................................................................26

*Brewer v. Lake Easton Homeowners Ass'n*,
    2 Wash. App. 2d 770, 780–81 (2018) ........................................................32

*Brutsche v. City of Kent*,
    164 Wash. 2d 664 (2008) ...........................................................................35

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ...................................................................................26

*California v. BP P.L.C.*,
    2018 WL 1064293 (N.D. Cal. Feb. 27, 2018)...............................7, 10, 11, 13

*California v. Gen. Motors Corp.*,
    2007 WL 2726871 (N.D. Cal. Sept. 17, 2007) ............................... *passim*

*Chelan Basin Conservancy v. GBI Holding Co.*,
    194 Wash. App. 478 (2016) .................................................................30, 31, 32

*City of Milwaukee v. Illinois*,
    451 U.S. 304 (1981) ..........................................................................8, 9, 11, 13

*City of New York v. BP P.L.C.*,
    2018 WL 3475470 (S.D.N.Y. July 19, 2018) ............................... *passim*

*City of Oakland v. BP P.L.C.*,
    2018 WL 3109726 (N.D. Cal. June 25, 2018) ............................ *passim*

*Comer v. Murphy Oil USA, Inc.*,
    839 F. Supp. 2d 849 (S.D. Miss. 2012) ................................................38, 40

*Commonwealth Edison Co. v. United States*,
    271 F.3d 1327 (Fed. Cir. 2001) .................................................................18

*Connecticut v. Am. Elec. Power Co.*,
    582 F.3d 309 (2d Cir. 2009) ......................................................................18

*North Carolina ex rel. Cooper v. Tenn. Valley Auth.*,
    615 F.3d 291 (4th Cir. 2010).................................................................18, 27

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

iv

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

*Cotto Waxo Co. v. Williams*,
    46 F.3d 790 (8th Cir. 1995)................................................................................22

*County of San Mateo v. Chevron Corp.*,
    2018 WL 1414774 (N.D. Cal. Mar. 16, 2018).................................................7, 12

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000)........................................................................................22

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006)........................................................................................39

*Davis v. Globe Mach. Mfg. Co., Inc.*,
    102 Wash. 2d 68 (1984)..................................................................................36

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980)........................................................................................39

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)........................................................................................28

*Eastern Enterprises v. Apfel*,
    524 U.S. 498 (1998)........................................................................................25

*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938)..........................................................................................8

*Evarone v. Lease Crutcher Lewis*,
    167 Wash. App. 1009 (2012)..........................................................................35

*Experience Hendrix, L.L.C. v. HendrixLicensing.com, LTD*,
    766 F. Supp. 2d 1122 (W.D. Wash. 2011).......................................................22

*Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters*,
    61 F. Supp. 2d 740 (S.D. Ohio 1999)..............................................................25

*Gaines v. Pierce Cty.*,
    66 Wash. App. 715 (1992)..........................................................................34, 37

*Garcia v. State, Dep't of Transp.*,
    161 Wash. App. 1 (2011)............................................................................36, 37

*Gazija v. Nicholas Jerns Co.*,
    86 Wash. 2d 215 (1975)..................................................................................32

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000)........................................................................................27

*Gordon v. Virtumundo, Inc.*,
    575 F.3d 1040 (9th Cir. 2009).........................................................................28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM      v

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

*Grennan v. Crowley Marine Servs., Inc.*,
  116 P.3d 1024 (Wash. Ct. App. 2005) ...................................................................33

*Grundy v. Brack Family Tr.*,
  151 Wash. App. 557 (2009) .............................................................................32, 34, 35

*Hartley v. State*,
  103 Wash. 2d 768 (1985) ...................................................................................36

*Matter of Harvey*,
  3 Wash. App. 2d 204 (2018) ................................................................................35

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ..............................................................................22, 23, 24

*Illinois v. City of Milwaukee*,
  406 U.S. 91 (1972) ....................................................................................8, 9, 10

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ......................................................................................*passim*

*Japan Whaling Ass'n v. Am. Cetacean Soc'y*,
  478 U.S. 221 (1986) ...........................................................................................39

*Jesner v. Arab Bank*,
  138 S. Ct. 1386 (2018) ...........................................................................16, 17, 20

*Kiobel v. Royal Dutch Petroleum Co.*,
  569 U.S. 108 (2013) ................................................................................19, 20

*Kitsap County v. Allstate Ins. Co.*,
  136 Wash. 2d 567 (1998) .................................................................................30

*Kitsap County v. Kitsap Rifle and Revolver Club*,
  184 Wash. App. 252 (2014) .............................................................................32

*Kurns v. R.R. Friction Prods. Corp.*,
  565 U.S. 625 (2012) ...........................................................................................23

*Lakey v. Puget Sound Energy, Inc.*,
  176 Wash. 2d 909 (2013) .............................................................................26, 32

*Lead Indus. Ass'n, Inc. v. EPA*,
  647 F.2d 1130 (D.C. Cir. 1980) ...........................................................................27

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ...........................................................................................11

*Me. Yankee Atomic Power Co. v. United States*,
  44 Fed. Cl. 372 (1999) ..........................................................................................25

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

vi

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1
2
*Mobil Oil Corp. v. Higginbotham*,
   436 U.S. 618 (1978) ...................................................................................15

3
*Mujica v. AirScan Inc.*,
   771 F.3d 580 (9th Cir. 2014).......................................................................20

4
5
*NAACP v. Claiborne Hardware Co.*,
   458 U.S. 886 (1982) ...................................................................................30

6
7
*Nat'l Sea Clammers Ass'n v. City of New York*,
   616 F.2d 1222 (3d Cir. 1980)...............................................................18, 39

8
*Native Vill. of Kivalina v. ExxonMobil Corp.*,
   663 F. Supp. 2d 863 (N.D. Cal. 2009) .............................................9, 37, 38, 40

9
10
*Native Vill. of Kivalina v. ExxonMobil Corp.*,
   696 F.3d 849 (9th Cir. 2012)................................................................. *passim*

11
12
*Peterson v. Islamic Republic of Iran*,
   758 F.3d 185 (2d Cir. 2014)........................................................................25

13
*Ranza v. Nike, Inc.*,
   793 F.3d 1059 (9th Cir. 2015)......................................................................5

14
15
*Retail Clerks Health & Welfare Tr. Funds v. Shopland Supermarket, Inc.*,
   96 Wash. 2d 939 (1982) .............................................................................30

16
17
*RJR Nabisco, Inc. v. European Cmty.*,
   136 S. Ct. 2090 (2016) ...............................................................................33

18
*Rubin v. Coors Brewing Co.*,
   514 U.S. 476 (1995) ...................................................................................28

19
20
*S.-Cent. Timber Dev., Inc. v. Wunnicke*,
   467 U.S. 82 (1984) .....................................................................................24

21
22
*Saldana v. Occidental Petroleum Corp.*,
   774 F.3d 544 (9th Cir. 2014)........................................................................6

23
*Sam Francis Found. v. Christies, Inc.*,
   784 F.3d 1320 (9th Cir. 2015)....................................................................22

24
25
*San Diego Bldg. Trades Council v. Garmon*,
   359 U.S. 236 (1959) ...................................................................................23

26
*Sierra Club v. U.S. Def. Energy Support Ctr.*,
   2011 WL 3321296 (E.D. Va. July 29, 2011) ..........................................37, 38

27
28
*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ...................................................................................28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

vii

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

*Sosa v. Alvarez-Machain*,
 542 U.S. 692 (2004) ...........................................................................17, 19

*State Farm Mut. Ins. Co. v. Campbell*,
 538 U.S. 408 (2003) ...................................................................................25

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
 560 U.S. 702 (2010) ...................................................................................25

*Tex. Indus. Inc. v. Radcliff Materials, Inc.*,
 451 U.S. 630 (1981) .....................................................................................8

*Transmission Agency of N. California v. Sierra Pac. Power Co.*,
 295 F.3d 918 (9th Cir. 2002) .....................................................................26

*United Mine Workers v. Pennington*,
 381 U.S. 657 (1965) ...................................................................................28

*United States v. Pink*,
 315 U.S. 203 (1942) ...................................................................................39

*Re v. Tenney*,
 56 Wash. App. 394 (1989) .........................................................................36

*Vieth v. Jubelirer*,
 541 U.S. 267 (2004) ...................................................................................40

*W. Lynn Creamery, Inc. v. Healy*,
 512 U.S. 186 (1994) ...................................................................................23

*White v. Lee*,
 227 F.3d 1214 (9th Cir. 2000) ...................................................................28

*Ziglar v. Abbasi*,
 137 S. Ct. 1843 (2017) ...............................................................................17

**Statutes**

15 U.S.C. § 45(a)(1) ...........................................................................................15

15 U.S.C. § 77a *et seq.* ......................................................................................16

15 U.S.C. § 78a *et seq.* ......................................................................................16

15 U.S.C. § 717c-1 .............................................................................................15

15 U.S.C. § 2901 *et seq.* .................................................................................3, 4

15 U.S.C. § 2921 .................................................................................................4

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

viii

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

15 U.S.C. § 2933 .................................................................................................................4

15 U.S.C. § 2936(3) ..........................................................................................................4

15 U.S.C. § 2952(a) ..........................................................................................................4

16 U.S.C. § 1451(j) ..........................................................................................................14

26 U.S.C. § 263(c) ............................................................................................................14

26 U.S.C. § 613A(c)(1) .....................................................................................................14

26 U.S.C. § 617 .................................................................................................................14

30 U.S.C. § 21a ...................................................................................................5, 6, 14, 27

30 U.S.C. § 1201 ...............................................................................................................27

42 U.S.C. § 5801 ...............................................................................................................27

42 U.S.C. § 7401(b)(1) .......................................................................................................4

42 U.S.C. § 7411 ...............................................................................................................10

42 U.S.C. § 7601 .................................................................................................................4

42 U.S.C. § 13384 *et seq.* .................................................................................................4

42 U.S.C. § 13389(c)(1) .................................................................................................4, 27

42 U.S.C. § 13401 ...................................................................................................5, 14, 27

42 U.S.C. § 13411 .........................................................................................................14, 27

42 U.S.C. § 13412 .........................................................................................................14, 27

42 U.S.C. § 13415 .........................................................................................................14, 27

42 U.S.C. § 15903 .........................................................................................................14, 27

42 U.S.C. § 15904 .........................................................................................................14, 27

42 U.S.C. § 15909 .........................................................................................................14, 27

42 U.S.C. § 15910 .........................................................................................................14, 27

42 U.S.C. § 15927 ...........................................................................................................5, 14

42 U.S.C. § 17001 *et seq.* .................................................................................................4

42 U.S.C. § 17301 ...............................................................................................................15

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                          ix

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

43 U.S.C. § 1701(a)(12) ................................................................14

King Co. Ordinance LU-18 ...........................................................31

Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998) .......................4

Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999) .........................4

Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000) ...............4

Wash. Admin. Code § 332-12-220 .............................................5, 31

Wash. Admin. Code § 332-12-260 .............................................5, 31

Wash. Rev. Code § 7.48.120 ..........................................................30

Wash. Rev. Code § 7.48.160 ..........................................................30

Wash. Rev. Code § 78.52.001 .................................................3, 5, 31

Wash. Rev. Code § 78.52.330 ...................................................5, 31

Wash. Rev. Code § 79.14.020 ...................................................5, 31

**Other Authorities**

Endangerment and Cause or Contribute Findings for Greenhouse Gases Under
Section 202(a) of the Clean Air Act,
74 Fed. Reg. 66,496 (Dec. 15, 2009) ...........................................40

*Energy Policy Act of 2005: Hearings Before the Subcomm. on Energy & Air
Quality of the H. Comm. on Energy & Commerce*,
109th Cong. (2005) .......................................................................40

Graham Ruddick, *Donald Trump says US could re-enter Paris climate deal*,
The Guardian (Jan. 28, 2018), http://bit.ly/2niJFsW......................21

*Hearing Before the Subcomm. on Toxic Substances & Envtl. Oversight of the S.
Comm. on Env't & Pub. Works*,
99th Cong. 2 (1985) ......................................................................40

*Hearings Before the S. Comm. on Energy & Nat. Res.*,
102d Cong. 208 (1992)...................................................................40

Michael D. Shear, *Trump Will Withdraw U.S. From Paris Climate Agreement*,
N.Y. Times (June 1, 2017), http://nyti.ms/2wNImI7 .......................4

*National Climate Program Act: Hearing Before the Subcomm. on the Env't &
the Atmosphere of the H. Comm. on Sci. & Tech.*,
94th Cong. 29 (1976).....................................................................40

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

x

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Remarks by President Trump at the Unleashing American Energy Event (June 29, 2017), http://bit.ly/2El7yWU ....................................................................5

S. Res. 98, 105th Cong. (1997) ...............................................................................4

U.S. Env'tl Prot. Agency, Regulations for Greenhouse Gas Emissions from Passenger Cars and Trucks, http://bit.ly/2EWvcKK ......................................4

UNFCCC Recitals, http://bit.ly/1BQK8Wg....................................................3

UNFCCC, *Status of Ratification of the Convention*, http://bit.ly/1ujgxQ3 ................................3

**Treatises**

Restatement (Second) Torts § 158 ........................................................................35

Restatement (Second) Torts § 821B .....................................................................18

**Regulations**

16 C.F.R. § 260.4(a) ...............................................................................................15

16 C.F.R. § 317.3 ...................................................................................................16

17 C.F.R. § 240.10b-5 ............................................................................................16

2017–2025 Model Year Light-Duty Vehicle GHG Emissions and CAFE Standards: Supplemental Notice of Intent, 76 Fed. Reg. 48,758 (Aug. 9, 2011) ...........................................................40

Light-Duty Vehicle Greenhouse Gas Emission Standards and Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324 (May 7, 2010) .............................................................40

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

xi

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

## MEMORANDUM OF POINTS AND AUTHORITIES[1]

### I.   INTRODUCTION

Plaintiff King County seeks to hold five energy companies liable for the impacts of global warming.  Relying on public nuisance and trespass theories, Plaintiff alleges that it has been harmed by decades of worldwide fossil fuel production and the global greenhouse gas emissions of countless global consumers, including King County itself and its resident citizens and businesses.  Plaintiff's claims are not limited to harms allegedly caused by fossil fuels extracted, sold, marketed, or used in King County.  Instead, Plaintiff attempts to use state tort law to regulate the nationwide (indeed, worldwide) activity of companies that play a key role in virtually every sector of the global economy—Defendants and their subsidiaries supply the fuels that enable production and innovation, literally keep the lights and heat on, power nearly every form of transportation, and form the basic materials from which innumerable consumer, technological, and medical devices are fashioned.  The Complaint raises federal statutory, regulatory, and constitutional issues; aims to upset bedrock federal-state divisions of responsibility; and has profound implications for the global economy, international relations, and America's national security.  For these reasons and more, cases asserting nearly identical claims have universally been rejected by U.S. courts.  In fact, in the last five weeks, both the Northern District of California and the Southern District of New York have dismissed the same claims, against the same five Defendants, brought by the same private lawyers representing Plaintiff here.  *City of Oakland v. BP P.L.C.*, 2018 WL 3109726, at *6 (N.D. Cal. June 25, 2018); *City of New York v. BP P.L.C.*, 2018 WL 3475470 (S.D.N.Y. July 19, 2018).  The result here should be the same.

As the courts in *Oakland* and *New York* both recognized, the law that governs the sort of global warming tort claims asserted here is *federal* common law, but Plaintiff's Complaint fails to state a viable cause of action under federal common law standards.  Indeed, the

---

[1] Defendants have separately moved to dismiss the Complaint for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2).  Defendants' submission of this motion is subject to, and without waiver of, those additional defenses.  For the reasons stated in Defendants' separate motions to dismiss for lack of personal jurisdiction, venue cannot be grounded in this district under 28 U.S.C. § 1391.  However, because  this action was removed from Washington Superior Court, King County, venue is proper in this district under 28 U.S.C. § 1441(a).

Complaint's conflict with federal law and policy could not be starker.  For nearly 50 years, the federal government has aimed to achieve energy independence by decreasing the Nation's reliance on oil imports, including by opening federal lands and coastal areas to promote fossil fuel extraction, establishing strategic petroleum reserves, and contracting with fossil fuel companies to develop those resources.  During this time, the U.S. has also enacted environmental statutes and regulations designed to strike an appropriate—and evolving— balance between protecting the environment and ensuring economic and national security. U.S. foreign policy has pursued these dual goals by negotiating with other countries to craft workable international frameworks to respond to global warming while evaluating how such regulation could affect the economy, national security, and foreign relations.  This lawsuit takes issue with, and runs counter to, these efforts, threatening to upend the government's longstanding energy and environmental policies and "compromis[ing] the very capacity of the President to speak for the Nation with one voice in dealing with other governments" on global warming issues.  *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003).

This case is about *global* production and *global* emissions, not a local nuisance. Plaintiff asks this Court to disregard the recognized boundaries of tort law and hold these select Defendants liable for the actions of literally billions of third parties not just in King County, but around the world.  These claims cannot be adjudicated without deciding whether the alleged harms are outweighed by the social utility of fossil fuels—not just in King County, but around the world.  Under well-established principles of federal law, such claims cannot proceed for multiple reasons, as *Oakland* and *New York* concluded.  *See Oakland*, 2018 WL 3109726, at *6; *New York*, 2018 WL 3475470, at *7; *see also Am. Elec. Power Co. v. Conn.*, 564 U.S. 410, 421 (2011) ("*AEP*"); *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855 (9th Cir. 2012).

Moreover, even assuming arguendo that state law could properly be applied to Plaintiff's claims, those claims are not viable under Washington law for multiple reasons.  In particular, nuisance and trespass claims are not viable where, as here, Defendants' conduct was authorized by law.  In fact, Washington's official policy is to "promote the exploration,

2

1  development, production, and utilization of oil and gas in the state," as "in the public interest."

2  Wash. Rev. Code § 78.52.001.  Plaintiff's claims additionally fail because the relevant conduct

3  occurred outside the state, Plaintiff has failed to allege actual and substantial injury,

4  Defendants' conduct was not the proximate cause of Plaintiff's injuries, and an "abatement

5  fund" is not an available remedy under Washington law.

6      In sum, this Complaint asserts already-rejected claims based on already-rejected

7  theories.  It too should be rejected and dismissed.

8                          **II.    BACKGROUND**

9  **A.  Global Warming Is a National and Global Issue**

10      Global warming is an important international issue that concerns every nation on Earth.

11  Plaintiff does not contend that global warming is a localized issue, unique to King County, but

12  rather alleges that worldwide greenhouse gas emissions have caused "planetary warming."

13  FAC ¶ 136.  As an issue of planetary significance, global warming is "the subject of

14  international agreements" and "active discussions . . . as to whether and how climate change

15  should be addressed through a coordinated framework."  *Oakland*, 2018 WL 3109726, at *7.

16  International discussions, which began more than 30 years ago, led to the adoption of the

17  United Nations Framework Convention on Climate Change ("UNFCCC") in 1988, which

18  established the Intergovernmental Panel on Climate Change ("IPCC").  FAC ¶ 130.  *See*

19  UNFCCC, *Status of Ratification of the Convention*, http://bit.ly/1ujgxQ3.  Noting that global

20  warming was "a common concern of humankind," the UNFCCC "[a]cknowledg[ed] that the

21  global nature of climate change calls for the widest possible cooperation by all countries and

22  their participation in an effective and appropriate international response."  UNFCCC Recitals,

23  http://bit.ly/1BQK8Wg.  The United States Senate ratified the Convention in 1992.

24      The United States has also acted at the national level to address global warming while

25  balancing important economic and social interests.  As early as 1978, Congress established a

26  "national climate program" to improve the country's understanding of global warming through

27  enhanced research, information collection and dissemination, and international cooperation.

28  *See* Nat'l Climate Program Act of 1978, 15 U.S.C. § 2901 *et seq.*  Following this, in the

1   Global Climate Protection Act of 1987, Congress recognized the uniquely international

2   character of global warming and directed the Secretary of State to coordinate U.S. negotiations

3   on the issue.  *See* 15 U.S.C. § 2901(5); *see also* 15 U.S.C. § 2952(a).[2]

4     The Clean Air Act, which is the primary federal statute governing emission standards,

5   established a comprehensive scheme to promote and balance multiple objectives, deploying

6   resources to "protect and enhance the quality of the Nation's air resources, so as to promote

7   the public health and welfare and the productive capacity of its population." 42 U.S.C.

8   § 7401(b)(1).  Congress authorized the Environmental Protection Agency ("EPA") to regulate

9   air pollutants like greenhouse gas emissions, and EPA has exercised this authority on its own

10  and with other agencies.[3]  *Id.* § 7601.  Other laws, like the Energy Policy Act of 2005 and the

11  Energy Independence and Security Act of 2007, sought further reductions of greenhouse gas

12  emissions at the national level.  *See* 42 U.S.C. § 13389(c)(1); 42 U.S.C. § 17001 *et seq.*

13    Reflecting the complex tradeoffs inherent in national energy and security policy, the

14  political branches of the U.S. Government have always balanced environmental regulations

15  with economic and social interests.  For example, the U.S. Senate unanimously adopted a

16  resolution urging the President not to sign the Kyoto Protocol if it would result in serious harm

17  to the U.S. economy or did not do enough to regulate other countries' emissions.  *See* S. Res.

18  98, 105th Cong. (1997).[4]  More recently, President Trump cited similar economic concerns

19  when he announced his intent to withdraw the U.S. from the Paris Agreement, shortly after

20  which he reaffirmed the importance of fossil fuels to the American economy and the country's

21  dedication to encouraging fossil fuel production.  *See* Michael D. Shear, *Trump Will Withdraw*

---

22  [2] Congress has revisited the issue of global warming several times.  For example, the Global Change Research
23  Act of 1990 established a research program for global climate issues, 15 U.S.C. § 2921, directed the President to establish a research program to "improve understanding of global change," *id.* § 2933, and provided for regular
24  scientific assessments that "analyze[] current trends in global change," *id.* § 2936(3).  Congress later directed the Secretary of Energy to conduct assessments related to greenhouse gases and report to Congress.  Energy Policy
25  Act of 1992, Pub. L. No. 102-486, § 1604, 106 Stat. 2776, 3002 (codified at 42 U.S.C. § 13384 *et seq.*).

[3] Indeed, a "national program" addressing greenhouse gas emissions from vehicles "was developed jointly by
26  EPA and the National Highway Traffic Safety Administration."  *See* U.S. Env't Prot. Agency, Regulations for Greenhouse Gas Emissions from Passenger Cars and Trucks, http://bit.ly/2EWvcKK.

27  [4] Congress then enacted a series of laws effectively barring EPA from implementing the Protocol in the absence
of Senate ratification.  *See* Pub. L. No. 105-276, 112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047,
28  1080 (1999); Pub. L. No. 106-377, 114 Stat. 1441, 1441A-41 (2000).

4

1   *U.S. From Paris Climate Agreement*, N.Y. Times (June 1, 2017), http://nyti.ms/2wNImI7;

2   Remarks by President Trump at the Unleashing American Energy Event (June 29, 2017),

3   http://bit.ly/2El7yWU.  And state governments—including Washington—recognize the

4   importance of fossil fuels to their citizens and economies, joining the federal government in

5   authorizing and encouraging the production of those fuels within their jurisdictions.  *See*, *e.g.*,

6   Wash. Rev. Code § 78.52.001 (declaring it "in the public interest" to "promote the exploration,

7   development, production, and utilization of oil and gas in the state"); *id.* § 78.52.330

8   (provision "[t]o assist in the development of oil and gas in this state"); *id.* § 79.14.020

9   (authorizing public lands to be leased "for the purpose of prospecting for, developing, and

10  producing oil, gas, or other hydrocarbon substances"); *see also* Wash. Admin. Code § 332-12-

11  220; *id.* § 332-12-260; 42 U.S.C. § 13401; 42 U.S.C. § 15927; 30 U.S.C. § 21a.

12   **B.  Plaintiff Seeks to Hold Five Energy Producers Solely Liable for Global Warming**

13   According to Plaintiff, global greenhouse gas emissions "since the dawn of the

14  Industrial Revolution" have contributed to global warming in the form of increased "global

15  average temperature."  FAC ¶¶ 137, 143(c).  Plaintiff claims Defendants are the "five largest,

16  investor-owned producers of fossil fuels in the world,"[5] and alleges that they "are collectively

17  responsible, through their production, marketing, and sale of fossil fuels, for over 11% of all

18  the carbon and methane pollution from industrial sources that has accumulated in the

19  atmosphere since the dawn of the Industrial Revolution."  *Id.* ¶ 143(b)-(c).

20   Climate scientists have warned about the risk of global warming since the 1950s, *id.*

21  ¶¶ 122–139, and Plaintiff alleges that Defendants have "maintained scientific staffs for

22  decades who have kept track of the climate science," *id.* ¶ 135.  *See id.* ¶¶ 144–153.  Plaintiff

23  alleges that notwithstanding this alleged knowledge, Defendants "promoted fossil fuel use in

24  massive quantities through affirmative advertising for fossil fuels and downplaying global

25  warming risks."  *Id.* ¶ 154.  According to Plaintiff, this advertising "encouraged fossil fuel

26  consumption" by third parties.  *Id.*  Plaintiff further contends that Defendants engaged in a

27   
28   [5] Plaintiff ignores corporate separateness and improperly aggregates the activities of each Defendant's subsidiaries and affiliates.  *See Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070–71 (9th Cir. 2015).

1  public relations "campaign" to "downplay[] the harms and risks of global warming" and "help

2  Defendants continue to produce fossil fuels and sell their products on a massive scale." *Id.* ¶

3  155.  Plaintiff alleges that this "campaign" was largely carried on by lobbying organizations,

4  including the American Petroleum Institute and the Global Climate Coalition. *Id.* ¶¶ 155–159.

5       Although Plaintiff does not claim Defendants have violated any laws, it alleges that

6  Defendants' lawful worldwide conduct, including lobbying and other First Amendment-

7  protected activities, renders them liable for nuisance and trespass under state law because

8  "King County will incur severe climate change injuries" sometime in the future.  FAC Part

9  VIII; *id.* ¶¶ 177–200.  Plaintiff seeks, *inter alia*, compensatory damages for "the costs of

10  actions King County has already taken, is currently taking, and needs to take to protect King

11  County infrastructure or property," and "an abatement fund remedy to be paid for by

12  Defendants to provide for infrastructure, costs of studying and planning, and other costs in

13  King County necessary for King County to adapt to global warming impacts." *Id.*  Relief

14  Requested A–B.

### III.    LEGAL STANDARD

16       A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim

17  to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).  After

18  stripping away any "legal conclusions" and "conclusory statements," the Court, relying on its

19  "judicial experience and common sense," *id.* at 678–79, must dismiss if the remaining

20  allegations fail to "raise a right to relief above the speculative level," *Bell Atl. Corp. v.*

21  *Twombly*, 550 U.S. 544, 545 (2007).  Dismissal is also appropriate if the claims are barred as a

22  matter of law, such as where they are displaced or preempted by federal law, *AEP*, 564 U.S. at

23  423; infringe on the executive's foreign affairs power, *Garamendi*, 539 U.S. at 429; are barred

24  by the Constitution, *BMW of N. Am. v. Gore*, 517 U.S. 559, 571, 585 (1996); or are non-

25  justiciable, *Saldana v. Occidental Petroleum Corp.*, 774 F.3d 544, 545 (9th Cir. 2014).

### IV.    ARGUMENT

27       "No plaintiff has ever succeeded in bringing a nuisance claim based on global

28  warming."  *Oakland*, 2018 WL 3109726, at *4.  In *Oakland*, Judge Alsup dismissed nearly

identical claims brought against the same five Defendants by municipalities represented by the same private attorneys.  As here, the plaintiffs' "theory rest[ed] on the sweeping proposition that otherwise lawful and everyday sales of fossil fuels, combined with an awareness that greenhouse gas emissions lead to increased global temperatures, constitute a public nuisance." *Oakland*, 2018 WL 3109726 at *4.  That theory, "breathtaking" in scope, "would reach the sale of fossil fuels anywhere in the world, including all past and otherwise lawful sales, where the seller knew that the combustion of fossil fuels contributed to the phenomenon of global warming."  *Id.*  Less than a month later, Judge Keenan reached the same conclusion in *New York*.  There, the court acknowledged that "Congress has expressly delegated to the EPA the determination as to what constitutes a reasonable amount of greenhouse gas emission under the Clean Air Act," such that the statute "displaces the City's claims."  2018 WL 3475470, at *5.  Judge Keenan cautioned against judicial intervention where, as here, the "claims implicate countless foreign governments and their laws and policies," and are "the subject of international agreements."  *Id.* at *7.

Because Plaintiff's claims have no basis in federal or state law, are barred by numerous constitutional doctrines, and violate the separation of powers, this Court should dismiss.

## A.   Plaintiff's Claims Arise Under Federal Common Law and Should Be Dismissed

Plaintiff's Complaint is premised on the theory that Washington law governs tort claims based on global warming.  But as the Supreme Court and the Ninth Circuit have held, claims aimed at the interstate and international effects of greenhouse gas emissions arise under *federal* law.  In denying a motion to remand nearly identical claims, Judge Alsup held that claims addressing "the national and international geophysical phenomenon of global warming . . . are necessarily governed by federal common law."  *California v. BP P.L.C.*, 2018 WL 1064293, at *2 (N.D. Cal. Feb. 27, 2018) ("*BP*").[6]  And Judge Keenan likewise held in *New*

---

[6] Although another California district court remanded similar global warming claims, it did so based on the misapprehension that the displacement of federal common-law remedies—which is a *merits* issue that arises *after* the court recognizes that federal common law governs (and thus gives rise to federal-question jurisdiction)—somehow eliminates federal jurisdiction and leaves only state law to govern the case.  *County of San Mateo v. Chevron Corp.*, 2018 WL 1414774, at *1–3 (N.D. Cal. Mar. 16, 2018); *id.* at *3 (agreeing that comparable "claims raise national and perhaps global questions").  But as both *Oakland*, 2018 WL 3109726, at *9, and *New York*, 2018 WL 3475470, at *6, recognized, such reasoning is erroneous because the applicability of displacement

7

1  *York* that "the City's claims are governed by federal common law" because they "are

2  ultimately based on the 'transboundary' emission of greenhouse gases" and therefore "require

3  a uniform standard of decision." 2018 WL 3475470, at *4.  But Plaintiff is not entitled to

4  relief under federal common law because Congress has displaced global warming-based tort

5  claims and because Plaintiff's claims are incompatible with federal common law principles.

6  **1.  Federal common law governs global-warming based tort claims like Plaintiff's**

7  Although "[t]here is no federal general common law," *Erie R. Co. v. Tompkins*, 304

8  U.S. 64, 78 (1938), the Court has long recognized that there remain "some limited areas" in

9  which the governing legal rules will be supplied not by state law, but by "what has come to be

10  known as 'federal common law.'" *Tex. Indus. Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630,

11  640 (1981).  Where "the interstate or international nature of the controversy makes it

12  inappropriate for state law to control," "our federal system does not permit the controversy to

13  be resolved under state law." *Id.* at 641.  Because such controversies implicate "uniquely

14  federal interests," *Tex. Indus.*, 451 U.S. at 640, "the basic scheme of the Constitution . . .

15  demands" that federal common law apply, *AEP*, 564 U.S. at 421.  Thus, "if federal common

16  law exists, it is because state law cannot be used." *City of Milwaukee v. Illinois*, 451 U.S. 304,

17  313 n.7 (1981) ("*Milwaukee II*").

18  "The control of interstate pollution" is one area in which federal common law has

19  historically governed. *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987).  For example,

20  the Supreme Court has held that "regulation of interstate water pollution is a matter of federal,

21  not state, law," and that nuisance claims involving interstate water and air pollution "should be

22  resolved by reference to federal common law." *Id.* at 488; *see also Illinois v. City of*

23  *Milwaukee*, 406 U.S. 91, 103 (1972) ("*Milwaukee I*") ("When we deal with air and water in

24  their ambient or interstate aspects, there is a federal common law.").  Courts "develop[ed]

25  federal common law" to resolve issues involving interstate pollution because in this area "there

26  exists a significant conflict" between "federal policy or interest and the use of state law."

27  _____

28  on the merits does not change the fact that global warming tort claims can only be *governed* by federal common law.

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

8

1   *Milwaukee II*, 451 U.S. at 313.  The Court has thus repeatedly "approved federal common-law

2   suits brought by one State to abate pollution emanating from another State."  *AEP*, 564 U.S. at

3   421.  "[T]he implicit corollary" of these rulings was that, because the nature of the dispute

4   required federal standards, "state common law was preempted."  *Ouellette*, 479 U.S. at 488.

5        The Supreme Court has held that, under this line of cases, claims asserting global-

6   warming-related injuries from emissions of greenhouse gases are governed by federal common

7   law.  *See AEP*, 564 U.S. at 421–22.  In *AEP*, eight States and various other plaintiffs sued five

8   electric utility companies, contending that "the defendants' carbon-dioxide emissions" had

9   substantially contributed to global warming, thereby "creat[ing] a 'substantial and

10  unreasonable interference with public rights,' in violation of the federal common law of

11  interstate nuisance, or, in the alternative, of state tort law."  564 U.S. at 418.  The Supreme

12  Court, as a threshold matter, agreed with the plaintiffs and the Second Circuit that such claims

13  were necessarily governed by federal common law.  *Id*. at 421 ("'When we deal with air and

14  water in their ambient or interstate aspects, there is a federal common law.'" (quoting

15  *Milwaukee I*, 406 U.S. at 103)).  In reaching that conclusion, the Court emphasized that when

16  dealing with a global-warming tort claim, "borrowing the law of a particular State would be

17  inappropriate."  *AEP*, 564 U.S. at 422.

18       In *Kivalina*, a case brought by some of the same private attorneys as here and pleading

19  nearly identical global-warming-related tort claims, the Ninth Circuit followed *AEP* and held

20  that federal common law governed.  696 F.3d at 855–56.  In *Kivalina*, as in this case, a local

21  government entity (an Alaskan village) asserted a public nuisance claim for damages to city

22  property and "critical infrastructure" as a result of "sea levels ris[ing]" and other climatic

23  impacts allegedly resulting from the defendant oil, coal, and electric companies' "emissions of

24  large quantities of greenhouse gases."  *Id*. at 853–54.  The village asserted this public nuisance

25  claim under federal common law and, in the alternative, state law.  *Native Vill. of Kivalina v.*

26  *ExxonMobil Corp.*, 663 F. Supp. 2d 863, 869 (N.D. Cal. 2009), *aff'd*, 696 F.3d 849.  The Ninth

27  Circuit began by addressing the parties' "threshold" disagreement as to whether the plaintiff's

28  claims arose under federal common law.  696 F.3d at 855.  The Court held that, under *AEP*,

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                                    9

1  such a global-warming tort suit was the sort of "transboundary pollution suit[]" to which

2  federal common law applied.  *Id.* at 855–56.[7]

3      Under *AEP* and *Kivalina*, Plaintiff's claims are governed by federal common law.  *See*

4  *AEP*, 564 U.S. at 421–22; *Kivalina*, 696 F.3d at 855–56.  They are based on global fossil fuel

5  production and the global emissions of countless nonparties—not conduct occurring

6  exclusively, or even primarily, in King County.  *See* FAC ¶ 3.  The scope of these claims, and

7  the conduct on which they are based, demonstrates the "overriding federal interest in the need

8  for a uniform rule of decision."  *Milwaukee I*, 406 U.S. at 105 n.6.  Thus, notwithstanding the

9  label Plaintiff puts on its claims, "the scope of the worldwide predicament" at issue "demands

10  the most comprehensive view available, which in our American court system means our

11  federal courts and our federal common law."  *BP*, 2018 WL 1064293 at *3; *see also New York*,

12  2018 WL 3475470 at *6 (because "these types of 'interstate pollution' claims arise under

13  federal common law" and implicate "areas of federal concern that have been delegated to the

14  Executive Branch as they require a uniform, national solution," it would be "illogical" to think

15  that they could be governed by state law).

16      The inherently federal nature of Plaintiff's global-warming tort claims is not altered by

17  the fact that Congress, in enacting the Clean Air Act, carved out a narrow enforcement role for

18  the states.  *See AEP*, 564 U.S. at 425 (citing 42 U.S.C. § 7411).  Within a scheme established

19  by Congress to address sources of interstate pollution, state common law can supply a remedy

20  for a defendant's emissions *only within that source state*, if at all; the existence of the federal

21  statute "precludes a court from applying the law of an affected State against an out-of-state

22  source."  *Ouellette*, 479 U.S. at 492–94.  Because Plaintiff's claims rely on an analysis of

23  *global* emissions and production, not emissions or production occurring exclusively in

24  Washington, those claims cannot be governed by Washington law.  *See id.* at 496 (rejecting

---

[7] The plaintiffs in *Kivalina* and *AEP* alternatively asserted state-law claims, but those claims were not before the
26  courts on appeal.  *See Kivalina*, 696 F.3d at 855; *AEP*, 564 U.S. at 429.  However, in view of those courts'
holdings that federal common law governed the inherently interstate and international tort claims associated with
27  global warming, and that application of a particular State's law to such claims would be "inappropriate," *AEP*,
564 U.S. at 422, it is not surprising that, following the dismissal of their federal claims, the plaintiffs on remand
28  in both cases did not attempt to pursue any such alternative theory that state law could be applied.

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                10

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

application of state law to out-of-state sources because it would result in "a variety of" "'vague' and 'indeterminate'" state common law "nuisance standards" and "[t]he application of numerous States' laws would only exacerbate the vagueness and resulting uncertainty"); *AEP*, 564 U.S. at 422 (application of a particular State's law would be "inappropriate"); *BP*, 2018 WL 1064293, at *3 ("A patchwork of fifty different answers to the same fundamental global issue would be unworkable."). In short, Plaintiff's claims "must stand or fall under federal common law." *Oakland*, 2018 WL 3109726, at *9.

### 2.   Congress has displaced federal common law governing global warming based tort claims through the Clean Air Act

Although global warming claims necessarily arise under federal common law, *AEP* and *Kivalina* held that any such cause of action fails to state a claim because Congress displaced federal tort remedies by excluding them from the Clean Air Act's regulatory scheme. *AEP*, 564 U.S. at 423–29; *Kivalina*, 696 F.3d at 856–58. Plaintiff's claims fail for the same reason.

"[T]he right to assert a federal common law public nuisance claim has limits." *Kivalina*, 696 F.3d at 856. "Federal common law is a necessary expedient, and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." *Milwaukee II*, 451 U.S. at 314; *see also id.* at 317 ("[W]e start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law."). Accordingly, "federal common law does not provide a remedy" "when federal statutes directly answer the federal question." *Kivalina*, 696 F.3d at 856.

"The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute speak[s] directly to [the] question at issue." *AEP*, 564 U.S. at 424. In *AEP*, the Supreme Court recognized that Congress has spoken directly to the issue of greenhouse gas emissions because they "qualify as air pollution subject to regulation under the [Clean Air] Act." *Id.* (citing *Massachusetts v. EPA*, 549 U.S. 497, 528–29 (2007)). The Court thus held that "the Clean Air Act and the EPA actions it authorizes

11

1    displace any federal common law right to seek abatement of carbon-dioxide emissions from

2    fossil-fuel fired power plants." *Id.* at 424; *see also Kivalina*, 696 F.3d at 857.

3         Attempting to distinguish its claims from *AEP* and *Kivalina*, Plaintiff disclaims any

4    attempt "to impose liability on Defendants for their direct emissions of greenhouse gases,"

5    FAC ¶ 10, and asserts that its nuisance and trespass claims are predicated solely on

6    Defendants' extraction and marketing activities, *id.* ¶¶ 140–143.  But as in *AEP* and *Kivalina*,

7    Plaintiff claims that its injuries are due to global warming, which, it alleges, is caused by

8    excessive worldwide *emissions*.  *Id.* ¶¶ 131–139.  Indeed, the Complaint uses the term

9    "emissions" *60 times*.  The fact that Plaintiff's claims rest on a derivative theory of liability—

10   *i.e.*, that Defendants are liable for enabling *other persons'* allegedly unreasonable and

11   excessive emissions—does not distinguish it from *AEP* or *Kivalina*.  Indeed, in *Kivalina*, the

12   Ninth Circuit expressly held that the plaintiff's derivative theory of indirect liability—based on

13   allegations that defendants had "conspir[ed] to mislead the public about the science of global

14   warming"—was "dependent upon the success" of the underlying public nuisance claim, and

15   therefore was governed by federal common law and displaced.  696 F.3d at 854, 858.

16        Not surprisingly, all three federal district courts to have addressed the issue have

17   concluded that global warming claims against fossil fuel producers are legally

18   indistinguishable from the emissions claims dismissed in *AEP* and *Kivalina*.  In *San Mateo*,

19   the court held that "*Kivalina* stands for the proposition that federal common law is not just

20   displaced when it comes to claims against domestic sources of emissions but also when it

21   comes to claims against energy producers' contributions to global warming and rising sea

22   levels.  Put another way, [*AEP*] did not confine its holding about the displacement of federal

23   common law to particular sources of emissions, and *Kivalina* did not apply [*AEP*] in such a

24   limited way."  *San Mateo*, 2018 WL 1414774, at *1.  The court thus held that the plaintiffs'

25   claims were completely displaced.  In *Oakland*, the court likewise rejected the plaintiffs'

26   proposed "distinction" between claims based on the defendant's "own emissions of

27   greenhouse gases" and claims based on the defendant's "sale of fossil fuels to those who

28   eventually burn the fuel": "If an oil producer cannot be sued under the federal common law

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                    12

for [its] own emissions, *a fortiori* [it] cannot be sued for someone else's."  2018 WL 3109726, at *6.[8]  The court in *New York* reached the same result, emphasizing that "the City alleges that its climate-change related injuries are the direct result of the *emission* of greenhouse gases from the combustion of Defendants' fossil fuels, and not the production and sale of those fossil fuels."  2018 WL 3475470, at *5.

The incompatibility of Plaintiff's claims with the Clean Air Act is highlighted by the fact that Plaintiff would have to prove, *inter alia*, that the greenhouse gas emissions for which it seeks to hold Defendants responsible created an "*unreasonable* interference with a right common to the general public."  *Milwaukee II*, 451 U.S. at 348 (emphasis added). "[A]djudication of Plaintiff's claim" would thus "require the Court to balance the competing interests of reducing global warming emissions and the interests of advancing and preserving economic and industrial development" dependent on fossil fuels.  *California v. Gen. Motors Corp.*, 2007 WL 2726871, at *8, 15 (N.D. Cal. Sept. 17, 2007).  In short, even though Plaintiff "fixate[s] on an earlier moment in the train of industry, the earlier moment of production and sale of fossil fuels, not their combustion," *BP*, 2018 WL 1064293, at *4, Plaintiff's global-warming-based tort claims necessarily implicate the reasonableness of greenhouse gas emissions.  Because Congress has "designated an expert agency, here, EPA, as best suited to serve as primary regulator of greenhouse gas emissions," Plaintiff's claims "cannot be reconciled with the decisionmaking scheme Congress enacted." *AEP*, 564 U.S. at 428–29.

### 3. Congress has displaced any federal common law nuisance claim based on the domestic production of fossil fuels

Even framed as a case only about oil and gas *production*, Plaintiff's claims are

---

[8] In *Oakland*, the court declined to dismiss solely on displacement grounds because it concluded that the plaintiffs' claims "add[ed] another dimension not addressed in *AEP* or *Kivalina*, namely that the conduct and emissions contributing to the nuisance arise *outside* the United States, although their ill effects reach *within* the United States."  2018 WL 3109726, at *6.  Because the Clean Air Act does not regulate overseas emissions, the court concluded that it "did not necessarily displace plaintiffs' federal common law claims."  *Id.*  The court nevertheless held that plaintiffs' claims were "foreclosed by the need for federal courts to defer to the legislative and executive branches when it comes to such international problems[.]"  *Id.*  Thus, even if Plaintiff's claims here are only displaced to the extent they are based on conduct leading to domestic emissions—over which the EPA has regulatory authority—their remaining claims are not viable under federal common law to the extent they are based on conduct leading to overseas emissions.  *See infra* IV.A.5.

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                    13

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

displaced by numerous statutes that speak "directly" to the reasonableness of that conduct.

- The Energy Policy Act of 1992 provides that "[i]t is the goal of the United States in carrying out energy supply and energy conservation research and development . . . to strengthen national energy security by reducing dependence on imported oil."  42 U.S.C. § 13401.  The statute directs the Secretary of Energy "to increase the recoverability of domestic oil resources," *id.* § 13411(a), and to investigate "oil shale extraction and conversion" in order "to produce domestic supplies of liquid fuels from oil shale," *id.* § 13412.  It authorizes a research center to "improve the efficiency of petroleum recovery," "increase ultimate petroleum recovery," and "delay the abandonment of resources" in certain parts of the United States.  *Id.* § 13415(b)–(c).

- The Energy Policy Act of 2005 declared it "the policy of the United States that . . . oil shale, tar sands, and other unconventional fuels are strategically important domestic resources that should be developed to reduce the growing dependence of the United States on politically and economically unstable sources of foreign oil imports,"  42 U.S.C. § 15927, and offered financial incentives to fossil fuel producers to increase domestic fossil fuel production.  *See, e.g.*, 42 U.S.C. §§ 15903, 15904, 15909(a), 15910(a)(2)(B).

- The Mining and Minerals Policy Act of 1970 proclaimed that "it is the continuing policy of the Federal Government in the national interest to foster and encourage . . . economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help assure satisfaction of industrial, security and environmental needs."  30 U.S.C. § 21a.

- The Coastal Zone Management Act of 1972 explained that "expanded energy activity" would further the "national objective of attaining a greater degree of energy self-sufficiency."  16 U.S.C. § 1451(j).

- The Federal Land Policy and Management Act of 1976 stated that "it is the policy of the United States that . . . the public lands be managed in a manner which recognizes the Nation's need for domestic sources of minerals . . . from the public lands."  43 U.S.C. § 1701(a)(12).

- And the federal tax code has a number of provisions that subsidize the extraction and refining activities of fossil fuel companies to encourage production and use.  *See, e.g.*, 26 U.S.C. §§ 263(c), 613A(c)(1), and 617.

There can be no doubt that these statutes "speak[] directly to [the] question" at issue here, *AEP*, 564 U.S. at 424—namely, whether fossil fuel production itself is unreasonable given the potential threat of global warming-related harms.[9]  Whereas Plaintiff alleges that Defendants' production of fossil fuels has created an "unreasonable" interference with public rights, FAC ¶ 206, historically "the problem wasn't too much oil, but too little, and our national policy emphasized the urgency of reducing dependence on foreign oil."  *See Oakland*,

---

[9] These statutes would not necessarily displace all state law claims related to oil production.  For example, a producer could be held liable for spilling oil on its neighbor's property during the course of production—the referenced statutes say nothing about *that* conduct.  But here Plaintiff has alleged that fossil-fuel production *itself* is a nuisance.

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

14

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

2018 WL 3109726, at *6; *id.* ("In our industrialized and modern society, we needed (and still need) oil and gas to fuel power plants, vehicles, planes, trains, ships, equipment, homes and factories.  Our industrial revolution and our modern nation, . . . have been fueled by fossil fuels.").  Congress has clearly (and repeatedly) stated that fossil fuels are not a public nuisance, but a public necessity, and "the court [is] not free to 'supplement' Congress' answer [such] that [these statutes] become[] meaningless."  *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978).  Accordingly, Plaintiff's federal common law claims are displaced.

### 4.  Congress has displaced any federal common law nuisance claim based on "promotion" of lawful products

Plaintiff also describes its public nuisance claim as aimed at Defendants' promotion and marketing activities, *see, e.g.*, FAC ¶¶ 5–7, 154–176, but any theory of public nuisance based on misleading "promotion" of a lawful product has been displaced because numerous federal statutes "speak directly" to the issue of misleading advertising.

Since the Federal Trade Commission Act was implemented in 1914, "unfair or deceptive acts or practices in or affecting commerce" have been "unlawful."  15 U.S.C. § 45(a)(1).  The Federal Trade Commission has interpreted this Act to prohibit "misrepresent[ing], directly or by implication, that a product, package, or service offers a general environmental benefit."  16 C.F.R. § 260.4(a).  More recently, Congress has enacted two laws that speak directly to misrepresentation in the promotion of fossil fuels.  The Energy Policy Act of 2005 states that "[i]t shall be unlawful for any entity, directly or indirectly, to use or employ, in connection with the purchase or sale of natural gas . . . any manipulative or deceptive device or contrivance."  15 U.S.C. § 717c-1.  And the Energy Independence and Security Act of 2007 makes it "unlawful for any person, directly or indirectly, to use or employ, in connection with the purchase or sale of crude oil[,] gasoline or petroleum distillates at wholesale, any manipulative or deceptive device or contrivance."  42 U.S.C. § 17301.  The Act's implementing regulations expressly outlaw "the making of any untrue statement of material fact . . . that operates or would operate as a fraud or deceit upon any person," as well as "[i]ntentionally fail[ing] to state a material fact that under the circumstances renders a

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

15

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

statement made by such person misleading." 16 C.F.R. § 317.3.  These laws speak directly to Plaintiff's claim that Defendants have misrepresented the environmental impacts of fossil fuels, and thus displace Plaintiff's federal common law cause of action.[10]

In short, whether Plaintiff's nuisance claims are based on domestic emissions, production, or promotion, they are squarely displaced by statute and must be dismissed.

### 5.  Alternatively, Plaintiff has failed to plead a viable federal common law claim

Even if Congress had not displaced the relevant federal common law, Plaintiff has failed to state a claim that complies with federal common law standards.  Federal common law has never been extended to the sort of expansive derivative theory of liability that Plaintiff asserts here.  There is no precedent for applying tort liability against producers of lawful products at lawful levels merely because consumers happen to create pollution while *using* those products.[11]  *See AEP*, 564 U.S. at 422 ("Nor have we ever held that a State may sue to abate any and all manner of pollution originating outside its borders.").  As Plaintiff's counsel admitted in parallel California proceedings, "[a]pplying federal common law to producer-based cases would extend the scope of federal nuisance law well beyond its original justification."  *BP*, No. 17-cv-06011, ECF No. 81 at 9.  Nor is there any precedent under federal common law to recognize a cause of action for tort injuries based on conduct occurring *overseas*.  To the contrary, "there are sound reasons why regulation of the worldwide problem of global warming should be determined by our political branches, not by our judiciary."  *Oakland*, 2018 WL 3109726, at *9.

The Supreme Court's recent decision in *Jesner v. Arab Bank*, 138 S. Ct. 1386 (2018), cautions against Plaintiff's proposed expansion of federal common law remedies.  In *Jesner*, the plaintiffs sued the defendant under the Alien Tort Statute ("ATS"), alleging that the bank

---

[10] To the extent Plaintiff's claims are based on alleged misstatements to shareholders or the SEC, *see*, *e.g.*, FAC ¶¶ 166, 171–176, they are displaced by the securities laws, which comprehensively regulate corporate communications with investors and regulators.  *See* 15 U.S.C. § 77a *et seq.*; *id.* § 78a *et seq.*; 17 C.F.R. § 240.10b-5.

[11] Indeed, the attenuated causal chain from Defendants' production and promotion of fossil fuels to global warming and the related sea-level rise and other harms alleged by Plaintiff, dependent on the intervening acts of *billions* of third parties, defeats proximate causation under federal common law.

facilitated certain terrorist acts committed abroad.  Because the ATS is "strictly jurisdictional," *Jesner*, 138 S. Ct. at 1397, the statute is "read as having been enacted on the understanding that the common law would provide a cause of action for [a] modest number of international law violations," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004).  The question in *Jesner* was whether the Court had "authority and discretion in an ATS suit to impose liability on a corporation without a specific direction from Congress to do so." *Id.* at 1394.  The Court answered "no," stressing its "reluctance to extend judicially created private rights of action." *Id.* at 1402.  Citing prior decisions limiting remedies in court-created *Bivens* actions, the Court explained that "'a decision to create a private right of action is one better left to legislative judgment in the great majority of cases,' . . . because 'the Legislature is in the better position to consider if the public interest would be served by imposing a new substantive legal liability.'" *Id.* (citations omitted).  The Court thus announced that "[i]f there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy, . . . courts must refrain from creating a remedy in order to respect the role of Congress." *Id.* (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017)); *see also Oakland*, 2018 WL 3109726, at *6 ("One consideration weighing in favor of judicial caution is where 'modern indications of congressional understanding of the judicial role in the field have not affirmatively encouraged greater judicial creativity.'") (quoting *Sosa*, 542 U.S. at 728).

Here, there are many reasons why Plaintiff's proposed damages remedy against fossil-fuel producers contravenes congressional judgments and therefore fails under federal common law.  *First*, Plaintiff's claim that Defendants should be held liable for producing "massive amounts of fossil fuels," FAC ¶ 2, would "require a balancing of policy concerns—including the harmful effects of greenhouse gas emissions, our industrialized society's dependence on fossil fuels, and national security." *Oakland*, 2018 WL 3109726, at *6.  As the Court explained in *AEP*, "[t]he appropriate amount of regulation in any particular greenhouse gas-producing sector cannot be prescribed in a vacuum:  As with questions of national or international policy, informed assessment of competing interests is required.  Along with the environmental benefit potentially achievable, our nation's energy needs and the possibility of

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

17

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

economic disruption must weigh in the balance."  564 U.S. at 427.  But "questions of how to appropriately balance" the "worldwide negatives [of global warming] against the worldwide positives of the energy itself, and of how to allocate the pluses and minuses among the nations of the world, demand the expertise of our environmental agencies, our diplomats, our Executive, and at least the Senate."  *Oakland*, 2018 WL 3109726, at *7.  "Nuisance suits in various United States judicial districts regarding conduct worldwide are far less likely to solve the problem" and "could interfere with reaching a worldwide consensus."  *Id.*; *see also New York*, 2018 WL 3475470, at *7 ("[T]he immense and complicated problem of global warming requires a comprehensive solution that weighs the global benefits of fossil fuels use with the gravity of the impending harms.").

*Second*, Congress has expressly authorized and encouraged fossil-fuel extraction for decades, despite being aware of climate change.  *See supra* Part IV.A.3.  The Restatement (Second) of Torts, which federal courts have generally applied when dealing with interstate pollution,[12] states that even where "it would be a nuisance at common law, conduct that is fully authorized by statute, ordinance or administrative regulation does not subject the actor to tort liability."  Restatement § 821B cmt. f; *see also id.* cmt. e.  Accordingly, "Courts traditionally have been reluctant to enjoin as a public nuisance activities which have been considered and specifically authorized by the government."  *North Carolina ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 309 (4th Cir. 2010) ("*Cooper*").  "This is especially true 'where the conduct sought to be enjoined implicates the technically complex area of environmental law.'"  *Id.*  Because Congress has made clear that oil and gas production is not a public nuisance, but rather a public necessity, the Court should decline Plaintiff's invitation to create a damages remedy here.  *See Oakland*, 2018 WL 3109726, at *6.

---

[12] *See Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 328 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011) ("[W]e apply the Restatement definition of public nuisance to the federal common law of nuisance[.]"); *Nat'l Sea Clammers Ass'n v. City of New York*, 616 F.2d 1222, 1234 (3d Cir. 1980), *vacated on other grounds*, *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981) ("[W]e are convinced that the Court would . . . look to the Restatement formulation as an appropriate source for a federal rule."); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1353 (Fed. Cir. 2001) (looking to Restatement for contours and scope of common law nuisance).

*Third*, Plaintiff's requested relief—an abatement fund and damages based on Defendants' worldwide fossil-fuel extraction—"would effectively allow plaintiffs to govern conduct and control energy policy on foreign soil[.]" *Oakland*, 2018 WL 3109726, at *7. The federal common law of nuisance has never been held to authorize such an extraterritorial cause of action based on foreign conduct, and "courts should be 'particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs.'" *Id.* (quoting *Sosa*, 542 U.S. at 727). Extending federal common law to overseas fossil-fuel production would violate the "the 'presumption' that United States law governs domestically but does not rule the world." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013). The Supreme Court regularly applies this "presumption" when interpreting federal law because it "'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord,'" and "helps ensure that the Judiciary does not erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Id.* (citation omitted). The "principles underlying the presumption" apply equally to federal common law claims, because "'the danger of unwarranted judicial interference in the conduct of foreign policy is magnified' where 'the question is not what Congress has done but instead what courts may do.'" *Oakland*, 2018 WL 3109726, at *7 (quoting *Kiobel*, 569 U.S. at 116). Thus, before federal courts "run interference" in the "delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed." *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 146–47 (1957).

Congress has expressed no such intention here, nor is it likely to do so given that Plaintiff's claims "undoubtedly implicate the interests of countless governments, both foreign and domestic." *Oakland*, 2018 WL 3109726, at *7. Indeed, "as the United States aptly note[d]" in an amicus brief, "many foreign governments actively support the very activities targeted by plaintiff['s] claims." *Id.* A substantial amount of Defendants' overseas conduct is undertaken pursuant to acts of foreign governments (e.g., granting extraction licenses and leasing state-owned land), and foreign governments depend on revenues from Defendants'

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

19

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1    production activities.  Plaintiff's proposed damages remedy disregards the admonition that

2    courts must exercise caution in interpreting federal common law, as "the political branches,

3    not the judiciary, have the responsibility and institutional capacity to weigh foreign-policy

4    concerns." *Jesner*, 138 S. Ct. at 1403; *see also Kiobel*, 569 U.S. at 116 (noting that Congress

5    "alone has the facilities necessary to make fairly such an important policy decision where the

6    possibilities of international discord are so evident and retaliative action so certain").

7        *Fourth*, in addition to its foreign policy implications, Plaintiff's proposed global

8    warming tort would interfere with other states' energy and environmental policies.  *See infra*

9    IV.B.2.  Federal common law should not be used to impose one state's (or one municipality's)

10   policy preferences on the rest of the country.

11       Although Plaintiff's global warming tort claims are governed by federal common law,

12   the federal common law of nuisance does not provide a remedy for these claims.  Accordingly,

13   the Court should dismiss the Complaint with prejudice.

14   **B.  Plaintiff's Claims Are Independently Barred by Numerous Federal Doctrines**

15       Regardless of whether Plaintiff's claims arise under federal or state law, dismissal is

16   warranted because adjudication of these claims would interfere with the foreign affairs powers

17   of the political branches; because the relief Plaintiff seeks would violate the Commerce, Due

18   Process, and Takings Clauses; because the claims are preempted by federal law; and because

19   the claims are barred by the First Amendment.

20   **1.  Plaintiff's claims infringe on the federal foreign affairs power**

21       The Supreme Court has held that "state laws 'must give way if they impair the

22   effective exercise of the Nation's foreign policy.'" *Garamendi*, 539 U.S. at 419 (citation

23   omitted).  In addition to invalidating state statutes, the foreign affairs doctrine bars state

24   common-law causes of action.  *See In re Assicurazioni Generali, S.P.A.*, 592 F.3d 113, 115,

25   119–20 (2d Cir. 2010); *Mujica v. AirScan Inc.*, 771 F.3d 580, 620 (9th Cir. 2014) (Zilly, J.,

26   concurring in judgment in relevant part) (district court properly dismissed, under the foreign

27   affairs doctrine, California common-law claims based on conduct in Colombia).  Plaintiff's

28   claims would undermine the federal government's foreign affairs powers by impairing the

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

20

President's ability to negotiate and implement comprehensive international frameworks on global warming.  Indeed, "[to] litigate such an action for injuries from foreign greenhouse gas emissions in federal court would severely infringe upon the foreign-policy decisions that are squarely within the purview of the political branches of the U.S. Government." *New York*, 2018 WL 3475470, at *7.

"Global warming is already the subject of international agreements," and "[t]he United States is also engaged in active discussions with other countries as to whether and how climate change should be addressed through a coordinated framework." *Oakland*, 2018 WL 3109726, at *7.  The United States has clearly stated its policy to seek multilateral reductions in worldwide carbon emissions, and has used domestic emissions reductions as a bargaining chip to extract similar commitments from other nations in negotiations.  *See supra* I.A.  Most recently, President Trump announced his intent to withdraw from the Paris Agreement for, among other reasons, what he determined to be its unfair impact on the American economy.[13] *See id*.  Plaintiff, apparently dissatisfied by these developments, is attempting to "employ[] a different, state system of economic pressure" on the fossil fuel industry.  *Garamendi*, 539 U.S. at 423 (citation omitted).  But "by seeking to impose damages for the [Defendants'] lawful worldwide [fossil fuel extraction], Plaintiff's nuisance claims sufficiently implicate the political branches' powers over . . . foreign policy." *Gen. Motors*, 2007 WL 2726871, at *14; *see also New York*, 2018 WL 3475470, at *7.

Moreover, because Plaintiff asks this Court to label Defendants' worldwide conduct a public nuisance, resolution of this case threatens to "undercut[] the President's diplomatic discretion and the choice he has made exercising it." *Garamendi*, 539 U.S. at 423–24.  In *Garamendi* the Court invalidated California's effort to encourage Holocaust reparations by European insurance carriers based on "the likelihood that state legislation will produce . . . more than incidental effect in conflict with express foreign policy of the National

---

[13] Underscoring the need for a uniform approach, President Trump also noted the Paris Agreement continues to be evaluated, and that the government's focus is on negotiating a "good deal for the U.S."  Graham Ruddick, *Donald Trump says US could re-enter Paris climate deal*, The Guardian (Jan. 28, 2018), http://bit.ly/2niJFsW.

1  Government."  539 U.S. at 420.  Similarly, in *Crosby v. National Foreign Trade Council*, 530

2  U.S. 363 (2000), the Court struck down a Massachusetts statute barring state entities from

3  transacting with companies doing business in Burma—which was intended to spur that

4  country to improve its human rights record.  *Id.* at 366–70.  The Court held that the statute

5  violated the foreign affairs power because it "undermine[d] the President's capacity . . . for

6  effective diplomacy" by "compromis[ing] the very capacity of the President to speak for the

7  Nation."  *Id.* at 381 ("the President's effective voice" on matters of foreign affairs must not "be

8  obscured by state or local action").

9         Without question, Plaintiff's claims "touch[] on foreign affairs."  *Oakland,* 2018 WL

10  3109726, at *9.  Because this "global warming nuisance tort would have an inextricable effect

11  on . . . foreign policy" that would conflict with the federal government's objectives, the claims

12  must be dismissed.  *Gen. Motors*, 2007 WL 2726871, at *14.

13         **2.  Plaintiff's claims are barred by the Commerce Clause**

14         Plaintiff's claims should also be dismissed because they seek to impose Washington's

15  legal standards on out-of-state commercial activities.  State regulation "that has the 'practical

16  effect' of regulating commerce occurring wholly outside that State's border is invalid under

17  the Commerce Clause."  *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see also Cotto Waxo*

18  *Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995) ("[A] statute has extraterritorial reach when

19  it necessarily requires out-of-state commerce to be conducted according to in-state terms.").

20  Extraterritorial regulation violates the Commerce Clause "whether or not the commerce has

21  effects within the state."  *Healy*, 491 U.S. at 336; *see also Sam Francis Found. v. Christies,*

22  *Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (extraterritorial regulation of commerce is

23  *per se* unconstitutional); *Experience Hendrix, L.L.C. v. HendrixLicensing.com, LTD*, 766 F.

24  Supp. 2d 1122, 1142 n.24 (W.D. Wash. 2011).

25         "The critical inquiry" in determining whether state regulation violates the Commerce

26  Clause "is whether the practical effect of the regulation is to control conduct beyond the

27  boundaries of the State."  *Healy*, 491 U.S. at 336.  Here, Plaintiff requests damages and an

28  "abatement fund remedy" for a nuisance Defendants allegedly caused by "produc[ing] massive

1    quantities of fossil fuels" around the world "for over a hundred years." FAC ¶ 140.  Although

2    Plaintiff asserts that it "does not seek to control energy policy in the United States or on

3    foreign soil," FAC ¶ 10, it is well-established that "[t]he obligation to pay compensation can

4    be, indeed is designed to be, a potent method of governing conduct and controlling policy."

5    *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959); *see also Kurns v. R.R.*

6    *Friction Prods. Corp.*, 565 U.S. 625, 637 (2012) ("[S]tate regulation can be . . . effectively

7    exerted through an award of damages, and the obligation to pay compensation can be, indeed

8    is designed to be, a potent method of governing conduct and controlling policy."); *BMW*, 517

9    U.S. at 572 n.17 ("State power may be exercised as much by a jury's application of a state rule

10   of law in a civil lawsuit as by a statute.").  For this reason, the Supreme Court has held that "a

11   state may not impos[e] economic sanctions on violators of its laws with the intent of changing

12   tortfeasors' lawful conduct in other States."  *Id.* at 572.

13          The Supreme Court has recognized that common-law environmental tort claims, in

14   particular, can force a defendant to "change its methods of doing business and controlling

15   pollution to avoid the threat of ongoing liability," and that courts theoretically could "require

16   the source to cease operations by ordering immediate abatement."  *Ouellette*, 479 U.S. at 495.

17   Plaintiff's tort claims, if successful, would require Defendants to change their conduct not just

18   within Washington, but around the world, as its claims are based on Defendants'

19   "cumulative," "worldwide" contributions to the alleged nuisance.  FAC ¶ 143(b); *see also*

20   *Oakland*, 2018 WL 3109726, at *4 (Plaintiff's "breathtaking[ly]" broad theory "would reach

21   the sale of fossil fuels anywhere in the world").  In short, Plaintiff's requested "relief would

22   effectively allow plaintiff[] to govern conduct and control energy policy" in other states in

23   violation of the Commerce Clause.  *Oakland*, 2018 WL 3109726, at *7; *see also Healy*, 491

24   U.S. at 336.  Indeed, Plaintiff is asking this Court to impose what amounts to a carbon tax on

25   out-of-state conduct, which the Commerce Clause plainly prohibits.  *See W. Lynn Creamery,*

26   *Inc. v. Healy*, 512 U.S. 186, 201 (1994) ("Commerce Clause jurisprudence is not so rigid as to

27   be controlled by the form by which a State erects barriers to commerce.").

28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

23

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1    The Commerce Clause inquiry also requires courts to "consider[] how [the regulation]

2    may interact with the legitimate regulatory regimes of other States[.] . . . [T]he Commerce

3    Clause protects against inconsistent legislation arising from the projection of one state

4    regulatory regime into the jurisdiction of another State." *Healy*, 491 U.S. at 336–37.

5    Imposing penalties "based in large part on conduct that happened in other jurisdictions" would

6    "infring[e] on the policy choices of other States," *BMW*, 517 U.S. at 572–73, many of which

7    depend on the extraction of petroleum resources for energy and economic security.  King

8    County may not use Washington tort law to "impose its own policy choice on neighboring

9    states," let alone on every state in the country.  *Id.* at 571.

10    Where, as here, exercises of state power also burden foreign commerce, they are held

11    to an even stricter standard under the Commerce Clause than those burdening only interstate

12    commerce.  *See, e.g.*, *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 311

13    (1994) ("In the unique context of foreign commerce, a State's power is further constrained

14    because of the special need for federal uniformity." (internal citations omitted)); *S.-Cent.*

15    *Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 100 (1984) ("It is a well-accepted rule that state

16    restrictions burdening foreign commerce are subjected to a more rigorous and searching

17    scrutiny.").  Because Plaintiff seeks to indirectly "control energy policy on foreign soil" by

18    labeling worldwide production of fossil fuels a nuisance, *Oakland*, 2018 WL 3109726, at *7,

19    its claims are barred by the Foreign Commerce Clause.

20    **3.  Plaintiff's claims are barred by the Due Process and Takings Clauses**

21    Plaintiff does not allege that Defendants violated *any* of federal or state law regulating

22    the extraction, production, promotion, or sale of fossil fuels.  Yet it seeks "hundreds of

23    millions of dollars" to abate future harms, plus damages for alleged past harms, based on

24    Defendants' lawful economic activity and constitutionally protected lobbying activities across

25    the country over the course of several decades.  *See* FAC ¶ 213 & Relief Requested.  Imposing

26    such massive extraterritorial and retroactive liability would constitute "a due process violation

27    of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

24

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

Due process forbids States from "punish[ing] a defendant for conduct that may have been lawful where it occurred." *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408, 421 (2003) (collecting cases). Nor may a State "impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW*, 517 U.S. at 572–73 & n.19. Here, as in *Oakland*, the "challenged conduct is, as far as the complaints allege, lawful in every nation." 2018 WL 3109726, at *7. Plaintiff is thus prohibited from seeking to punish Defendants for its fossil fuel extraction.

Similarly, due process prohibits states from imposing retroactive liability for lawful conduct. In *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), the Court invalidated a federal statute imposing retroactive liability on coal companies for the medical costs of former coal miners. Justice O'Connor, writing for a four-justice plurality, observed that the Coal Act was unconstitutional under the Takings Clause because it "improperly place[d] a severe, disproportionate, and extremely retroactive burden on Eastern." *Id.* at 538; *see also id.* at 539, 549 (Kennedy, J., concurring in the judgment and dissenting in part) (statute "must be invalidated as contrary to essential due process principles" because it created "liability for events which occurred 35 years ago" and had "a retroactive effect of unprecedented scope").[14] Here, Plaintiff seeks to impose hundreds of millions of dollars of liability on Defendants based on conduct occurring over the past 100 years, even though that conduct was incontrovertibly lawful when it occurred (and still is today). *See* FAC ¶ 140. Imposing such retroactive liability would be a grievous violation of due process. *See Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 714 (2010) (plurality) ("It would be absurd to allow a State to do by judicial decree what the Takings Clause forbids it to do by legislative fiat.").

---

[14] Courts have held that *Eastern Enterprises* "stands for a clear principle: a liability that is severely retroactive, disruptive of settled expectations and wholly divorced from a party's experience may not constitutionally be imposed." *Me. Yankee Atomic Power Co. v. United States*, 44 Fed. Cl. 372, 378 (1999); *see also Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters*, 61 F. Supp. 2d 740, 743 (S.D. Ohio 1999); *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 192 (2d Cir. 2014) (asking whether a challenged statute "impose[d] severe retroactive liability on a limited class of parties that could not have anticipated the liability").

1       **4.  Plaintiff's claims are preempted by federal law**

2       State-law tort claims are preempted when they conflict with federal law or where

3 Congress has occupied the field through legislation.  *See Buckman Co. v. Plaintiffs' Legal*

4 *Comm.*, 531 U.S. 341, 348 (2001); *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260,

5 1263 (9th Cir. 1996) ("Preemption [exists] where the state law stands as an obstacle to the

6 accomplishment and execution of the full objectives of Congress."); *Transmission Agency of*

7 *N. California v. Sierra Pac. Power Co.*, 295 F.3d 918, 928 (9th Cir. 2002) ("Preemption of

8 state law is compelled whether Congress' command is explicitly stated in the statute's

9 language or implicitly contained in its structure and purpose.").  State-law tort claims are also

10 preempted where they implicate "'uniquely federal interests'" that are "committed by the

11 Constitution and laws of the United States to federal control."  *Boyle v. United Tech. Corp.*,

12 487 U.S. 500, 504 (1988) (citations omitted).  Plaintiff's claims here are preempted for all

13 three reasons.

14       First, by enacting the Clean Air Act, Congress delegated to EPA broad authority over

15 whether and how to regulate carbon-dioxide emissions.  *See AEP*, 564 U.S. at 427 (noting that

16 the Clean Air Act directs EPA to establish emissions standards for categories of stationary

17 sources that, "caus[e], or contribut[e] significantly to, air pollution which may reasonably be

18 anticipated to endanger public health or welfare").

19       Second, any state-law damages award here would necessarily be premised on a finding

20 that Defendants' production and promotion of energy resources was "unreasonable"—i.e., that

21 the harm to King County outweighed the social benefits of Defendants' conduct.  *Lakey v.*

22 *Puget Sound Energy, Inc.*, 176 Wash. 2d 909, 923 (2013) ("We determine the reasonableness

23 of a defendant's conduct by weighing the harm to the aggrieved party against the social utility

24 of the activity.").  And the Court could not make *that* determination without concluding that

25 the resulting greenhouse gas emissions were unreasonable, for emissions are the *sine qua non*

26 of Plaintiff's alleged injuries.  But the Court is prohibited from making any determination

27 about the reasonable level of greenhouse gas emissions because "Congress has entrusted the

28 [EPA] with the responsibility for making these scientific judgments, and [this Court] must

1  respect both Congress' decision and the Agency's ability to rely on the expertise that it

2  develops." *Lead Indus. Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1146 (D.C. Cir. 1980).

3        The Supreme Court has "admonished against the 'tolerat[ion]' of 'common-law suits

4  that have the potential to undermine [the federal] regulatory structure.'" *Cooper*, 615 F.3d at

5  303 (quoting *Ouellette*, 479 U.S. at 497). Plaintiff's proposed solution to the important issue

6  of global warming—an avalanche of litigation based on overlapping application of every

7  State's common law—presents a significant obstacle to the federal regulation of air pollution

8  because it would impose standards "whose content must await the uncertain twists and turns of

9  litigation," which "will leave whole states and industries at sea and potentially expose them to

10  a welter of conflicting court orders across the country." *Id.* at 301. This "could well lead to

11  increased air pollution," and "'[i]t is unlikely—to say the least—that Congress intended to

12  establish such a chaotic regulatory structure.'" *Id.* at 302 (quoting *Ouellette*, 479 U.S. at 497).

13  Moreover, Plaintiff's claims, which seek to label Defendants' production activities a public

14  nuisance, would frustrate Congress's objective of increasing fossil fuel extraction. *See*, *e.g.*,

15  42 U.S.C. §§ 13401, 13411, 13412, 13415, 15903, 15904, 15909, 15910.

16        Plaintiff's claims also second-guess the balance that these same federal statutes strike

17  between promoting energy production and protecting the environment. *See*, *e.g.*, 42 U.S.C.

18  § 13389(c)(1) (calling for development of "national strategy" to deploy "greenhouse gas

19  intensity reducing technologies and practices"); 42 U.S.C. § 5801 (Congressional purpose to

20  "develop, and increase the efficiency and reliability of use of, all energy sources" while

21  protecting "environmental quality"); 30 U.S.C. § 21a (Congressional purpose to encourage

22  "economic development of domestic mineral resources" balanced with "environmental

23  needs"); 30 U.S.C. § 1201 (coal mining operations are "essential to the national interest" but

24  must be balanced by "cooperative effort[s] . . . to prevent or mitigate adverse environmental

25  effects"). Plaintiff's claims are preempted because they interfere with this federal policy of

26  protecting the environment *and* promoting fossil-fuel extraction. *See Geier v. Am. Honda*

27  *Motor Co.*, 529 U.S. 861, 881 (2000) (tort claims preempted where they "would have

28  presented an obstacle to the variety and mix of devices that the federal regulation sought");

1   *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1060 (9th Cir. 2009) ("conflict preemption" exists

2   where claims are an "obstacle to the accomplishment and execution of the full purposes and

3   objectives of Congress").

4        Third, Plaintiff's claims implicate "uniquely federal interests" "committed by the

5   Constitution and laws of the United States to federal control," *Boyle*, 487 U.S. at 504,

6   including foreign relations and our nation's energy and national security policies.  *See supra*

7   IV.A.2–5, IV.B.1.  Plaintiff's claims are thus squarely preempted.

8        **5.  Plaintiff's claims are barred by the First Amendment**

9        Plaintiff seeks to hold Defendants liable for "affirmative[ly] advertising . . . fossil fuels

10   and downplaying global warming risks," FAC ¶ 154, as well as for funding scientific research,

11   "media attacks," and a newspaper editorial, *id.* ¶¶ 155–176.  But such speech is

12   constitutionally protected.  *See Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481–82 (1995)

13   (The First Amendment protects "the free flow of commercial information" (citation omitted));

14   *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) ("A consumer's concern for the free flow

15   of commercial speech often may be far keener than his concern for urgent political dialogue.").

16        Plaintiff's claims are also barred by the *Noerr-Pennington* doctrine, which immunizes

17   lobbying activity from civil liability.  *See E. R. R. Presidents Conference v. Noerr Motor*

18   *Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington,* 381 U.S. 657 (1965);

19   *see also White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) (confirming that the doctrine

20   "applies equally in all context," and not just antitrust).  The doctrine precludes liability based

21   on "publicity campaign[s] directed at the general public, seeking legislation or executive

22   action, . . . even when the campaign employs unethical and deceptive methods." *Allied Tube*

23   *& Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988).

24        Here, Plaintiff targets speech that is plainly protected by *Noerr-Pennington*.  For

25   example, Plaintiff alleges that Defendants engaged in "large-scale, sophisticated advertising

26   and communications campaigns . . . to portray fossil fuels as environmentally responsible and

27   essential to human well-being."  FAC ¶ 5.  Plaintiff also alleges that Defendants have

28   "sponsored communications campaigns . . . to deny and discredit the mainstream scientific

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM
    28
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1   consensus on global warming, downplay the risks of global warming, and even to launch

2   unfounded attacks on the integrity of leading climate scientists." *Id.* ¶ 6.  These

3   communications campaigns were allegedly directed by industry lobbying organizations,

4   including the Global Climate Coalition and the American Petroleum Institute.  *Id.* ¶¶ 155–159.

5   Although Plaintiff asserts that the "purpose" of these communication campaigns was simply

6   "to increase sales and protect market share," *id.* ¶ 7, the alleged conduct—taken as true—

7   describes an attempt to forestall regulation that would limit fossil fuel production.  *See id.*

8   ¶ 151 (alleging "campaign designed to convince the public that the science was too uncertain

9   to warrant fossil fuel reductions.").  Indeed, Plaintiff alleges that "[t]he campaign's purpose

10  and effect has been to help Defendants *continue to produce fossil fuels* and sell their products

11  on a massive scale." *Id.* ¶ 155 (emphasis added); *see id.* ¶ 160 (alleging that one Defendant

12  used "front groups to create uncertainties about basic climate change science" to "bolster

13  production of fossil fuels").

14      The Complaint also describes Defendants' alleged attempts to "discredit" and

15  "undermine the IPCC's 1995 and 2001 conclusions[.]"  *Id.* ¶ 162.  The Intergovernmental

16  Panel on Climate Change ("IPCC") was created to provide *governments* with information

17  about climate change, and any alleged criticism of "IPCC conclusions" would naturally have

18  been directed towards governments, not consumers.  Plaintiff also targets quintessential

19  lobbying activity when it alleges that Defendants produced "reports" "making the case for the

20  necessary role of fossil fuels," *id.* ¶ 174 and warning that "the costs of carbon dioxide

21  reductions are 'ultimately born by consumers and taxpayers,'" *id.* ¶ 173.  Arguments about the

22  role of fossil fuels in national energy policy are plainly directed to lawmakers and regulators

23  who are deciding whether to subsidize more expensive forms of energy.

24      Attempting to sidestep *Noerr-Pennington*, Plaintiff now disclaims any desire to impose

25  "liability for lobbying activity," and asserts that "to the extent any particular promotional

26  activity might have had dual goals of both promoting a commercial product in the marketplace

27  and influencing policy, Plaintiff invokes such activities for the purpose of the former, not the

28  latter, and/or as evidence relevant to show Defendants' knowledge of the dangerous nature of

1   their products." FAC ¶ 10.  But that is not how the First Amendment works.  "[E]xpression on

2   public issues 'has always rested on the highest rung of the hierarchy of First Amendment

3   values,'" *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 911 (1982) (citation omitted),

4   and where a defendant engages in such "constitutionally protected activity"—such as

5   advocating against regulation—the First Amendment prohibits liability based on that conduct

6   *even if* that conduct had dual purposes, *id.* at 916–17.  Because Plaintiff's claims turn, in part,

7   on speech immunized by *Noerr-Pennington*, they must be dismissed.

8      **C.   The Amended Complaint Does Not Allege Viable State-Law Claims**

9        Even if Plaintiff's claims arose under state law and were not defeated by numerous

10   federal doctrines, the claims would still fail.  Most notably, Plaintiff has unclean hands to the

11   extent it has contributed to, and benefited from, the conduct for which it seeks to hold

12   Defendants liable.  *See Retail Clerks Health & Welfare Tr. Funds v. Shopland Supermarket,*

13   *Inc.*, 96 Wash. 2d 939, 949 (1982) ("'He who seeks equity must do equity,' and 'he who

14   comes into equity must come with clean hands.'").  Notwithstanding Plaintiff's asserted

15   commitment "to do its part" to reduce (but not eliminate) *future* greenhouse gas emissions,

16   FAC ¶ 195, Plaintiff, like every other city and county in the country, has "benefit[ed] from and

17   participate[d] in the use of fossil fuels as a source of power, and has done so for many

18   decades."  *New York*, 2018 WL 3475470, at *5.  Moreover, Plaintiff cannot state a claim for

19   relief under either of its state-law causes of action.

20       **1.   Plaintiff fails to state a public nuisance claim.**

21        Washington law defines a nuisance as an "unreasonable interference with another's use

22   and enjoyment of property."  *Kitsap County v. Allstate Ins. Co.*, 136 Wash. 2d 567 (1998);

23   Wash. Rev. Code § 7.48.120.  Recognizing the potential for nuisance law to be interpreted

24   overbroadly, the Washington legislature has sought to exercise "legislative control over public

25   nuisance."  *Chelan Basin Conservancy v. GBI Holding Co.*, 194 Wash. App. 478, 492 (2016).

26   Washington law thus "explicitly" provides that "[n]othing which is done or maintained under

27   the express authority of a statute, can be deemed a nuisance."  *Id.*  (quoting Wash. Rev. Code

28

1   § 7.48.160); *see also Asche v. Bloomquist*, 132 Wash. App. 784 (2006) (permit issued in

2   accordance with County's zoning ordinance precluded public nuisance claim).

3          Plaintiff's claims are precluded because Washington law explicitly authorizes the

4   conduct targeted by Plaintiff's claims—fossil-fuel production, promotion, and sale.  The State

5   has declared it "to be in the public interest to foster, encourage, and promote the exploration,

6   development, production, and utilization of oil and gas in the state in such manner as will

7   prevent waste," and "to authorize and to provide for the operation and development of oil and

8   gas properties in such manner as to assure that the maximum economic recovery of oil and gas

9   may be obtained and the rights of owners thereof fully protected[.]"  Wash. Rev. Code

10  § 78.52.001.  "To assist in the development of oil and gas in this state and to further the

11  purposes of this chapter," Washington allows owners of separate properties to "operate" and

12  "develop their land as a unit."  *Id.* § 78.52.330.  And the State's Department of Natural

13  Resources "is authorized to lease public lands for the purpose of prospecting for, developing,

14  and producing oil, gas, or other hydrocarbon substances."  *Id.* § 79.14.020; *see also* Wash.

15  Admin. Code § 332-12-220 (authorizing the Commissioner of Public Lands to lease those

16  lands for the purpose of oil and gas extraction); Wash. Admin. Code § 332-12-260 (requiring

17  oil and gas lessees to "produce oil, gas or associated substances in paying quantities from the

18  leased lands").  Even King County's Comprehensive Plan includes "policies to preserve

19  opportunities for mining and to assure extractive industries maintain environmental quality and

20  minimize impacts to adjacent land uses."  King Co. Ordinance LU-18.  The "goal" of these

21  policies is "to facilitate the efficient utilization of *valuable* mineral, oil, and gas deposits when

22  consistent with maintaining environmental quality and minimizing impacts."  *Id.* (emphasis

23  added).

24         Because fossil-fuel extraction has been expressly authorized, and even encouraged, by

25  the State, Defendants' conduct—the mere production/extraction of fossil fuels—cannot be a

26  nuisance.  *See Chelan Basin*, 194 Wash. App. at 489–93 (looking to the legislative intent

27  underlying the Shoreline Management Act, and finding the Act extinguished nuisance claims

28

1  for preexisting landfills).[15]  Even absent such specific authorization, Plaintiff has failed to

2  plead an *unreasonable* interference with the enjoyment of land.  Under Washington law, the

3  "reasonableness of a defendant's conduct" is determined by "weighing the harm to the

4  aggrieved party against the social utility of the activity." *Lakey*, 176 Wash. 2d at 923.  Here

5  Plaintiff has failed to allege *any* substantial injury.  Rather, Plaintiff speculates about potential

6  injuries from global warming that may or may not occur over the next 80 years.  *See* FAC

7  ¶¶ 138, 177–200.[16]  But "[t]o qualify for relief, [Plaintiff] must be able to point to more than a

8  'mere danger of future harm, unaccompanied by present damage.'"  *Brewer v. Lake Easton*

9  *Homeowners Ass'n*, 2 Wash. App. 2d 770, 780–81 (2018) (quoting *Gazija v. Nicholas Jerns*

10  *Co.*, 86 Wash. 2d 215, 219 (1975)).  The Complaint contains exactly two paragraphs alleging

11  actual—as opposed to speculative—injury to the County.  FAC ¶¶ 201–202.  The first

12  paragraph alleges only that some areas above the mean high tide line—*i.e.* areas that are

13  occasionally inundated—are now subject to "regular inundate[ion]." *Id.* ¶ 201.  But "minor

14  water intrusion" does not constitute "significant injury or appreciable harm." *Grundy*, 151

15  Wash. App. at 568.  And Plaintiff does not explain how the alleged change in inundation

16  regularity is interfering with its "use and enjoyment" of its property, instead resorting, once

17  again, to speculation about future harms.  FAC ¶ 201 (alleging that sea level rise will "grow

18  worse" and that "eventually portions of coastal areas owned by the County may be

19  continuously submerged").  The second paragraph asserts that the "harms" from global

20  warming "include encroachments upon and interferences with the County's property . . . , as

21  well as injuries to public health[.]" *Id.* ¶ 202.  But that is a legal conclusion—*i.e.,* a statement

22

23  [15] Although a defendant can be held liable if its conduct "deviate[d] in some way from its initial authorization," *Chelan Basin Conservancy*, 194 Wash. App. at 493, Plaintiff has not alleged any deviation here.  Nor has Plaintiff

24  alleged that Defendant's authorized conduct occurred in "an inappropriate place," or was conducted in an "improper manner." *Kitsap County v. Kitsap Rifle and Revolver Club*, 184 Wash. App. 252, 277 (2014).

25  Plaintiff's claims attempt to control *whether* authorized conduct can occur at all, and Washington law does not (and cannot) sanction that view of nuisance.

26  [16] The Complaint includes 22 paragraphs discussing the "expected impacts" of global warming, FAC ¶ 182, the "future coastal impacts" of sea level rise, *id.* ¶ 186, projected changes in ocean acidity, *id.* ¶ 187, "projected

27  climate impacts" on King County, *id.* ¶ 188, and the "potential" health effects of global warming, *id.* ¶ 191. These alleged future harms are so nebulous that the County claims to need "additional study" to determine the scope of these impacts and how best to prepare for them. *Id.* ¶ 190; *see also id.* ¶ 198 ("King County must plan

28  for and adapt to future harms[.]").

that Defendants have created a nuisance—that the Court need not accept as true. *Ashcroft*, 556 U.S. at 678.

On the other side of the scale is the "development of our modern world," which has "literally been fueled by oil and coal," *Oakland*, 2018 WL 3109726, at *5. Given the overwhelming disparity between Plaintiff's alleged injuries and the incalculable benefits of fossil fuel extraction, Defendants' conduct was clearly reasonable. Accordingly, Plaintiff has failed to state a nuisance claim that is "plausible on its face." *Ashcroft* 556 U.S. at 678.[17]

The public nuisance claim also fails because Plaintiff seeks to apply Washington nuisance law extraterritorially. It is a "basic premise of our legal system" that "[a]bsent clearly expressed [legislative] intent to the contrary, . . . laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016) (citation omitted). Washington courts have embraced this presumption when applying State statutes. *See Grennan v. Crowley Marine Servs., Inc.*, 116 P.3d 1024, 1029 (Wash. Ct. App. 2005) (discussing the presumption against extraterritoriality). In its codification of the common law nuisance tort, the Washington legislature did not rebut this presumption, and "no court has ever sanctioned [the statute's] extraterritorial application." *Anderson v. Teck Metals, Ltd.*, 2015 WL 59100, at *11 (E.D. Wash. Jan. 5, 2015) (finding that Washington's nuisance statute did not apply to defendant's "activities in Canada").

Yet Plaintiff would have this Court apply Washington's nuisance statute to Defendants' worldwide "production and promotion of massive quantities of fossil fuels" over the last hundred years. And though Plaintiff asserts that each Defendant does business in Washington, nearly all of the conduct alleged in the Complaint occurs outside the State. FAC ¶ 143(f) ("Chevron, Exxon, BP, and ConocoPhillips produce significant amounts of fossil fuels from tar sands in Canada"); ¶ 34 (BP "'sanctioned three exciting new [exploration]

---

[17] In *Oakland*, the plaintiffs contended that the judge "need not weigh or consider the social utility of defendant's conduct," because "global warming constitutes a nuisance as a matter of law." 2018 WL 3109726, at *7. The court rejected that argument, holding that it could not "ignore the public benefits derived from defendants' conduct in adjudicating plaintiffs' claims." *Id.* at *7–8 (citing Restatement (Second) of Torts §§ 821B, 826, and 829A). The Court dismissed the claims, holding that the "adjustment of conflicting pros and cons ought to be left to Congress or diplomacy." *Id.*

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

33

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1  projects in Trinidad, India, and the Gulf of Mexico"); ¶ 42 ("BP also operates in Alaska"); ¶ 71

2  (Chevron "produces oil in Alaska"); ¶ 82 ("ConocoPhillips is Alaska's largest oil producer");

3  ¶¶ 169, 172 (detailing Defendants' promotion of fossil fuels over the internet).  Plaintiff

4  alleges, in effect, that the worldwide production and promotion of fossil fuels have caused a

5  nuisance admittedly global in scope: "Defendant[s have] increased the *global* temperature and

6  contributed to sea level rise."  ¶ 141 (emphasis added).  If Washington's nuisance statute

7  cannot reach activities just across the border in Canada, *see Teck*, it certainly cannot be applied

8  to fossil-fuel production occurring around the world.

9  **2.  Plaintiff fails to state a trespass claim**

10  Plaintiff's failure to state a nuisance claim dooms its trespass claim, as "there is little

11  remaining difference between trespass and nuisance."  *Gaines v. Pierce Cty.*, 66 Wash. App.

12  715, 719 (1992) (citing *Bradley v. Am. Smelting & Refining Co.*, 104 Wash. 2d 677, 684

13  (1985)).  "Both hinge on an invasion of plaintiff's interest in property," and "[t]he distinction

14  between direct and indirect invasions has been abandoned."  *Id.* (citation omitted).

15  Plaintiff alleges that Defendants are liable for intentional trespass.  FAC ¶ 216.

16  "Intentional trespass occurs only where there is: '(1) an invasion of property affecting an

17  interest in exclusive possession, (2) an intentional act, (3) reasonable foreseeability that the act

18  would disturb the plaintiff's possessory interest, and (4) actual and substantial damages.'"

19  *Grundy v. Brack Family Tr.*, 151 Wash. App. 557, 567–68 (2009) (citation omitted).  Plaintiff

20  cannot satisfy these elements.

21  As an initial matter, the Complaint fails to allege any invasion of Plaintiff's property,

22  much less actual and substantial damages.  Rather, the Complaint speculates at length about

23  *future* invasions that may occur as a result of global warming.  *See* FAC ¶¶ 177–200, and the

24  damages that *are* alleged are legally insufficient, *see supra* IV.C.1.  In *Grundy*, a property

25  owner alleged that sea water was splashing onto her property because her neighbors raised the

26  height of their bulkhead.  151 Wash. App. at 561.  The plaintiff alleged that although "some

27  wave splash entered [her] property during winter months before the [defendants] raised their

28  bulkhead, the intensity and amount of the invasion from this splash increased after the

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                34

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1  [defendants'] bulkhead was raised." *Id.* at 561.  The court held that the fact that the

2  defendant's "seawall caused the water to enter Grundy's property does not, without more,

3  create liability for trespass," because the defendant's conduct did not "cause actual and

4  substantial injury." *Id.* at 570.  The allegations of damages here are equally insubstantial.

5    The Complaint also fails to plausibly suggest that it was reasonably foreseeable that

6  Defendants' "intentional" acts—*i.e.*, producing fossil-fuels—would disturb Plaintiff's

7  possessory interest.  *Brutsche v. City of Kent*, 164 Wash. 2d 664, 674 n.7 (2008).  Although

8  Plaintiff alleges that Defendants knew their conduct would lead to global warming, they do not

9  (and could not) allege that Defendants were "substantially certain that the trespass would result

10  from [their] intentional actions." *Grundy*, 151 Wash. App. at 569 (citing *Brutche v. City of*

11  *Kent*, 164 Wash. 2d 664, 674 n.7 (2008)).  Even if Defendants were aware that the combustion

12  of fossil fuels contributes to global warming, they could not have known with "substantial

13  certainty that [the] particular consequence" alleged here—flooding in King County—would

14  "result from [their] act[s]." *Evarone v. Lease Crutcher Lewis*, 167 Wash. App. 1009 (2012);

15  *see also Bradley*, 104 Wash. 2d at 683 (a defendant will be held to have intended an act

16  "where a reasonable man in the defendant's position would believe that *a particular result* was

17  substantially certain to follow") (emphasis added).  Plaintiff would apparently hold Defendants

18  liable based solely on their alleged knowledge that fossil-fuel combustion causes global

19  warming.  But that "breathtaking" theory of liability "would reach the sale of fossil fuels

20  anywhere in the world, including all past and otherwise lawful sales, where the seller knew

21  that the combustion of fossil fuels contributed to the phenomenon of global warming."

22  *Oakland*, 2007 WL 3109726, at *4.

23    The trespass claim also fails because Defendants' conduct was "privileged." *Matter of*

24  *Harvey*, 3 Wash. App. 2d 204, 216 (2018) ("Conduct that would otherwise constitute a

25  trespass is not a trespass if it is privileged.") (citing Restatement (Second) of Torts § 158, cmt.

26  e).  "A privilege may derive from the consent of the possessor or may be given by law because

27  of the purpose for which the actor acts." *Id.*  As discussed above, Defendants' conduct is fully

28  authorized (and encouraged) by federal, state, and local law.  *See supra* IV.A.3, IV.C.1.

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

35

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

Moreover, although Plaintiff alleges that it did not grant Defendants "permission" to engage in the allegedly tortious conduct, FAC ¶ 222, Plaintiff has purchased and used substantial amounts of fossil fuels for decades to power its fleet of cars, schools, jails, courts, office buildings, street lights, etc.  And Plaintiff admits that the consequences of fossil-fuel combustion have been publicly known for decades.  *Id.* ¶¶ 122–139.  Accordingly, accepting the truth of Plaintiff's factual allegations, Plaintiff has impliedly consented to the very conduct it now targets—the production, marketing, and sale of "massive quantities of fossil fuels . . . all with knowledge . . . that doing so would lead to climate change-related injuries." *Id.* ¶ 222. Plaintiff has thus failed to state a claim for trespass.

### 3. Plaintiff's allegations fail to plausibly suggest that Defendants proximately caused the alleged injuries

To prevail on a public nuisance or trespass claim in Washington, a plaintiff must establish that the defendant's alleged misconduct was the "proximate cause" of the plaintiff's injuries.  *Re v. Tenney*, 56 Wash. App. 394, 398 (1989).  "Washington law recognizes two elements to proximate cause:  Cause in fact and legal causation." *Hartley v. State*, 103 Wash. 2d 768, 777–78 (1985).  "Cause in fact refers to the 'but for' consequences of an act— the physical connection between an act and injury." *Id.* at 778.  "If an event would have occurred regardless of a defendant's conduct, that conduct is not the proximate cause of the plaintiff's injury." *Davis v. Globe Mach. Mfg. Co., Inc.*, 102 Wash. 2d 68, 74 (1984).  "Legal causation, on the other hand, rests on policy considerations as to how far the consequences of defendant's acts should extend." *Id.*  It "focuses on whether the connection between the defendant's act and the result is too remote or inconsequential to impose liability." *Garcia v. State, Dep't of Transp.*, 161 Wash. App. 1, 15 (2011) (citing *Hartley*, 103 Wash. 2d at 778– 79).  Plaintiff has not alleged facts plausibly supporting either element.

With respect to cause in fact, Plaintiff does not allege that its alleged injuries from sea rise would not have occurred if any Defendant had altered its behavior and stopped producing fossil fuel products, reduced production, or warned the public about the possible risks.  Nor could it, as the "undifferentiated nature of greenhouse gas emissions from all global sources

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

36

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1    and their worldwide accumulation over long periods of time . . . make[] clear that there is no

2    realistic possibility of tracing any particular alleged effect of global warming to any particular

3    [action] by any specific person, entity, [or] group at any particular point in time." *Kivalina*,

4    663 F. Supp. 2d at 880; *see also Amigos Bravos v. U.S. Bureau of Land Mgmt.*, 816 F. Supp.

5    2d 1118, 1135 (D.N.M. 2011) ("[C]limate change is dependent on an unknowable multitude of

6    [greenhouse gas] sources and sinks, and it is impossible to say with any certainty that

7    Plaintiffs' alleged injuries were the result of any particular action or actions by Defendants.").

8         Even if Defendants' productions were considered cumulatively, the allegations fail to

9    demonstrate that Plaintiff's injuries would not have arisen but for Defendants' conduct.

10   Plaintiff concedes that nearly 90% of emissions from industrial sources are *not* attributable to

11   Defendants, FAC ¶ 143(c), and that more than 85 percent of "the increase in global mean

12   surface temperature from 1880–2010" is attributable to *other* sources, *id.* ¶ 141.  Although

13   Plaintiff asserts that Defendants are "five of the ten largest producers," *id.* ¶ 140, they have not

14   sued the third, fifth, seventh, eighth, or tenth largest producers, nor any one of the thousands of

15   smaller producers that supply the vast majority of the world's fossil fuels.  These unnamed

16   producers—many of which are OPEC members that have voluntarily *limited* their production

17   for decades—would almost certainly have increased production to meet worldwide demand for

18   fossil fuels had Defendants decreased their extraction and production activities.  Accordingly,

19   Plaintiff has not alleged (and cannot prove) that worldwide emissions would have been

20   materially lower—and thus that global warming would not have occurred or that sea levels

21   would not have risen—but for Defendants' conduct.  *See Gaines*, 66 Wash. App. at 722–23

22   ("Cause in fact is not established if plaintiff's injury would have occurred without defendant's

23   breach of duty"); *cf. Sierra Club v. U.S. Def. Energy Support Ctr.*, 2011 WL 3321296, at *5

24   (E.D. Va. July 29, 2011) (allegations failed to show that "if there had been a reduction in the

25   amount of greenhouse gases emitted by producers of fuel from oil sands crude, those

26   reductions would not have been offset by increased emissions elsewhere on the planet").

27        The Court should also dismiss because Defendants' conduct is too "remote and

28   insubstantial to impose liability." *Garcia*, 161 Wash. App. at 15; *see also Benefiel v. Exxon*

1   *Corp.*, 959 F.2d 805, 807 (9th Cir. 1992) (affirming dismissal where alleged damages were

2   "remote and derivative" and defendants' conduct "did not directly cause [plaintiffs] any

3   injury"); *Ass'n of Wash. Pub. Hosp. Dist. v. Philip Morris Inc.*, 241 F.3d 696, 706 (9th Cir.

4   2001) (affirming dismissal of Washington-law public nuisance claims alleging increased

5   healthcare costs from tobacco sales, because the alleged damages were too remote from the

6   alleged misconduct and initial injury).  Plaintiff's claims are "dependent on a series of events

7   far removed both in space and time from the Defendants'" alleged misconduct.  *Kivalina*, 663

8   F. Supp. 2d at 881.  Indeed, Plaintiff seeks to hold Defendants liable for conduct that allegedly

9   began in *the mid Nineteenth Century*.  FAC ¶ 143(b).

10       Moreover, Plaintiff's alleged injuries have arisen (or will arise) only because countless

11   intervening users, including Plaintiff itself, combusted fossil fuels for transportation,

12   electricity, or heat, and the greenhouse gases those users emitted mixed with the aggregated

13   emissions of billions of other users from around the world for many decades to increase the

14   concentration of greenhouse gases in the atmosphere.  Plaintiff's claims thus flout the

15   "uniformly accepted principle[] of tort law" that the plaintiff must "prove more than that the

16   defendant's action triggered a series of other events that led to the alleged injury." *Benefiel*,

17   959 F.2d at 807; *see also Comer v. Murphy Oil USA, Inc.*, 839 F. Supp. 2d 849, 868 (S.D.

18   Miss. 2012) (the "assertion that [defendants'] emissions combined over a period of decades or

19   centuries with other natural and man-made gases to cause or strengthen a hurricane and

20   damage personal property is precisely the type of remote, improbable, and extraordinary

21   occurrence that is excluded from liability."); *Amigos Bravos*, 816 F. Supp. 2d at 1136; *Sierra*

22   *Club*, 2011 WL 3321296, at *5; *Kivalina*, 696 F.3d at 868 (Pro, J., concurring).

23       **4.  No remedy is available**

24       "The relief for nuisance may be either damages or injunction."  *Asche v. Bloomquist*,

25   132 Wash. App. 784, 800 (2006).  Plaintiff has not requested injunctive relief, and it is not

26   entitled to damages because it has not alleged any actual injury.  *See supra* IV.C.1–2.

27       Plaintiff alternatively seeks "hundreds of millions of dollars" for an abatement fund

28   that will ostensibly be used to pay for infrastructure projects—such as drainage pipes, culverts,

1    bridges, roads, and waste treatment plants—to mitigate the impacts of rising seas and heavier

2    rains. FAC ¶¶ 190, 213. Plaintiff also wants Defendants to subsidize public health services,

3    community clinics, and "surveillance systems," which will allegedly be needed to address the

4    future impacts of global warming. *Id.* ¶ 191–192. But Plaintiff's request for an "abatement

5    fund" has no basis in Washington law. Indeed, a search for the term "abatement fund" in

6    Washington cases returns exactly zero results. It would be inappropriate for this Court, sitting

7    in diversity, to create a new remedy that has never been recognized by any Washington court.

8       **D. Plaintiff's Claims Violate the Separation of Powers**

9          Plaintiff asks this Court to decide whether the extraction and production of fossil fuels

10   worldwide is "unreasonable" given its alleged connection to global warming and the potential

11   that such warming will lead to future harms. But the judgment they seek is not within "the

12   proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler

13   Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Absent legislative authorization, courts are "without

14   competence" to address matters "of high policy," such as global warming, *Diamond v.

15   Chakrabarty*, 447 U.S. 303, 317–18 (1980), and they lack authority to "formulate national

16   policies or develop standards for matters not legal in nature," *Japan Whaling Ass'n v. Am.

17   Cetacean Soc'y*, 478 U.S. 221, 230 (1986). Matters of global concern, such as rising seas

18   allegedly caused by worldwide emissions, are "committed by the Constitution to the political

19   departments of the Federal Government." *United States v. Pink*, 315 U.S. 203, 222–23 (1942).

20   For this reason, "the political branches have … made foreign policy determinations regarding

21   the United States' role in the international concern about global warming." *Gen. Motors*, 2007

22   WL 2726871, at *14; *see also Oakland*, 2018 WL 3109726, at *7 ("The United States is also

23   engaged in active discussions with other countries as to whether and how climate change

24   should be addressed through a coordinated framework."); *New York*, 2018 WL 347570, at *6–

25   7. Accordingly, global warming-based tort claims cannot be adjudicated without dragging the

26   Court "into precisely the geopolitical debate more properly assigned to the coordinate

27   branches." *Gen. Motors*, 2007 WL 2726871, at *10; *see also Kivalina*, 663 F. Supp. 2d at

28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

39

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1   876–77; *Comer*, 839 F. Supp. 2d at 865.[18]

2        The claims are also ill-suited for judicial resolution because, unlike Congress, which

3   may weigh competing policy interests, courts "must be governed by *standard, by rule*." *Vieth*

4   *v. Jubelirer*, 541 U.S. 267, 278 (2004) (plurality). But global-warming-related tort "claims

5   require a balancing of policy concerns—including the harmful effects of greenhouse gas

6   emissions, our industrialized society's dependence on fossil fuels, and national security,"

7   *Oakland*, 2018 WL 3109726, at *6—and there are no judicial standards to make that

8   assessment. *See Kivalina*, 663 F. Supp. 2d at 874–75.

9        There is also no "manageable method of discerning the entities that are creating and

10  contributing to the alleged nuisance" because "there are multiple worldwide sources of

11  atmospheric warming across myriad industries and multiple countries." *Gen. Motors*, 2007

12  WL 2726871, at *15. And regarding remedies, there is no "guidance" for "determining who

13  should bear the costs associated with the global climate change that admittedly result from

14  multiple sources around the globe." *Id.*; *Oakland*, 2018 WL 3109726, at *5 ("Having reaped

15  the benefit of [the] historic progress" made possible by fossil fuels, "would it really be fair to

16  now ignore our own responsibility in the use of fossil fuels and place the blame for global

17  warming on those who supplied what we demanded?"). Accordingly, "the allocation of

18  fault—and cost—of global warming is a matter appropriately left for determination by the

19  executive or legislative branch." *Kivalina*, 663 F. Supp. 2d at 877.

20                        **V.    CONCLUSION**

21        For the foregoing reasons, Plaintiff's claims should be dismissed with prejudice.

22

23  [18] Congress has engaged in robust debate about the potential harms of global warming and the economic and
    political consequences of regulating greenhouse gases. *The National Climate Program Act: Hearing Before the
    Subcomm. on the Env't & the Atmosphere of the H. Comm. on Sci. & Tech.*, 94th Cong. 29 (1976); *Global

24  Warming: Hearing Before the Subcomm. on Toxic Substances & Envtl. Oversight of the S. Comm. on Env't &
    Pub. Works*, 99th Cong. 2 (1985); *Global Climate Change: Hearings Before the S. Comm. on Energy & Nat. Res.*,

25  102d Cong. 208 (1992); *Energy Policy Act of 2005: Hearings Before the Subcomm. on Energy & Air Quality of
    the H. Comm. on Energy & Commerce*, 109th Cong. (2005); Endangerment and Cause or Contribute Findings for

26  Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496 (Dec. 15, 2009). The EPA
    has similarly balanced the costs and benefits of regulating greenhouse gases. *See* Light-Duty Vehicle Greenhouse

27  Gas Emission Standards and Corporate Average Fuel Economy Standards, 75 Fed. Reg. 25,324 (May 7, 2010);
    2017–2025 Model Year Light-Duty Vehicle GHG Emissions and CAFE Standards: Supplemental Notice of

28  Intent, 76 Fed. Reg. 48,758 (Aug. 9, 2011).

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                    40

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

DATED this 31st day of August, 2018.

By: */s/ Angelo J. Calfo*
    */s/ Theodore V. Wells, Jr.*
    */s/ Daniel J. Toal*
    */s/ Jaren E. Janghorbani*
    */s/ Dawn Sestito*
    */s/ M. Randall Oppenheimer*

Angelo J. Calfo, WSBA #27079
CALFO EAKES & OSTROVSKY PLLC
1301 Second Avenue, Suite 2800
Seattle, WA 98101
Telephone: (206) 407-2200
Facsimile: (206) 407-2224
E-mail: angeloc@calfoeakes.com

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Jaren E. Janghorbani (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-Mail: twells@paulweiss.com
E-Mail: dtoal@paulweiss.com
E-Mail: jjanghorbani@paulweiss.com

M. Randall Oppenheimer (*pro hac vice forthcoming*)
Dawn Sestito (*pro hac vice forthcoming*)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA  90071-2899
Telephone:  (213) 430-6000
Facsimile:  (213) 430-6407
E-Mail:  roppenheimer@omm.com
E-Mail:  dsestito@omm.com

*Attorneys for Defendant EXXON MOBIL CORPORATION*

By: ***/s/ Theodore J. Boutrous, Jr.*
    */s/ Joshua S. Lipshutz*
    */s/ Robert M. McKenna*
    */s/ Adam Nolan Tabor*
    */s/ Herbert J. Stern*
    */s/ Joel M. Silverstein*
    */s/ Neal S. Manne*
    */s/ Erica Harris*

Theodore J. Boutrous, Jr. (*pro hac vice*)
Joshua S. Lipshutz (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  (213) 229-7000
Facsimile:  (213) 229-7520
E-mail:  tboutrous@gibsondunn.com
E-mail:  jlipshutz@gibsondunn.com

Robert M. McKenna (WSBA No. 18327)
Adam Nolan Tabor (WSBA No. 50912)
ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Ave., Suite 5600
Seattle, WA 98104
Telephone:  (206) 839-4300
Facsimile:  (206) 839-4301
E-mail:  rmckenna@orrick.com
E-mail:  atabor@orrick.com

Herbert J. Stern (*pro hac vice*)
Joel M. Silverstein (*pro hac vice*)
STERN & KILCULLEN, LLC
325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, NJ 07932-0992
Telephone:  (973) 535-1900
Facsimile:  (973) 535-9664
E-mail:  hstern@sgklaw.com
E-mail:  jsilverstein@sgklaw.com

Neal S. Manne (*pro hac vice*)
Erica Harris (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666
E-mail:  nmanne@susmangodfrey.com
E-mail:  eharris@susmangodfrey.com

*Attorneys for Defendant CHEVRON CORPORATION*

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

41

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1

2   ** Pursuant to this Court's Electronic Filing
    Procedure III.L, the electronic signatory has
3   obtained approval from all other signatories

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM                42

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

By: */s/ Jonathan W. Hughes*
    */s/ Matthew T. Heartney*
    */s/ John D. Lombardo*
    */s/ Phillip H. Curtis*
    */s/ Nancy Milburn*

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA  94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
E-mail:  jonathan.hughes@apks.com

Matthew T. Heartney (*pro hac vice*)
John D. Lombardo (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA  90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail:  matthew.heartney@apks.com
E-mail:  john.lombardo@apks.com

Philip H. Curtis (*pro hac vice*)
Nancy Milburn (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8383
Facsimile: (212) 715-1399
E-mail:  philip.curtis@apks.com
E-mail:  nancy.milburn@apks.com

*Attorneys for Defendant BP P.L.C.*

*s/ Eric P. Tuttle*
*/s/ Jerome C. Roth*
*/s/ Daniel P. Collins*
*/s/ Elizabeth A. Kim*
*/s/ David C. Frederick*
*/s/ Brendan J. Crimmins*
*/s/ David K. Suska*
*/s/ Erika Holsman*

Eric P. Tuttle (WSBA No. 46820)
Daniel P. Collins (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
E-mail: eric.tuttle@mto.com

Jerome C. Roth (*pro hac vice*)
Elizabeth A. Kim (*pro hac vice*)
MUNGER TOLLES & OLSON (SF)
560 Mission Street, 27th Floor
San Francisco, CA  94105-2907
Telephone: (415) 512-4089
Facsimile: (415) 512-4077
Email: jerome.roth@mto.com
Email: elizabeth.kim@mto.com

David C. Frederick (*pro hac vice*)
Brendan J. Crimmins (*pro hac vice*)
David K. Suska (*pro hac vice*)
KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC
1615 M St. NW, Suite 400
Washington, D.C.  20036
Telephone: (202) 326-7972
Facsimile: (202) 326-7999
Email: bcrimmins@kellogghansen.com

Erika Holsman (WSBA No. 46992)
BEVERIDGE & DIAMOND PC
600 University Street, Suite 1601
Seattle, WA  98101
Telephone: (206) 315-4800
Facsimile: (206) 315-4801
Email: eholsman@bdlaw.com

*Attorneys for Defendant ROYAL DUTCH SHELL PLC*

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

43

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1   By: */s/ Katherine A. Christofilis*
       */s/ Adam Rosenberg*
2       */s/ Sean C. Grimsley*
       */s/ Jameson R. Jones*
3       */s/ Tracie J. Renfroe*
       */s/ Carol M. Wood*

4

5   Adam Rosenberg, WSBA #39256
   Katherine A. Christofilis, WSBA #42584
6   WILLIAMS, KASTNER & GIBBS PLLC
   601 Union Street, Suite 4100
   Seattle, WA 98101-2380
7   Telephone:  (206) 628-6600
   Facsimile:  (206) 628-6611
8   E-mail:  arosenberg@williamskastner.com
   E-mail:  kchristofilis@williamskastner.com

9

10  Sean C. Grimsley (*pro hac vice*)
   Jameson R. Jones (*pro hac vice*)
   Alex J. Harris (*pro hac vice*)
11  BARTLIT BECK HERMAN
   PALENCHAR & SCOTT LLP
12  1801 Wewatta St., Suite 1200
   Denver, CO 80202
13  Telephone:   (303) 592-3123
   Facsimile:    (303) 592-3140
14  Email:  sean.grimsley@bartlit-beck.com
   Email:  jameson.jones@bartlit-beck.com
15  Email:  alex.harris@bartlit-beck.com

16  Tracie J. Renfroe (*pro hac vice*)
   Carol M. Wood (*pro hac vice*)
17  KING & SPALDING LLP
   1100 Louisiana Street, Suite 4000
18  Houston, TX 77002
   Telephone: (713) 751-3200
19  Facsimile: (713) 751-3290
   E-mail:  trenfroe@kslaw.com
20  E-mail:  cwood@kslaw.com

21  *Attorneys for Defendant CONOCOPHILLIPS*

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISMISS
FOR FAILURE TO STATE A CLAIM

44