1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

WESTERN DISTRICT OF WASHINGTON

10

AT SEATTLE

11 | KING COUNTY,

12 |                Plaintiff,

13 |      v.

14 | BP P.L.C., a public limited company of      Case No. 2:18-cv-00758RSL
    England and Wales, CHEVRON

15 | CORPORATION, a Delaware corporation,     **NOTICE OF SUPPLEMENTAL**
    CONOCOPHILLIPS, a Delaware             **AUTHORITY**

16 | corporation, EXXON MOBIL
    CORPORATION, a New Jersey corporation,

17 | ROYAL DUTCH SHELL PLC, a public
    limited company of England and Wales, and

18 | DOES 1 through 10,

19 |              Defendants.

20
21
22
23
24
25
26
27
28

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

## NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants write to inform the Court of *City of New York v. Chevron Corp., et al.*, No. 18-2188, __ F.3d __, 2021 WL 1216541 (2d Cir. Apr. 1, 2021), in which the Second Circuit affirmed the dismissal of an action brought by the City of New York that, like this one, sought to hold energy producers liable for climate change-related harms under state tort law.[1] A copy of *City of New York* is attached hereto. Most notably, the Second Circuit held: (1) plaintiff's claims seeking damages for the alleged impacts of global climate change "must be brought under federal common law," *id.* at *9, and (2) federal common law does not provide plaintiff a viable cause of action because "the Clean Air Act displaces the [plaintiff's] common law damages claims," *id.* at *10 (citing *American Electric Power Co. v. Connecticut*, 564 U.S. 410, 427–28 (2011) ("*AEP*"); *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 857–58 (9th Cir. 2012)). The Second Circuit's decision is relevant for multiple reasons including, but not limited to, the following three points.

*First*, the Second Circuit held that the City of New York's purportedly state-law claims alleging climate change-related harms were in fact governed by federal common law. As the court explained, "Global warming presents a uniquely international problem of national concern," and "therefore is not well-suited to the application of state law." *Id.* at *1. The Second Circuit cautioned that, although "the City is not expressly seeking to impose a standard of care or emission restrictions on the Producers, the goal of its lawsuit is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)." *Id.* at *7. The court thus concluded that "[b]ecause it . . . 'implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations, this case poses the quintessential example of when federal common law is needed." *Id.* at *6.

---

[1] This Notice of Supplemental Authority is submitted subject to, and without waiver of, any defense, affirmative defense, or objection, including personal jurisdiction, insufficient process, or insufficient service of process.

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

The Second Circuit also rejected the City of New York's attempt to evade federal common law by recasting its claims as unrelated to emissions. Although the City insisted that its claims "concern[] only 'the production, promotion, and sale of fossil fuels,' not the regulation of emissions," the Second Circuit reasoned that "[i]t is precisely *because* fossil fuels emit greenhouse gases—which collectively 'exacerbate global warming'—that the City is seeking damages." *Id.* at *5. The court further emphasized that "[a]rtful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions." *Id.* "Put differently, the City's complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the City's harm. But the City cannot have it both ways." *Id.*

*Second*, *City of New York* held that "the Clean Air Act displaces the City's common law damages claims" with respect to domestic emissions because those "claims, if successful, would operate as a *de facto* regulation on greenhouse gas emissions," and "Congress has already 'spoken directly to th[at] issue' by 'empower[ing] the EPA to regulate [those very] emissions.'" *Id.* at *10 (citing *AEP*, 564 U.S. at 427–28; *Kivalina*, 696 F.3d at 857–58). Moreover, the court held that the displacement of federal common law by federal statute did not "resuscitate" the City's *state* common law claims, which never existed. The court of appeals explained that "where a federal statute displaces federal common law, it does so not 'in a field in which the [s]tates have traditionally occupied,' but one in which the states have traditionally *not* occupied." *Id.* at *12. As a result, "state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one." *Id.*

*Third*, the Second Circuit held that, to the extent the City's claims focused on foreign emissions, they fail because "condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern." *Id.* at *16 (citing *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018)). Especially in light of the federal government's ongoing diplomatic efforts to secure a

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue,
Los Angeles, CA 90071-3197
213.229.7000

1   global solution to global climate change, the court emphasized that "federal courts must

2   proceed cautiously when venturing into the international arena so as to avoid unintentionally

3   stepping on the toes of the political branches." *Id.*

4          In light of *City of New York*'s relevance to this action, Defendants intend to request the

5   opportunity to submit supplemental briefing on that case once the stay has been lifted pursuant

6   to the Order Continuing Stay dated April 8, 2021 (Dkt. #169).

7

8          DATED this 14th day of April, 2021.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: /s/ Angelo J. Calfo
  /s/ Theodore V. Wells, Jr.
  /s/ Daniel J. Toal

Angelo J. Calfo (WSBA #27079)
Gabriel Reilly-Bates (WSBA #52257)
CALFO EAKES LLP
1301 Second Avenue, Suite 2800
Seattle, WA 98101
Telephone: (206) 407-2200
Facsimile: (206) 407-2224
E-mail: angeloc@calfoeakes.com

Theodore V. Wells, Jr. (*pro hac vice*)
Daniel J. Toal (*pro hac vice*)
Yahonnes Cleary (*pro hac vice forthcoming*)
Caitlin Grusauskas (*pro hac vice forthcoming*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-Mail: twells@paulweiss.com
E-Mail: dtoal@paulweiss.com

*Attorneys for Defendant EXXON MOBIL
CORPORATION*

By: **/s/ Theodore J. Boutrous, Jr.
  /s/ Joshua S. Lipshutz
  /s/ Robert M. McKenna
  /s/ Herbert J. Stern
  /s/ Joel M. Silverstein
  /s/ Neal S. Manne
  /s/ Erica Harris

Theodore J. Boutrous, Jr. (*pro hac vice*)
Joshua S. Lipshutz (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  +213 229 7000
Facsimile:  +213 229 7520
E-mail:  tboutrous@gibsondunn.com
E-mail:  jlipshutz@gibsondunn.com

Robert M. McKenna (WSBA No. 18327)
ORRICK, HERRINGTON & SUTCLIFFE
LLP
701 Fifth Ave., Suite 5600
Seattle, WA 98104
Telephone:  +1 206 839 4300
Facsimile:  +1 206 839 4301
E-mail:  rmckenna@orrick.com

Herbert J. Stern (*pro hac vice*)
Joel M. Silverstein (*pro hac vice*)
STERN, KILCULLEN & RUFALO LLC
325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, NJ 07932-0992
Telephone:  +973 535 1900
Facsimile:  +973 535 9664
E-mail:  hstern@sgklaw.com
E-mail:  jsilverstein@sgklaw.com

Neal S. Manne (*pro hac vice*)
Erica Harris (*pro hac vice*)
Johnny W. Carter (*pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone:  713.651.9366
Facsimile:  713.654.6666
E-mail:  nmanne@susmangodfrey.com
E-mail:  eharris@susmangodfrey.com
E-mail:  jcarter@susmangodfrey.com

Steven M. Shepard (*pro hac vice*)
SUSMAN GODFREY LLP
1301 Avenue of the Americas
New York, NY 10019

Telephone: 212.729.2010
E-mail: sshepard@susmangodfrey.com

Kemper P. Diehl (WSBA #53212)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: 206.516.3880
Facsimile: 206.516.3883
E-mail: kdiehl@susmangodfrey.com

*Attorneys for Defendant CHEVRON
CORPORATION*

** Pursuant to this Court's Electronic Filing
Procedure III.L, the electronic signatory has
obtained approval from all other signatories

| | |
|---|---|
| 1 | By: /s/ Jonathan W. Hughes | By: /s/ Erika H. Spanton |
| 2 | /s/ Matthew T. Heartney | Erika H. Spanton (WSBA No. 46992) |
| 3 | /s/ John D. Lombardo | BEVERIDGE & DIAMOND, P.C. |

By: */s/ Jonathan W. Hughes*
    */s/ Matthew T. Heartney*
    */s/ John D. Lombardo*
    */s/ Nancy Milburn*

Jonathan W. Hughes (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
E-mail: jonathan.hughes@apks.com

Matthew T. Heartney (*pro hac vice*)
John D. Lombardo (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
777 South Figueroa Street, 44th Floor
Los Angeles, California 90017-5844
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
E-mail: matthew.heartney@apks.com
E-mail: john.lombardo@apks.com

Nancy Milburn (*pro hac vice*)
ARNOLD & PORTER KAYE SCHOLER
LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8383
Facsimile: (212) 715-1399
E-mail: philip.curtis@apks.com
E-mail: nancy.milburn@apks.com

*Attorneys for Defendant BP P.L.C.*

By: */s/ Erika H. Spanton*

Erika H. Spanton (WSBA No. 46992)
BEVERIDGE & DIAMOND, P.C.
600 University Street, Suite 1601
Seattle, WA 98101
Telephone: (206) 315-4815
E-mail: espanton@bdlaw.com

David C. Frederick (*pro hac vice*)
Grace W. Knofczynski (*pro hac vice*)
Daniel S. Severson (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
E-mail: dfrederick@kellogghansen.com
E-mail: gknofczynski@kellogghansen.com
E-mail: dseverson@kellogghansen.com

*Attorneys for Defendant ROYAL DUTCH
SHELL PLC*

By: /s/ Daniel A. Brown
    /s/ Sean C. Grimsley
    /s/ Jameson R. Jones
    /s/ Daniel R. Brody

Daniel A. Brown, WSBA #22028
WILLIAMS, KASTNER & GIBBS PLLC
601 Union Street, Suite 4100
Seattle, WA 98101-2380
Telephone: (206) 628-6600
Fax: (206) 628-6611
dbrown@williamskastner.com

Sean C. Grimsley (*pro hac vice*)
Jameson R. Jones (*pro hac vice*)
Daniel R. Brody (*pro hac vice*)
BARTLIT BECK LLP
1801 Wewatta St., Suite 1200
Denver, Colorado 80202
Telephone: 303-592-3123
Facsimile: 303-592-3140
Email: sean.grimsley@bartlit-beck.com
Email: jameson.jones@bartlit-beck.com
Email: dan.brody@bartlit-beck.com

*Attorneys for Defendant CONOCOPHILLIPS*

2021 WL 1216541
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

CITY OF NEW YORK, Plaintiff-Appellant,

v.

CHEVRON CORPORATION,
ConocoPhillips, Exxon Mobil
Corporation, Royal Dutch Shell plc,

BP p.l.c., Defendants-Appellees.*

No. 18-2188
|
August Term 2019
|
Argued: November 22, 2019
|
Decided: April 1, 2021

Appeal from the United States District Court for the Southern District of New York, No. 18-cv-182, John F. Keenan, *Judge*.

**Attorneys and Law Firms**

John Moore (Richard Dearing, Claude S. Platton, Nwamaka Ejebe, on the brief, for James E. Johnson, Corporation Counsel of the City of New York, New York, NY; Steve W. Berman, on the brief, Hagens Berman Sobol Shapiro LLP, Seattle, WA; Matthew F. Pawa, on the brief, Hagens Berman Sobol Shapiro LLP, Newton Centre, MA, for Appellant City of New York.

Theodore J. Boutrous, Jr. (Joshua S. Lipshutz, on the brief), Gibson, Dunn & Crutcher LLP, Los Angeles, CA; Andrea E. Neuman, Anne Champion, on the brief, Gibson, Dunn & Crutcher LLP, New York, NY; Herbert J. Stern, Joel M. Silverstein, on the brief, Stern & Kilcullen, LLC, Florham Park, NJ, for Appellee Chevron Corporation.

John F. Savarese, Ben M. Germana, Wachtell, Lipton, Rosen & Katz, New York, NY; Sean C. Grimsley, James R. Jones, Bartlit Beck LLP, Denver, CO, for Appellee ConocoPhillips.

Theodore V. Wells, Jr., Daniel J. Toal, Jaren Janghorbani, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, NY; Dawn Sestito, O'Melveny & Myers LLP, Los Angeles, CA; Patrick J. Conlon, Exxon Mobil Corporation, Houston, TX, for Appellee Exxon Mobil Corporation.

David C. Frederick, Brendan J. Crimmins, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC, for Appellee Royal Dutch Shell.

Nancy G. Milburn, Arnold & Porter Kaye Scholer LLP, New York, NY, Matthew T. Heartney, Arnold & Porter Kaye Scholer LLP, Los Angeles, CA, for Appellee BP p.l.c.

Catherine M. Sharkey, Crystal Eastman Professor of Law, New York University School of Law, New York, NY, for Amicus Curiae Catherine M. Sharkey, Crystal Eastman Professor of Law.

David S. Frankel, Assistant Solicitor General, Steven C. Wu, Deputy Solicitor General, for Letitia James, Attorney General, State of New York, New York, NY, for Amici Curiae States of New York, California, Maryland, New Jersey, Oregon, Rhode Island, Vermont, and Washington, and the District of Columbia.

Harold Hongju Koh, Michael J. Wishnie, Conor Dwyer Reynolds, Yale Law School, Rule of Law Clinic, for Amici Curiae Professors Sarah H. Cleveland, Zachary D. Clopton, William S. Dodge, Harold Hongju Koh, Kermit Roosevelt III, and Christopher A. Whytock.

Kimberly Ong, Natural Resources Defense Council, New York, NY, for Amici Curiae New York City Environmental Justice Alliance, THE POINT Community Development Corporation, and UPROSE.

Michael Burger, Jennifer Danis, Morningside Heights Legal Services, Inc., Columbia Environmental Law Clinic, New York, NY, for Amici Curiae National League of Cities, U.S. Conference of Mayors, and International Municipal Lawyers Association.

Corbin K. Barthold, Richard A. Samp, Washington Legal Foundation, Washington, DC, for Amicus Curiae Washington Legal Foundation.

Eric Grant, Deputy Assistant Attorney General, R. Justin Smith, Christine W. Ennis, United States Department of Justice, Environment and Natural Resources Division, Washington, DC, for Amicus Curiae United States of America.

Peter D. Keisler, C. Frederick Beckner III, Ryan C. Morris, Tobias S. Loss-Eaton, Sidley Austin LLP, Washington, DC; Steven P. Lehotsky, Michael B. Schon, Jonathan D. Urick, U.S. Chamber Litigation Center, Washington, DC, for

Amicus Curiae Chamber of Commerce of the United States of America.

Philip S. Goldberg, Christopher E. Appel, Shook Hardy & Bacon L.L.P., Washington, DC; Linda E. Kelly, Peter C. Tolsdorf, Manufacturers' Center for Legal Action, Washington, DC, for Amicus Curiae National Association of Manufacturers.

Thomas M. Fisher, Solicitor General, Kian J. Hudson, Deputy Solicitor General, for Todd Rokita, Attorney General of Indiana, Office of the Attorney General, Indianapolis, IN, for Amici Curiae States of Indiana, Alabama, Alaska, Arkansas, Georgia, Kansas, Louisiana, Missouri, Montana, Nebraska, Oklahoma, South Carolina, Texas, Utah, and West Virginia.

Yaakov M. Roth, Jones Day, Washington, DC; Robert A. Mittelstaedt, Jones Day, San Francisco, CA; Robert E. Johnson, Jones Day, Cleveland, OH, Kelly Holt, Jones Day, Boston, MA, for Amicus Curiae Professor Richard A. Epstein.

Before: Kearse, Sullivan, and Park, Circuit Judges.

**Opinion**

Richard J. Sullivan, Circuit Judge:

**\*1** The question before us is whether municipalities may utilize state tort law to hold multinational oil companies liable for the damages caused by global greenhouse gas emissions. Given the nature of the harm and the existence of a complex web of federal and international environmental law regulating such emissions, we hold that the answer is "no."

Global warming presents a uniquely international problem of national concern. It is therefore not well-suited to the application of state law. Consistent with that fact, greenhouse gas emissions are the subject of numerous federal statutory regimes and international treaties. These laws provide interlocking frameworks for regulating greenhouse gas emissions, as well as enforcement mechanisms to ensure that those regulations are followed.

The City of New York has sidestepped those procedures and instead instituted a state-law tort suit against five oil companies to recover damages caused by those companies' admittedly legal commercial conduct in producing and selling fossil fuels around the world. In so doing, the City effectively seeks to replace these carefully crafted frameworks – which are the product of the political process – with a patchwork of

claims under state nuisance law. For many of the same reasons stated by the district court (Keenan, *J.*), we cannot condone such an action and we AFFIRM the dismissal of the City's complaint.

## I. Background

### A. Facts

Global warming is one of the greatest challenges facing humanity today.[1] Among the scientific community, there is near universal consensus that global warming is primarily caused, or at least accelerated, by the burning of fossil fuels, which emits greenhouse gases like carbon dioxide and methane into the atmosphere. Once released, those gases can remain in the atmosphere for hundreds of years, where they trap heat that would otherwise radiate into space.

According to the complaint, New York City "is exceptionally vulnerable" to the effects of global warming, such as rising sea levels, because of its "520-mile coastline." J. App'x at 76. So, in the aftermath of Hurricane Sandy, the City "launched a $20 billion-plus multilayered investment program in climate resiliency across all five boroughs." *Id.* at 107. These preparations have included constructing seawalls and other coastal armaments, enlarging and augmenting the City's storm and wastewater infrastructure, and implementing public-health programs designed to tackle the effects of heatwaves, among other measures meant to protect the public and City property.

Even though every single person who uses gas and electricity – whether in travelling by bus, cab, Uber, or jitney, or in receiving home deliveries via FedEx, Amazon, or UPS – contributes to global warming, the City asserts that its taxpayers should not have to shoulder the burden of financing the City's preparations to mitigate the effects of global warming. Rather, the City suggests that a group of large fossil fuel producers are primarily responsible for global warming and should bear the brunt of these costs. Included among that group are Defendants Chevron Corporation, ConocoPhillips, Exxon Mobil Corporation (together, the "Domestic Producers"), BP p.l.c., and Royal Dutch Shell plc (together with BP, the "Foreign Producers" and, collectively with the Domestic Producers, the "Producers"). The Producers "are, respectively, the first (Chevron), second (Exxon), fourth (BP), sixth (Shell), and ninth (ConocoPhillips) largest cumulative producers of fossil fuels worldwide" since the mid-nineteenth century. *Id.* at 85.

**\*2** As the City sees it, the Producers have known for decades that their fossil fuel products pose a severe risk to the planet's climate. The City alleges that, despite that knowledge, the Producers downplayed the risks and continued to sell massive quantities of fossil fuels, which has caused and will continue to cause significant changes to the City's climate and landscape.

The City freely admits that it is not able to halt the Producers' conduct under any federal statute or international agreement. Indeed, it acknowledges that the Producers' conduct is "lawful ... commercial activit[y]." City Br. at 19. Nonetheless, the City believes that it is appropriate to "shift the costs of protecting the City from climate change impacts back onto the companies that have done nearly all they could to create this existential threat." J. App'x at 45–46.

Understanding the context of this dispute requires some background knowledge about our nation's regulatory framework concerning environmental issues. The Clean Air Act was originally signed into law by President Lyndon Johnson in 1963 as "the nation's first modern environmental law." *N.Y. Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 319 (2d Cir. 2003). But it was not until seven years later, when Congress passed a round of significant amendments to the statute as part of the Clean Air Amendments of 1970, that the modern version of the Clean Air Act was born. *See* Clean Air Amendments of 1970, Pub. L. No. 91-604, 84 Stat. 1676.

" '[D]esigned to safeguard our precious air resources,' " *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 319 (quoting *Connecticut v. EPA*, 696 F.2d 147, 151 (2d Cir. 1982)), this statutory scheme "regulates pollution-generating emissions from both stationary sources, such as factories and powerplants, and moving sources, such as cars, trucks, and aircrafts," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 308, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014). "It is an intricate regulatory regime intended to 'protect and enhance the quality of the [n]ation's air resources so as to promote the public health and welfare and the productive capacity of its population.' " *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 319–20 (quoting 42 U.S.C. § 7401(b)(1)).

Consistent with that mandate, the Environmental Protection Agency (the "EPA") was established in 1970 to implement programs to regulate pollution from both mobile and stationary sources under the Clean Air Act and other related statutes, *see Friends of the Earth v. Carey*, 535 F.2d 165, 168–69 (2d Cir. 1976), a role which was later interpreted to include the regulation of carbon dioxide and other greenhouse gases, *see Massachusetts v. EPA*, 549 U.S. 497, 528–32, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). The EPA pursues this directive through a variety of programs and rules. For instance, the EPA, in collaboration with the Department of Transportation, enforces a series of fuel-economy standards designed to increase vehicle fuel efficiency, thereby reducing the consumption of fossil fuels and the emission of greenhouse gases. *See, e.g.*, The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 83 Fed. Reg. 42,986 (Aug. 24, 2018). The EPA also promulgates technology-based standards for certain facilities related to pollution control. *See, e.g.*, Review of Standards of Performance for Greenhouse Gas Emissions from New, Modified, and Reconstructed Stationary Sources: Electric Utility Generating Units, 83 Fed. Reg. 65,424 (proposed Dec. 20, 2018); Prevention of Significant Deterioration and Title V Greenhouse Gas Tailoring Rule, 75 Fed. Reg. 31,514 (June 3, 2010).

**\*3** But the Clean Air Act does not make environmental policy an exclusively federal matter. Rather, the Act envisions extensive cooperation between federal and state authorities. *See* 42 U.S.C. §§ 7401, 7411(c)(1), (d)(1)–(2). Under this "cooperative federalis[t]" approach, *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 320 (internal quotation marks omitted), states are given a meaningful role in regulating greenhouse gases and other emissions from sources within their borders, *see* 42 U.S.C. § 7401(a)(3) (delegating to states and localities the "primary responsibility" of preventing and controlling air pollution). Specifically, states are required to adopt plans to implement emission standards applicable to any existing source of air pollution. *Id.* § 7411(d). Those plans are then subject to EPA approval. *Id.* While state standards must be at least as stringent as the corresponding federal requirements, states may promulgate more stringent standards if they so choose. *Id.* § 7416.

The Clean Air Act gives states a much more limited role in regulating pollution sources beyond their borders. Indeed, it often limits states to commenting on proposed EPA rules or on another state's emission plan. *See, e.g.*, *id.* §§ 7607(d)(5), 7475(a)(2), 7410(a)(1).

But global warming – as its name suggests – is a global problem that the United States cannot confront alone. *See* 15 U.S.C. § 2901(5) (deeming international cooperation

"essential" to addressing global warming); *id.* § 2952(a) (stating that "[t]he President should direct the Secretary of State ... to initiate discussions with other nations leading toward international protocols and other agreements to coordinate global change research activities"). So, along with these domestic actions, the United States has worked cooperatively with foreign governments through diplomatic channels to coordinate a global response to climate change and greenhouse gas emissions. To that end, in 1992, the President signed, and the Senate ratified, the United Nations Framework Convention on Climate Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (the "U.N. Framework"). In the decades since then, the United States has continued to work with the international community to address this growing problem through multi-lateral agreements, such as the Paris Agreement, which the nation recently rejoined. *See* Depositary Notification, Acceptance by the United States of America, Paris Agreement, Reference C.N. 10.2021.Treaties-XXVII.7.d (Jan. 20, 2021).

**B. Procedural History**

In 2018, the City sued the Producers in federal court, asserting causes of action for (1) public nuisance, (2) private nuisance, and (3) trespass under New York law stemming from the Producers' production, promotion, and sale of fossil fuels. The City requested compensatory damages for the past and future costs of climate-proofing its infrastructure and property, as well as an equitable order ascertaining damages and granting an injunction to abate the public nuisance and trespass that would go into effect should the Producers fail to pay the court-ordered damages. In response, each of the Domestic Producers filed motions to dismiss the City's complaint under [Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).](#)[2]

On July 19, 2018, the district court granted those motions and dismissed the City's complaint in its entirety with prejudice. *See [City of New York v. BP P.L.C.](#)*, 325 F. Supp. 3d 466 (S.D.N.Y. 2018). First, the district court determined that the City's state-law claims were displaced by federal common law. It reasoned that transboundary greenhouse gas emissions are, by nature, a national (indeed, international) problem, and therefore must be governed by a unified federal standard. *[Id.](#)* at 471–72. Second, the district court determined that the Clean Air Act displaced the City's common law claims with respect to domestic emissions. *[Id.](#)* at 472–75. Lastly, the district court concluded that while the Clean Air Act does not displace claims targeting foreign emissions, judicial

caution counseled against permitting the City to bring federal common law claims against the Producers (especially the Foreign Producers) for foreign greenhouse gas emissions. *[Id.](#) at 475–76.*

**\*4** The City timely appealed.

## II. Standard of Review

We review the district court's decision *de novo*. *[Allco Fin. Ltd. v. Klee](#)*, 861 F.3d 82, 94 (2d Cir. 2017). In so doing, we must accept "all factual allegations as true and draw[ ] all reasonable inferences in favor of the [City]." *[Litwin v. Blackstone Grp., L.P.](#)*, 634 F.3d 706, 715 (2d Cir. 2011) (internal quotation marks omitted).

The City's complaint may survive only if it "contain[s] sufficient factual matter ... to state a claim to relief that is plausible on its face." *[Ashcroft v. Iqbal](#)*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *[Allco Fin.](#)*, 861 F.3d at 94 (internal quotation marks omitted).

## III. Discussion

### A. The City's State-Law Tort Claims Are Displaced by Federal Common Law.

#### 1. What Is Federal Common Law?

In the aftermath of *[Erie Railroad Co. v. Tompkins](#)*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), "[f]ederal courts, unlike state courts, ... do not possess a general power to develop and apply their own rules of decision," *[City of Milwaukee v. Illinois (Milwaukee II)](#)*, 451 U.S. 304, 312, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). But *Erie* was not a death knell to all federal common law. On the very day that the Supreme Court declared that "there is no federal *general* common law," *[Erie](#)*, 304 U.S. at 78, 58 S.Ct. 817 (emphasis added), the Court nevertheless reaffirmed the existence of "what ... we may call *specialized* federal common law," Henry J. Friendly, *In Praise of Erie – and of the New Federal Common Law*, 39 N.Y.U. L. Rev. 383, 405 (1964) (emphasis added); *see [Hinderlider v. La Plata River & Cherry Creek Ditch Co.](#)*, 304 U.S. 92, 110, 58 S.Ct. 803, 82 L.Ed. 1202

(1938) (holding that "whether the water of an interstate stream must be apportioned between ... two [s]tates is a question of 'federal common law' upon which neither the statutes nor the decisions of either [s]tate can be conclusive").

In a nutshell, federal common law exists in only the "few and restricted" enclaves, *Wheeldin v. Wheeler*, 373 U.S. 647, 651, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), where a federal court is "compelled to consider federal questions [that] cannot be answered from federal statutes alone," *Milwaukee II*, 451 U.S. at 314, 101 S.Ct. 1784 (internal quotation marks omitted). And once Congress speaks directly to those questions, "the need for such an unusual exercise of lawmaking by federal courts disappears." *Id.*; *see also Clearfield Tr. Co. v. United States*, 318 U.S. 363, 367, 63 S.Ct. 573, 87 L.Ed. 838 (1943) (holding that federal common law may be fashioned only "[i]n [the] absence of an applicable Act of Congress"). In that sense, federal common law functions much like legal duct tape – it is a "necessary expedient" that permits federal courts to address issues of national concern until Congress provides a more permanent solution. *See Milwaukee II*, 451 U.S. at 314, 101 S.Ct. 1784 (internal quotation marks omitted).

Despite its utility, however, courts have been quick to declare that our constitutional architecture restricts federal common law to a "modest role." *Rodriguez v. FDIC*, ––– U.S. ––––, 140 S.Ct. 713, 717, 206 L.Ed.2d 62 (2020); *see also Martinez v. Bloomberg LP*, 740 F.3d 211, 221 (2d Cir. 2014). And for good reason. Where federal common law exists, it "pre-empt[s] and replace[s]" state law. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988); *Milwaukee II*, 451 U.S. at 313 n. 7, 101 S.Ct. 1784 (explaining that "if federal common law exists, it is because state law cannot be used"). It thus threatens a potent mix of judicial lawmaking and encroachment on our federalist structure.

**\*5** So what are these "few and restricted" issues that demand the existence of federal common law? *Wheeldin*, 373 U.S. at 651, 83 S.Ct. 1441. They "fall into essentially two categories: those in which a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress has given the courts the power to develop substantive law." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (internal quotation marks and citation omitted); *see also Am. Elec. Power Co. v. Connecticut* (*AEP*), 564 U.S. 410, 421, 131 S.Ct. 2527, 180 L.Ed.2d 435 (2011) (acknowledging that federal common law "addresses subjects within national legislative power

where Congress has so directed or where the basic scheme of the Constitution so demands" (internal quotation marks omitted)); *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 742 F.3d 37, 41 (2d Cir. 2014) (stating that federal common law exists where "the relevant federal interest warrants displacement of state law" (internal quotation marks omitted)).

As these narrow categories suggest, the mere existence of a federal interest does not intrinsically call for a corresponding federal rule. *See Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 692, 126 S.Ct. 2121, 165 L.Ed.2d 131 (2006). There also must be a conflict between that federal interest and the operation of state law.[3] *Id.*; *see also O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (declaring such a conflict to be "a precondition for recognition of a federal rule of decision"); *Boyle*, 487 U.S. at 507, 108 S.Ct. 2510. That is not to say, however, that the conflict between state law and federal interests must be intractably severe before federal common law may spring into action. Indeed, the necessary conflict "need not be as sharp as that which must exist for ordinary pre-emption when Congress legislates in a field which the [s]tates have traditionally occupied." *Boyle*, 487 U.S. at 507, 108 S.Ct. 2510 (internal quotation marks omitted). "But conflict there must be." *Id.* at 508, 108 S.Ct. 2510.

### 2. Does Federal Common Law Apply Here?

With these principles in mind, we arrive at the parties' first dispute: whether the application of New York law to the City's nuisance and trespass claims would conflict with federal interests. This question demands at the outset that we clarify the nature of the City's lawsuit. Is this a clash over regulating worldwide greenhouse gas emissions and slowing global climate change, or is it a more modest litigation akin to a product liability suit such as *In re "Agent Orange" Product Liability Litigation*, 635 F.2d 987 (2d Cir. 1980), or *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 725 F.3d 65 (2d Cir. 2013)?

To hear the City tell it, this case concerns only "the production, promotion, and sale of fossil fuels," not the regulation of emissions. City Br. at 40. Though the City admits (as it must) that greenhouse gas emissions play a role in the case, the City insists that such emissions are only a link in "the causal chain" of the City's damages. *Id.* at 41. So, because it is not seeking to directly penalize emitters, and because it seeks damages rather than abatement, the City argues that its claims will not result in the regulation of global

emissions. In other words, we are told that this is merely a local spat about the City's eroding shoreline, which will have no appreciable effect on national energy or environmental policy. We disagree.

Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse gas emissions. It is precisely *because* fossil fuels emit greenhouse gases – which collectively "exacerbate global warming" – that the City is seeking damages. J. App'x at 115. Put differently, the City's complaint whipsaws between disavowing any intent to address emissions and identifying such emissions as the singular source of the City's harm. But the City cannot have it both ways.

**\*6** Stripped to its essence, then, the question before us is whether a nuisance suit seeking to recover damages for the harms caused by global greenhouse gas emissions may proceed under New York law. Our answer is simple: no.

For over a century, a mostly unbroken string of cases has applied federal law to disputes involving interstate air or water pollution. *See, e.g.*, *AEP*, 564 U.S. at 421, 131 S.Ct. 2527; *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487–89, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987); *Milwaukee II*, 451 U.S. at 327–28, 327 n. 19, 101 S.Ct. 1784; *Illinois v. City of Milwaukee* (*Milwaukee I*), 406 U.S. 91, 102–03, 102 n.3, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972); *New Jersey v. City of New York*, 283 U.S. 473, 477, 481–83, 51 S.Ct. 519, 75 L.Ed. 1176 (1931); *North Dakota v. Minnesota*, 263 U.S. 365, 374, 44 S.Ct. 138, 68 L.Ed. 342 (1923); *New York v. New Jersey*, 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921); *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907); *Missouri v. Illinois*, 200 U.S. 496, 26 S.Ct. 268, 50 L.Ed. 572 (1906); *see also Native Vill. of Kivalina v. ExxonMobil Corp.* (*Kivalina*), 696 F.3d 849, 855 (9th Cir. 2012); *Illinois v. City of Milwaukee* (*Milwaukee III*), 731 F.2d 403, 406–411 (7th Cir. 1984); *Texas v. Pankey*, 441 F.2d 236, 240 (10th Cir. 1971).[4] This is because such quarrels often implicate two federal interests that are incompatible with the application of state law: (i) the "overriding ... need for a uniform rule of decision" on matters influencing national energy and environmental policy, and (ii) "basic interests of federalism." *Milwaukee I*, 406 U.S. at 105 n.6, 92 S.Ct. 1385. The City's lawsuit is no different.

To state the obvious, the City does not seek to hold the Producers liable for the effects of emissions released in New York, or even in New York's neighboring states. Instead, the

City intends to hold the Producers liable, under New York law, for the effects of emissions made around the globe over the past several hundred years. In other words, the City requests damages for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet.

Such a sprawling case is simply beyond the limits of state law. To start, a substantial damages award like the one requested by the City would effectively regulate the Producers' behavior far beyond New York's borders. Since "[g]reenhouse gases once emitted 'become well mixed in the atmosphere,' " *AEP*, 564 U.S. at 422, 131 S.Ct. 2527 (quoting Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act, 74 Fed. Reg. 66,496, 66,514 (Dec. 15, 2009)), "emissions in [New York or] New Jersey may contribute no more to flooding in New York than emissions in China," *id.* (citations omitted); *see also* J. App'x at 85 ("Greenhouse gas molecules cannot be traced to their source, and greenhouse gases quickly diffuse and comingle in the atmosphere. However, because of their rapid and widespread global dispersal, greenhouse gas emissions from each of [the Producers'] fossil fuel products are present in the atmosphere in New York State."). Any actions the Producers take to mitigate their liability, then, must undoubtedly take effect across every state (and country). And all without asking what the laws of those other states (or countries) require. Because it therefore "implicat[es] the conflicting rights of [s]tates [and] our relations with foreign nations," this case poses the quintessential example of when federal common law is most needed. *Tex. Indus.*, 451 U.S. at 641, 101 S.Ct. 2061; *see also Milwaukee I*, 406 U.S. at 105 n.6, 92 S.Ct. 1385. Indeed, the fact that the federal government, the District of Columbia, and 23 states – Alabama, Alaska, Arkansas, California, Georgia, Indiana, Kansas, Louisiana, Maryland, Missouri, Montana, Nebraska, New Jersey, New York, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Utah, Vermont, Washington, and West Virginia – have filed *amicus* briefs on both sides of this dispute aptly illustrates that this is an interstate matter raising significant federalism concerns.

**\*7** The City disagrees, positing that because it seeks damages – not abatement or the imposition of pollution standards – its claims do not threaten to regulate emissions at all, let alone beyond New York's borders. But this ignores economic reality.[5] As the Supreme Court has long recognized, " 'regulation can be effectively exerted through an award of damages,' and 'the obligation to pay compensation can

be, indeed is designed to be, a potent method of governing conduct and controlling policy.' " *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 637, 132 S.Ct. 1261, 182 L.Ed.2d 116 (2012) (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)) (alterations omitted); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 & n.17, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Thus, while the City is not expressly seeking to impose a standard of care or emission restrictions on the Producers, the goal of its lawsuit is perhaps even more ambitious: to effectively impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them). If the Producers want to avoid all liability, then their only solution would be to cease global production altogether. And even if some level of ongoing liability were deemed palatable, a significant damages award would no doubt "compel[ ]" the Producers to develop new "means of pollution control." *Ouellette*, 479 U.S. at 495, 498 n.19, 107 S.Ct. 805; *see also Nat. Res. Def. Council v. NHTSA*, 894 F.3d 95, 104–05 (2d Cir. 2018) (reasoning that "[t]he notion that financial incentives deter environmental misconduct is hardly novel ... [as] common sense and basic economics tell us that increased cost of ... conduct will make that conduct less common" (internal quotation marks, alterations, and citations omitted)); *Boomer v. Atl. Cement Co.*, 26 N.Y.2d 219, 226, 309 N.Y.S.2d 312, 257 N.E.2d 870 (1970) (acknowledging that nuisance damages "effective[ly] spur" a change in behavior). The City even admits as much. *See* City Reply at 8 (acknowledging that tort damages could work "production-side changes"). Consequently, though the City's lawsuit would regulate cross-border emissions in an indirect and roundabout manner, it would regulate them nonetheless.

But the trouble does not stop there. To permit this suit to proceed under state law would further risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other. *See, e.g., AEP*, 564 U.S. at 427, 131 S.Ct. 2527; 43 U.S.C. § 1802(1) (acknowledging the regulatory goal of promoting oil resource management policies "to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade"); *cf. Nat. Res. Def. Council*, 894 F.3d at 100–

01 (explaining that the Energy Policy and Conservation Act was designed to avoid "another severe energy crisis through the creation of programs focused on energy regulation, energy conservation, and ... 'improved energy efficiency' " of various products (quoting 42 U.S.C. § 6201(5)). To be sure, global warming does not present a zero-sum contest between these ideals. One need look only at the burgeoning clean energy sector to see that these concepts can even be married. But compromises still must be struck. And as states will invariably differ in their assessment of the proper balance between these national and international objectives, there is a real risk that subjecting the Producers' global operations to a welter of different states' laws could undermine important federal policy choices.

**\*8** With that, we pause only to reconcile our conclusion with the parade of recent opinions holding that "state-law claim[s] for public nuisance [brought against fossil fuel producers] do[ ] not arise under federal law." *City of Oakland v. BP PLC*, 960 F.3d 570, 575 (9th Cir.), *amended & superseded on denial of reh'g*, 969 F.3d 895 (9th Cir. 2020), *petition for cert. filed*, No. 20-1089 (Jan. 8, 2021); *see also Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31, 34 (D. Mass. 2020); *Bd. of Cnty. Comm'rs v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947, 954 (D. Colo. 2019), *aff'd*, 965 F.3d 792, 798 (10th Cir.), *petition for cert. filed*, No. 20-783 (Dec. 4, 2020); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142, 146 (D.R.I. 2019), *aff'd*, 979 F.3d 50 (1st Cir.), *petition for cert. filed*, No. 20-900 (Dec. 30, 2020); *Mayor & City Council. v. BP P.L.C.*, 388 F. Supp. 3d 538, 548 (D. Md.), *as amended* (June 20, 2019), *aff'd*, 952 F.3d 452 (4th Cir.), *cert. granted*, —— U.S. ——, 141 S. Ct. 222, 207 L.Ed.2d 1165 (2020); *County of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937–38 (N.D. Cal. 2018), *aff'd*, 960 F.3d 586, 595 (9th Cir), *petition for cert. filed*, No. 20-884 (Dec. 30, 2020). At first blush, it might appear as though our conclusion is incompatible with those decisions. But the devil is in the (procedural) details.

In each of those cases, the plaintiffs brought state-law claims in state court; the defendants – many of the same fossil fuel producers present here – then sought to remove those cases to federal court, arguing that they anticipated raising federal preemption defenses. The single issue before each of those federal courts was thus whether the defendants' anticipated defenses could singlehandedly create federal-question jurisdiction under 28 U.S.C. § 1331 in light of the well-pleaded complaint rule. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 398, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (noting that "[t]he fact that a defendant might ultimately prove

that a plaintiff's claims are pre-empted under [federal law] does not establish that they are removable to federal court").[6]

Here, the City filed suit in federal court in the first instance. We are thus free to consider the Producers' preemption defense on its own terms, not under the heightened standard unique to the removability inquiry. So even if this fleet of cases is correct that federal preemption does not give rise to a federal question for purposes of removal, their reasoning does not conflict with our holding. To the contrary, the cases even acknowledge as much. *See, e.g.*, *City of Oakland*, 960 F.3d at 581 n.6 (noting that the court need "not address whether such interests may give rise to an affirmative federal [preemption] defense because such a defense is not grounds for federal jurisdiction"); *Massachusetts*, 462 F. Supp. 3d at 40 (noting that the City's lawsuit in this case is distinguishable since, unlike the *Massachusetts* action, it "was filed originally in federal court on diversity jurisdiction and so does not address the well-pleaded complaint rule"); *Bd. of Cnty. Comm'rs*, 405 F. Supp. 3d at 966 (explaining that the court "[wa]s not considering the merits of Plaintiffs' claims or whether they would survive a motion to dismiss, only whether there is a basis for federal jurisdiction"); *Rhode Island*, 393 F. Supp. 3d at 148–49 (holding that even if federal common law preempts the plaintiff's claims, it is not grounds for removal); *Mayor & City Council*, 388 F. Supp. 3d at 555 (same); *County of San Mateo*, 294 F. Supp. 3d at 938 (recognizing that "[t]here may be important questions of ordinary preemption, but those are for the state courts to decide upon remand"); *see also* Gil Seinfeld, *Climate Change Litigation in the Federal Courts: Jurisdictional Lessons from* California v. BP, 117 Mich. L. Rev. Online 25, 28 (2018) (noting that state courts "might or might not determine that state law nuisance actions of this sort are preempted by federal law, but it will be *state courts*, not federal courts, that do the determining").

## B. The Clean Air Act, in Turn, Displaces the City's Federal Common Law Claims Where Domestic Emissions Are Involved

**\*9** Having concluded that the City's claims must be brought under federal common law, we see that those federal claims immediately run headlong into a problem of their own. For many of the same reasons that federal common law preempts state law, the Clean Air Act displaces federal common law claims concerned with domestic greenhouse gas emissions.[7]

Congress displaces federal common law when it passes a statute that "speaks directly to the question" that the judge-made rule was designed to answer. *AEP*, 564 U.S. at 424, 131 S.Ct. 2527 (internal quotation marks and alterations omitted). And while this is a less rigorous standard than "that employed in deciding if federal law pre-empts state law," *Milwaukee II*, 451 U.S. at 316, 101 S.Ct. 1784; *see also AEP*, 564 U.S. at 423, 131 S.Ct. 2527 (explaining that preemption in this context "does not require the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law" (internal quotation marks and alteration omitted)), it still has bite. Such displacement requires a showing that "Congress has provided a sufficient legislative solution to the particular [issue] to warrant a conclusion that [the] legislation has occupied the field to the exclusion of federal common law." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 777 (7th Cir. 2011). Whether the Clean Air Act speaks directly to the domestic transboundary emissions claims here is easily answered by reference to two prior decisions, *AEP* and *Kivalina*.

In *AEP*, the City, along with several other plaintiffs, brought a common law nuisance action against "the five largest emitters of carbon dioxide in the United States" to redress those emitters' "contribut[ions] to global warming." 564 U.S. at 418, 131 S.Ct. 2527 (internal quotation marks omitted). In terms of relief, they sought an injunction "requiring each defendant to cap its carbon dioxide emissions and then reduce them by a specified percentage each year for at least a decade." *Id.* at 419, 131 S.Ct. 2527 (internal quotation marks omitted). Determining that the Clean Air Act already "provides a means to seek limits on emissions of carbon dioxide from domestic power plants," the Supreme Court concluded "that the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement" of greenhouse gas emissions. *Id.* at 424–25, 131 S.Ct. 2527. In short, the Court determined that "federal judges may [not] set limits on greenhouse gas emissions in [the] face of a law empowering [the] EPA to [do] the same." *Id.* at 429, 131 S.Ct. 2527.

In the wake of *AEP*, it is beyond cavil that the Clean Air Act displaced federal common law nuisance suits seeking to abate domestic transboundary emissions of greenhouse gases. But what about damages suits? That question was answered just a year after *AEP* by the Ninth Circuit in *Kivalina*.

**\*10** There, the city and village of Kivalina, Alaska sued numerous oil, energy, and utility companies for their emissions of greenhouse gases, which resulted in global warming and the "severe[ ] ero[sion]" of the land

where Kivalina sits. *Kivalina*, 696 F.3d at 853. Unlike the plaintiffs in *AEP*, however, Kivalina sought damages for past emissions, rather than abatement of future emissions. *Id.* at 857.

Despite the difference in remedies, the Ninth Circuit concluded that *AEP* controlled. The court reasoned that displacement of federal common law does not turn on the nature of the remedy but rather on the cause of action. *Id.* (holding that "displacement of a federal common law right of action means displacement of remedies"). So when *AEP* concluded that the Clean Air Act preempted "common law public nuisance abatement actions," it also "extinguished Kivalina's federal common law public nuisance damage action." *Id.*

We agree with the Ninth Circuit's sound reasoning and thus hold that the Clean Air Act displaces the City's common law damages claims. As we already determined, the City's claims, if successful, would operate as a *de facto* regulation on greenhouse gas emissions. And as both *AEP* and *Kivalina* conclude, Congress has already "spoken directly to th[at] issue" by "empower[ing] the EPA to regulate [those very] emissions." *Kivalina*, 696 F.3d at 857–58 (internal quotation marks omitted); *see also AEP*, 564 U.S. at 427–28, 131 S.Ct. 2527.

Even more fundamentally, though, *Kivalina* demonstrates that the displacement of a federal common law claim is an all-or-nothing proposition, which does not depend on the remedy sought. *See Kivalina*, 696 F.3d at 857; *see also Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 21–22, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (holding that displacement of a federal common law injunctive action necessarily implies that a damages action brought for the same claim is also displaced). So whether styled as an action for injunctive relief against the Producers to stop them from producing fossil fuels, or an action for damages that would have the same practical effect, the City's claims are clearly barred by the Clean Air Act.

The City, naturally, asks us to break from *Kivalina* on this point; but it fails to offer any compelling reason for us to do so. For instance, the City directs us to the concurring opinion in *Kivalina*, which it argues "properly recognized that congressional displacement or preemption can turn on whether the claim seeks injunctive relief or damages." City Br. at 53 n.8. But the concurrence says no such thing – at least, not as applied to the Clean Air Act's displacement

of federal common law nuisance claims. *See Kivalina*, 696 F.3d at 865 (Pro, *J.*, concurring) ("Under *AEP*, federal common law nuisance abatement claims are displaced by the [Clean Air Act]. And under *Middlesex*, if federal common law nuisance abatement claims are displaced, so are federal common law nuisance damages claims."); *id.* at 866 (Pro, *J.*, concurring) ("Congress could have included a federal damages cause of action in the [Clean Air Act], and it may add one at any time, but thus far it has opted not to do so. By supplying a federal remedy Congress chose not to provide, this Court would not be 'filling a gap,' it would be 'providing a different regulatory scheme' than the one chosen by Congress." (quoting *Milwaukee II*, 451 U.S. at 324 n.18, 101 S.Ct. 1784)). And given that damages here would effectively control the Producers' behavior beyond New York's borders, the City's reliance on *Exxon Shipping Co. v. Baker* is similarly misplaced. *See* 554 U.S. 471, 489 n.7, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008) (indicating that a common law nuisance claim seeking damages would be preempted where it "amount[s] to arguments for [regulatory] standards different from those provided by the [applicable federal statute]").

**\*11** Perhaps recognizing the difficulties posed by the Supreme Court's precedent in *AEP* and the Ninth Circuit's logic in *Kivalina*, the City next asks us to disregard those cases entirely, arguing that each dealt with claims over emissions, whereas the City's complaint limits itself to the "earlier moment of production and sale of fossil fuels," which the Clean Air Act does not regulate. City Br. at 49 (internal quotation marks omitted). But, as noted above, the City's focus on this "earlier moment" in the global warming lifecycle is merely artful pleading and does not change the substance of its claims.

The City's case hinges on the link between the release of greenhouse gases and the effect those emissions have on the environment generally (and on the City in particular). Indeed, the City does not seek any damages for the Producers' production or sale of fossil fuels that do not in turn depend on harms stemming from emissions.[8] So, while the Clean Air Act might not concern itself with aspects of fossil fuel production and sale that are unrelated to emissions, neither does the City's complaint.

The only daylight between this case and *AEP* and *Kivalina*, then, is that the City seeks to hold the Producers liable for emissions released by third parties in addition to those released by the Producers themselves. But "[i]f an oil

producer cannot be sued under the federal common law for [its] own emissions, *a fortiori* [it] cannot be sued for someone else's." *City of Oakland v. BP PLC,* 325 F. Supp. 3d 1017, 1024 (N.D. Cal. 2018), *vacated on other grounds,* 969 F.3d 895 (9th Cir. 2020). We thus see no reason why the City's claims should fare any better than the claims advanced in those cases.[9]

That Congress chose to preempt the federal common law of nuisance with a well-defined and robust statutory and regulatory scheme of environmental law is by no means surprising. Numerous courts have bemoaned the "often ... 'vague' and 'indeterminate' " standards attached to nuisance law. *Ouellette,* 479 U.S. at 496, 107 S.Ct. 805; *see also id.* at 496 n.17, 107 S.Ct. 805 (observing that "[t]here is perhaps no more impenetrable jungle in the entire law than that which surrounds the word 'nuisance' " (quoting W. Keeton *et al., Prosser and Keeton on Law of Torts* 616 (5th ed. 1984)); *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1055, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (Blackmun, *J.,* dissenting) (noting that "one searches in vain ... for anything resembling a principle in the common law of nuisance"); *North Carolina ex rel. Cooper v. Tenn. Valley Auth.,* 615 F.3d 291, 302 (4th Cir. 2010) (reasoning that "while public nuisance law doubtless encompasses environmental concerns, it does so at such a level of generality as to provide almost no standard of application"). Such an elastic standard is especially ill-suited to address "the technically complex area of environmental law," *New England Legal Found. v. Costle,* 666 F.2d 30, 33 (2d Cir. 1981), particularly since it would be administered by federal judges who "lack the scientific, economic, and technological resources" to "cop[e] with issues of this order," *AEP,* 564 U.S. at 428, 131 S.Ct. 2527. By contrast, it makes far more sense to "entrust[ ] [the] complex balancing" of interests that climate change demands to an "expert agency" such as the EPA. *Id.* at 427–28, 131 S.Ct. 2527.

**\*12**  At bottom, it is enough to say that the issues raised in this dispute concerning domestic emissions are squarely addressed by the Clean Air Act. As a result, we affirm the district court's conclusion that the City's federal common law claims concerning domestic greenhouse gas emissions are displaced by statute.

**C. The Clean Air Act's Displacement of Federal Common Law Does Not Resuscitate the City's State-Law Claims.**
As its final volley on this issue, the City argues that if the Clean Air Act displaced federal common law, then the City's

state law nuisance claims may snap back into action unless specifically preempted by statute. In other words, the City sees the Clean Air Act as having vaporized any preemptive effect that federal common law had on state law, thereby requiring us to engage in a traditional statutory preemption analysis. But while the caselaw on this point is admittedly not a model of clarity, the City's position is difficult to square with the fact that federal common law governed this issue in the first place.

The typical test for determining whether a federal statute preempts state law proceeds from the "assumption that the historic police powers of the states were not to be superseded by [federal statute] unless that was the clear and manifest purpose of Congress." *Milwaukee II,* 451 U.S. at 316, 101 S.Ct. 1784 (internal quotation marks omitted). But where "federal common law exists, it is because state law cannot be used." *Id.* at 313 n.7, 101 S.Ct. 1784. More to the point, where a federal statute displaces federal common law, it does so not " 'in a field in which the [s]tates have traditionally occupied,' " *Boyle,* 487 U.S. at 507, 108 S.Ct. 2510 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)), but one in which the states have traditionally *not* occupied.

Consequently, state law does not suddenly become presumptively competent to address issues that demand a unified federal standard simply because Congress saw fit to displace a federal court-made standard with a legislative one:

> The very reasons the [Supreme] Court gave for resorting to federal common law in *Milwaukee I* are the same reasons why the state claiming injury cannot apply its own state law to out-of-state discharges now. *Milwaukee II* [,which concluded that the Clean Water Act displaced federal common law,] did nothing to undermine that result.

*Milwaukee III,* 731 F.2d at 410. Indeed, under the City's view, if Congress were to pass legislation adopting verbatim a judge-made common law rule, that could potentially give birth to new state-law claims – claims that could not have existed in the absence of Congress's intervention – even though the substance of the applicable federal rule has not changed. Such an outcome is too strange to seriously contemplate.[10]

That is not to say, however, that Congress cannot grant states the authority to operate in an area of national concern. Of course it can. But "resort[ing] to state law" on a question previously governed by federal common law is

permissible only to the extent "authorize[d]" by federal statute. *Milwaukee III*, 731 F.2d at 411; *see also Ouellette*, 479 U.S. at 492, 107 S.Ct. 805. Applying that rule here, we conclude that the Clean Air Act does not authorize the type of state-law claims the City seeks to prosecute.

 **\*13** The Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the "primary regulator of [domestic] greenhouse gas emissions." *AEP*, 564 U.S. at 428, 131 S.Ct. 2527. This does not mean that states are excluded from the process. To the contrary, the Act employs a "cooperative federalis[t]" approach, which places "primary responsibility for enforcement on state and local governments." *N.Y. Pub. Int. Rsch. Grp.*, 321 F.3d at 320 (internal quotation marks omitted). But states are not granted unfettered discretion to impose any environmental regulations they choose, anywhere they choose. Rather, the Act simply "permit[s] each [s]tate to take the first cut at achieving EPA emissions standards *within its domain.*" *AEP*, 564 U.S. at 428, 131 S.Ct. 2527 (emphasis added).

In keeping with this cooperative federalist approach, the Clean Air Act "provides multiple avenues for enforcement," *id.* at 425, 131 S.Ct. 2527, several of which contemplate state involvement. But among the Act's expansive set of enforcement mechanisms, only two could even plausibly authorize the type of state-law claims pursued by the City.

Specifically, the Act includes a citizen-suit savings clause, which provides that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief." 42 U.S.C. § 7604(e). The Act also includes a states' rights savings clause, which states that "[e]xcept as otherwise provided[,] ... nothing in this chapter shall preclude or deny the right of any [s]tate or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution," except that the "[s]tate or political subdivision may not adopt or enforce any emissions standard or limitation" that is "less stringent than a standard or limitation" set by federal law. *Id.* § 7416.

Like the nearly identical savings clauses in the Clean Water Act, *see Bell v. Cheswick Generating Station*, 734 F.3d 188, 195–96 (3d Cir. 2013) (holding that there is "no meaningful distinction between the [savings clauses found in the] Clean Water Act and the Clean Air Act"), these provisions of the

Clean Air Act, when read together, plainly permit states to create and enforce their own emissions standards applicable to in-state polluters, *see Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690 (6th Cir. 2015). This no doubt holds true for both state legislation and common law claims under state tort law. *Id.* at 690–91.

But that authorization is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under "the law of the [pollution's] *source* [s]tate." *Ouellette*, 479 U.S. at 497, 107 S.Ct. 805; *see also AEP*, 564 U.S. at 429, 131 S.Ct. 2527; *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 517 (2d Cir. 2017); *Merrick*, 805 F.3d at 694; *Bell*, 734 F.3d at 196–97; *Cooper*, 615 F.3d at 306. So, for example, a New York resident could bring a nuisance suit against a Connecticut-based emitter under Connecticut law without upsetting the Clean Air Act's carefully balanced scheme, even if the alleged harm occurred in New York. *See Ouellette*, 479 U.S. at 498–99, 107 S.Ct. 805 (explaining, in the context of the nearly identical Clean Water Act, why the application of the source state's common law will not undermine Congress's intentions). But the City's lawsuit bears little resemblance to this "more bounded" example. *AEP*, 564 U.S. at 422, 131 S.Ct. 2527.

As detailed above, the City does not seek to take advantage of this slim reservoir of state common law. Rather, it wishes to impose New York nuisance standards on emissions emanating simultaneously from all 50 states and the nations of the world. To permit such a suit would "undermine this carefully drawn statute through a general savings clause," *Ouellette*, 479 U.S. at 494, 107 S.Ct. 805, and would "serious[ly] interfere[ ] with the achievement of the full purposes and objectives of Congress," *id.* at 493, 107 S.Ct. 805 (internal quotation marks omitted). "We thus cannot allow non-source states to ascribe to a generic savings clause a meaning that the Supreme Court in *Ouellette* held Congress never intended." *Cooper*, 615 F.3d at 304.

 **\*14** The Clean Air Act therefore does not authorize the City's state-law claims, meaning that such claims concerning domestic emissions are barred.

### D. Extraterritorial Reach of Federal Common Law

The last issue left before us, then, is what to do about the City's claims concerning foreign emissions. As we previewed above, that question cannot be answered by reference to the Clean Air Act alone.

"It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 255, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010) (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)) (internal quotation marks omitted). Put more bluntly, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

No such clear indication appears in the Clean Air Act. Indeed, the statutory scheme is silent about extraterritorial reach, except to authorize the EPA Administrator to mitigate domestic air pollutants that have caused or contributed to air pollution in a foreign country – and even then, only if that country provides reciprocal protections to the United States. *See* 42 U.S.C. § 7415; *see also* Jonathan Remy Nash, *The Curious Legal Landscape of the Extraterritoriality of U.S. Environmental Laws*, 50 Va. J. Int'l L. 997, 1004 (2010) (discussing this lone provision in the Clean Air Act as one of the few exceptions to the general rule that federal environmental statutes are silent about extraterritorial effect). In addition, Congress has tasked "the State Department – not [the] EPA – to formulate United States foreign policy with reference to environmental matters relating to climate." *Massachusetts*, 549 U.S. at 534, 127 S.Ct. 1438. Together, the statute's silence on the issue of extraterritorial reach, the fact that the Act contemplates the need for reciprocal protections from foreign nations, and the State Department's lead role in setting foreign policy on environmental matters, all plainly demonstrate that the Clean Air Act regulates only domestic emissions. *See California v. BP P.L.C.*, No. 17-cv-6011-WHA, 2018 WL 1064293, at *4 (N.D. Cal. Feb. 27, 2018) (holding that "foreign emissions are out of the EPA and Clean Air Act's reach"), *vacated on other grounds*, 969 F.3d 895 (9th Cir. 2020).

As a result, the Clean Air Act cannot displace the City's federal common law claims to the extent that they seek recovery for harms caused by foreign emissions. But that does not mean that those claims may proceed as a matter of federal common law. Like the district court, we conclude that foreign policy concerns foreclose New York's proposal here to recognize a federal common law cause of action targeting emissions emanating from beyond our national borders.

As an initial matter, we acknowledge that it is unsettled whether the presumption against extraterritoriality – a canon of statutory interpretation – applies to common law rules.

Indeed, there is at least some reason to think that it might not. *See, e.g.*, *Armada (Sing.) Pte. Ltd. v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 758 (N.D. Ill. 2017), *aff'd on other grounds*, 885 F.3d 1090 (7th Cir. 2018); *Leibman v. Prupes*, No. 14-cv-9003-CAS, 2015 WL 3823954, at *6 (C.D. Cal. June 18, 2015) (explaining that "the presumption is limited to statutes by its terms"); *see also* Jeffrey A. Meyer, *Extraterritorial Common Law: Does the Common Law Apply Abroad?*, 102 Geo. L.J. 301, 334 (2014) ("To date, the presumption against extraterritoriality has been applied to curb geographical extension of statutes but not the common law. The presumption has been justified as an expression of implied legislative intent rather than an implied limit on legislative authority or power." (footnote omitted)); Katherine Florey, *State Law, U.S. Power, Foreign Disputes: Understanding the Extraterritorial Effects of State Law in the Wake of* Morrison v. National Australia Bank, 92 B.U. L. Rev. 535, 574 (2012) (reasoning that "because [the presumption] is first and foremost an interpretive canon, it has little to say about common law that poses no issue of legislative intent"). Nevertheless, we are equally reluctant to give judge-made rules international effect in this context. *Cf. Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427–28, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) (acknowledging that a common law rule that touches on international issues must "reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs" and that in crafting such rules, federal courts cannot ignore "the national interest or ... international justice").

**\*15** This conclusion draws significant support from the Supreme Court's decisions in *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013), and *Jesner v. Arab Bank, PLC*, ––– U.S. ––––, 138 S. Ct. 1386, 200 L.Ed.2d 612 (2018). Both cases concerned the scope of federal common law causes of action brought under the Alien Tort Statute (the "ATS"), which is " 'strictly jurisdictional' and does not by its own terms provide or delineate the definition of a cause of action for violations of international law," *Jesner*, 138 S. Ct. at 1397; *see also id.* at 1409–10 (Alito, *J.*, concurring in part and concurring in the judgment).

In *Kiobel*, the Court concluded that although the presumption against extraterritoriality is a canon of statutory interpretation, "the principles underlying [that interpretive canon] similarly constrain courts considering [federal common law] causes of action that may be brought under the ATS." 569 U.S. at 116, 133 S.Ct. 1659. The Supreme Court reasoned that "the

danger of unwarranted judicial interference in the conduct of foreign policy is magnified ... [where] the question is not what Congress has done but instead what courts may do." *Id.*; *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 727, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (cautioning that "the potential implications for the foreign relations of the United States of recognizing [new private causes of action for violating international law] should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs").

In *Jesner*, the Court likewise refused to extend the scope of federal common law actions brought under the ATS due to foreign policy concerns. The Court again highlighted that the Judiciary is ill-equipped to gauge whether extending federal common law causes of action "would, or would not, create special risks of disrupting good relations with foreign governments." 138 S. Ct. at 1408 (plurality opinion). More broadly, the Court noted that "judicial caution ... guards against [federal] courts triggering ... serious foreign policy consequences, and instead defers such decisions, quite appropriately, to the political branches." *Id.* at 1407 (internal quotation marks omitted) (third alteration in original); *see also id.* at 1412 (Gorsuch, *J.*, concurring in part and concurring in the judgment) (noting that "the job of creating new causes of action and navigating foreign policy disputes belongs to the political branches").

Although the reasoning of *Jesner* and *Kiobel* is, at times, specific to the context of the ATS and violations of the laws of nations, these cases also rest on broad concerns over separation of powers, intrusion on the political branches' monopoly over foreign policy, and judicial caution with respect to creating (or extending) federal common law causes of action. *See, e.g.*, *Jesner*, 138 S. Ct. at 1402 (explaining that "recent precedents cast doubt on the authority of courts to extend or create private causes of action even in the realm of domestic law, where th[e] [Supreme] Court has 'recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases' "); *Kiobel*, 569 U.S. at 116–17, 133 S.Ct. 1659; *see also Sosa*, 542 U.S. at 725–28, 124 S.Ct. 2739; *Nahl v. Jaoude*, 968 F.3d 173, 179–80 (2d Cir. 2020) (recognizing that prudential concerns, such as foreign policy consequences, are a separate consideration from whether "a norm is sufficiently universal, specific, and obligatory" to have "attained sufficient stature in international law to provide a cause of action for an ATS claim"). We see no reason why those concerns are any less relevant here.

**\*16** Put simply, these cases teach that even outside of the statutory interpretation context, federal courts must proceed cautiously when venturing into the international arena so as to avoid unintentionally stepping on the toes of the political branches. *See Jesner*, 138 S. Ct. at 1403 (acknowledging that "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns"); *Kiobel*, 569 U.S. at 116, 133 S.Ct. 1659 (noting that Congress, not the Judiciary, has "the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain" (internal quotation marks omitted)); *cf. Sabbatino*, 376 U.S. at 428, 84 S.Ct. 923 (deciding that the judicial branch "will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law"). That lesson applies regardless of whether legislative intent is at issue.

Clearly, the concerns animating those decisions are present in this case. To hold the Producers accountable for purely foreign activity (especially the Foreign Producers) would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad. It would also bypass the various diplomatic channels that the United States uses to address this issue, such as the U.N. Framework and the Paris Agreement.

Such an outcome would obviously sow confusion and needlessly complicate the nation's foreign policy, while clearly infringing on the prerogatives of the political branches.[11] Affording extraterritorial effect to federal common law here would be all the more out of place given that Congress created a comprehensive scheme designed to address greenhouse gas emissions – the Clean Air Act – which it declined to extend beyond our borders. To the contrary, as explained above, the Clean Air Act contemplates the need for foreign nations to promulgate reciprocal legislation. *See* 42 U.S.C. § 7415(c). As a result, condoning an extraterritorial nuisance action here would not only risk jeopardizing our nation's foreign policy goals but would also seem to circumvent Congress's own expectations and carefully balanced scheme of international cooperation on a topic of global concern. *See Jesner*, 138 S. Ct. at 1402 (explaining that " ' if there are sound reasons to think Congress might doubt

the efficacy or necessity of a damages remedy, courts must refrain from creating the remedy in order to respect the role of Congress' " (alterations omitted) (quoting *Ziglar v. Abbasi,* ––– U.S. ––––, 137 S. Ct. 1843, 1858, 198 L.Ed.2d 290 (2017) (alteration omitted)).

We therefore agree with the district court that any federal common law claim against the Producers that is not displaced by the Clean Air Act nonetheless still fails under the reasoning supplied by *Kiobel* and *Jesner* and the need for judicial caution in the face of delicate foreign policy considerations.

**IV. Conclusion**

For the reasons stated above, we **AFFIRM** the judgment of the district court.

**All Citations**

--- F.3d ----, 2021 WL 1216541

Footnotes

\*  The Clerk of Court is respectfully directed to amend the caption as set forth above.

1  Because this appeal arrives before us at the pleading stage, we draw these facts from the complaint and accept them to be true. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.,* 620 F.3d 137, 139 n.1 (2d Cir. 2010).

2  The district court stayed the Foreign Producers' time in which to respond to the complaint, reasoning that the Domestic Producers' motion to dismiss asserted grounds that extended to all defendants. For the same reason, the Foreign Producers have not submitted answering briefs on appeal.

3  The nature of this conflict governs not only the "permissibility ... of judicial displacement of state rules" but the "scope" of that displacement as well. *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87–88, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994).

4  One exception is *Ohio v. Wyandotte Chemicals Corp.,* in which the Supreme Court stated, in dicta, that had the suit been brought in federal district court, rather than in the Supreme Court, it "would have to be adjudicated under state law." 401 U.S. 493, 498 n.3, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971). But the Supreme Court retreated from that language the very next term in *Milwaukee I. See Ouellette,* 479 U.S. at 488, 107 S.Ct. 805 (noting that *Milwaukee I* "overrul[ed] the contrary suggestion in *Wyandotte*"); *see also Milwaukee II,* 451 U.S. at 327 n.19, 101 S.Ct. 1784 (acknowledging that "[t]he Court in [*Milwaukee I*] found it necessary to overrule th[e] statement" in *Wyandotte*).

5  It likewise conveniently avoids the fact that the City also seeks injunctive relief in the form of abatement, to be applied in the event the Producers fail to pay a potentially enormous judgment.

6  On appeal, several of our sister circuits concluded that they possessed jurisdiction to conduct only a limited review of the district court's remand order under 28 U.S.C. § 1447(d). *See Rhode Island,* 979 F.3d at 53; *Bd. of Cnty. Comm'rs,* 965 F.3d at 799; *County of San Mateo,* 960 F.3d at 593; *Mayor & City Council,* 952 F.3d at 456–57. Thus, each of those courts considered only whether the cases were removable under the federal-officer removal statute, 28 U.S.C. § 1442; they did not address whether federal preemption supplied the defendants with a basis for removal.

7  Of course, one might ask, "Why go through all the effort of concluding that federal common law applies if it is just going to be displaced anyway?" Well, for one thing, the City argues that even if the Clean Air Act displaces federal common law, some residual state-law claims remain. As we will make clear, the extent to which that is true hinges, at least in part, on whether federal common law would govern the issue in the absence of the Clean Air Act. For another, as we address below, the Clean Air Act does not regulate foreign emissions. So the City's claims concerning those emissions still require us to apply federal common law.

8  For instance, the City argues that the Clean Air Act "addresses emissions, but is silent as to the remedy for environmental harms to the City's property resulting from the production, promotion, and sale of fossil fuels." City Br. at 48. But the City identifies no "environmental harms" to its property other than those caused by emissions.

9  And it is not as if federal law is oblivious to the harms that the City identifies. Federal climate change policy is acutely concerned with "coastal inundation[,] ... erosion[,] ... and rising sea levels," among other things. *AEP,* 564 U.S. at 417, 131 S.Ct. 2527. Indeed, it was these very harms that supplied Massachusetts with standing to challenge the EPA's initial failure to regulate greenhouse gas emissions. *See Massachusetts,* 549 U.S. at 522–23, 127 S.Ct. 1438.

10  Although the Supreme Court in *Ouellette* appeared to rely, at least in part, on the traditional preemption analysis under which "courts should not lightly infer pre-emption" of state-law claims, 479 U.S. at 491, 107 S.Ct. 805, the Court also found support for its ultimate conclusion – that the Clean Water Act had preempted state-law nuisance claims – by looking

to *Milwaukee I*, which held that, even in the absence of a federal statutory scheme, "the control of interstate pollution is primarily a matter of federal law," *id.* at 492, 107 S.Ct. 805 (citing *Milwaukee I*, 406 U.S. at 107, 92 S.Ct. 1385).

11    For instance, "the United States' longstanding position in international climate-change negotiations is to oppose the establishment of liability and compensation schemes at the international level." United States *Amicus* Br. at 16 (citing Todd Stern, Special Envoy for Climate Change, Special Briefing (Oct. 28, 2015), https://2009-2017.state.gov/s/climate/releases/2015/248980.htm (stating that "[w]e obviously do have [a] problem with the idea, and don't accept the idea, of compensation and liability and never accepted that and we're not about to accept it now")).

---

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.